287 P.3d 129

In re ʻĪAO GROUND WATER MANAGE-
MENT AREA HIGH–LEVEL SOURCE
WATER USE PERMIT APPLICA-
TIONS and Petition to Amend Interim
Instream Flow Standards of Waiheʻe
River and Waiehu, ʻĪao, and Waikapū
Streams Contested Case Hearing.

No. SCAP–30603.

Supreme Court of Hawaiʻi.

Aug. 15, 2012.

Isaac H. Moriwake and D. Kapuaʻala Sproat of Earthjustice for Appellant Hui O Nā Wai ʻEhā and Maui Tomorrow Foundation, Inc.

Anna Elento–Sneed and Pamela W. Bunn of Alston Hunt Floyd & Ing for Appellant Office of Hawaiian Affairs.

Patrick K. Wong, Corporation Counsel and Jane E. Lovell, Deputy Corporation Counsel, County of Maui, and Jon M. Van Dyke, for Appellee/Cross–Appellant County of Maui, Department of Water Supply.

Donna H. Kalama and Julie H. China, Deputy Attorneys General, for Appellee Commission on Water Resource Management.

David Schulmeister and Elijah Yip of Cades Schutte LLP for Appellee Hawaiian Commercial and Sugar Company.

Paul R. Mancini and James W. Geiger of Mancini, Welch & Geiger and Gilbert S.C.

Keith–Agaran for Appellee Wailuku Water Company, LLC.

RECKTENWALD, C.J., NAKAYAMA, and McKENNA, JJ., and Circuit Judge TRADER, in place of DUFFY, J., recused, with ACOBA, J., concurring separately.

Opinion of the Court by NAKAYAMA, J.

## I. INTRODUCTION

Nā Wai ʻEhā, or "the four great waters of Maui," is the collective name for the Waiheʻe River and the Waiehu, ʻIao, and Waikapū Streams. The case before the court began in June 2004 when Petitioners–Appellants/Cross–Appellees Hui[1] O Nā Wai ʻEhā and Maui Tomorrow Foundation, Inc. ("Hui/MTF"), through Earthjustice, petitioned Appellee/Cross–Appellee Commission on Water Resource Management ("the Commission") to amend the Interim Instream Flow Standards ("IIFS") for Nā Wai ʻEhā, which had been in place since 1988. Around the same time, several parties, including Applicant–Appellee/Cross–Appellant Maui County Department of Water Supply ("MDWS"), and Applicants–Appellees/Cross–Appellees Hawaiian Commercial & Sugar Company ("HC & S") and Wailuku Water Company ("WWC"), filed Water Use Permit Applications ("WUPA") for the same area. The Commission held a combined case hearing to resolve the IIFS and WUPA; in addition to the petitioner and applicants, the Office of Hawaiian Affairs ("OHA") applied to participate in the hearing. The current appeal seeks review of the Commission's resulting Findings of Fact, Conclusions of Law ("FOF/COL"), and Decision and Order ("D & O"), in which the Commission amended the IIFS for two of the four streams, and substantially retained the existing IIFS for the two remaining streams as measured above diversions.[2] The FOF/COL and D & O also resolved several WUPA; the Commission's resolution of the WUPA is not before the court on appeal.

Hui/MTF and OHA appeal on related grounds. Their primary complaint is that the Commission erred in balancing instream and noninstream uses, and therefore the IIFS do not properly protect traditional and customary native Hawaiian rights, appurtenant water rights, or the public trust. Both parties also contest the Commission's treatment of diversions, including the alternative source Well Number 7 ("Well No. 7"), a water well on HC & S's plantation that could be used to irrigate HC & S's cane fields. The parties contest the Commission's determination that HC & S will not be required to pump Well No. 7 to its full capacity, a decision that resulted in a higher estimated allowable diversion for HC & S, and lower IIFS for the streams.

MDWS's cross-appeal asks the court to clarify the priority of noninstream municipal use in setting the IIFS.

And finally, the Commission, HC & S, and WWC argue that the court does not have jurisdiction to hear Hui/MTF's and OHA's appeals.

As explained below, the court holds that it has jurisdiction in the instant case, and takes this opportunity to expand upon the jurisdictional analysis from *In re Water Use Permit Applications "Waiāhole I"*, 94 Hawaiʻi 97, 9 P.3d 409, (2000). In reviewing Hui/MTF's and OHA's points of error, the court concludes that the Commission on Water Resource Management erred in several respects. First, in considering the effect of the IIFS on native Hawaiian practices in Nā Wai ʻEhā, the Commission failed to enter findings of fact and conclusions of law regarding the effect of the amended IIFS on traditional and customary native Hawaiian practices in Nā Wai ʻEhā, and regarding the feasibility of

---

1. A "hui" is defined as, inter alia, a "[c]lub, association, society, corporation, company, institution, organization, band, league, firm, joint ownership, partnership, union, alliance, troupe, [or] team." Mary Kawena Pukui & Samuel H. Elbert, *Hawaiian Dictionary* 86 (rev. ed.1986).

2. The Commission's FOF/COL D & O differs from the 1988 IIFS in one important respect. In 1988, the Commission set the IIFS as the status quo at that time "without further amounts of water being diverted offstream through new or expanded diversions." Haw. Admin. Rules § 13–169–48 (1988). The FOF/COL D & O states that the IIFS will "remain" as established above diversions, but does not contain the restriction limiting new or expanded diversions.

protecting any affected practices. Second, the Commission's analysis of instream uses was incomplete, as it focused on amphidromous species and did not fully consider other instream uses to which witnesses testified during the hearings. Third, the Commission erred in its consideration of alternative water sources and in its calculation of diverting parties' acreage and reasonable system losses. The court must vacate the Commission's June 10, 2010 Findings of Fact, Conclusions of Law, Decision and Order, and remand the case for further proceedings.

## II. BACKGROUND

### A. Nā Wai 'Ehā Water Systems

#### 1. *Surface Water*[3]

Nā Wai 'Ehā are the Waihe'e River and Waiehu, 'Īao, and Waikapū Streams. The Waihe'e River is the principal water source in Nā Wai 'Ehā; it is about 26,585 feet long, and its watershed covers 4,500 acres. From 1984–2005, United States Geological Survey ("USGS") data shows streamflow upstream of all diversions as follows: the Q50[4] flow was 34 million gallons per day ("mgd"), the Q70[5] flow was 29 mgd, the Q90 flow was 24 mgd, and the Q100 flow was 14 mgd. The Waihe'e River's two main diversions are Waihe'e Ditch and Spreckels Ditch. See Section II.A.3., *infra*, for more information about the ditches. The two ditches are capable of diverting all of the dry-weather flow available at the intakes, however, even if all the water is being diverted, streamflow immediately downstream of the intakes may exist because of leakage through or subsurface flow beneath the dams at these sites. The dry-weather flow downstream of the intakes is commonly about 0.1 mgd, but the stream may not have continuous mauka-to-makai surface flow.

The Waiehu Stream is formed by the confluence of North and South Waiehu Streams; it is about 23,700 feet long, and its watershed covers about 6,600 acres. Gaging stations on both branches of the Waiehu Stream were discontinued in 1917, but USGS used historical data and record-extension techniques to estimate flows above all diversions for North Waiehu Stream from 1984–2005 as follows: the Q50 flow was between 3.1 to 3.6 mgd, the Q70 flow was between 2.3 to 2.7 mgd, the Q90 flow was between 1.4 to 2.7 mgd, and the Q100 flow was 1.6 mgd (as measured in March 1915). For South Waiehu Stream, USGS utilized the same record extension techniques, and estimated the 1984–2005 flows as follows: the Q50 flow was between 2.4 to 4.2 mgd, the Q70 flow was between 1.9 to 2.8 mgd, the Q90 flow was between 1.3 to 2.0 mgd, and the Q100 flow was 1.5 mgd (recorded in July 1913). The Waihe'e and Spreckels Ditches divert water from both North and South Waiehu Streams; in addition, the North Waiehu Ditch diverts from the North Waiehu Stream and the Cerizos Kuleana Ditch diverts from the South Waiehu Stream. There is extensive channel erosion below the Spreckels Ditch on South Waiehu Stream, with a 12-foot drop in the elevation of the stream just below the diversion, and there is a vertical concrete apron located in Waiehu Stream. Most of the water is diverted from North and South Waiehu Streams at the North Waiehu Ditch and Spreckels Ditch, respectively; due to these

---

3. " 'Surface water' means both contained surface water—that is, water upon the surface of the earth in bounds created naturally or artificially including, but not limited to, streams, other watercourses, lakes, reservoirs, and coastal waters subject to state jurisdiction—and diffused surface water—that is, water occurring upon the surface of the ground other than in contained water bodies. Water from natural springs is surface water when it exits from the spring onto the earth's surface." Hawai'i Revised Statutes ("HRS") § 174C–3 (1993). Diffused surface water is "Water, such as rainfall runoff, that collects and flows on the ground but does not form a watercourse." *Black's Law Dictionary* 1728 (9th ed. 2009).

4. Discussions of the volume of water in a stream utilize flowduration curves to express the percentage of time that streamflows were equaled or exceeded during a given period of record. The Q50 flow, also known as the median flow, is the flow that is equal or exceeded 50 percent of the time; the Commission found that the Q50 flow is "reflective of typical flow conditions."

5. To illustrate the previous footnote, the Q70 flow is the volume of water that is equaled or exceeded 70 percent of the time during any given time period. The Waihe'e River showed streamflows of at least 29 mgd 70 percent of the time from 1984–2005.

diversions and leakage, Waiehu Stream does not flow continuously from mauka to makai.

'Īao Stream is the second-largest stream in Nā Wai 'Ehā; it is about 38,000 feet long, and its watershed covers about 14,500 acres. USGS calculated the 1984–2005 flows above all diversions as follows: the Q50 flow was 25 mgd, the Q70 flow was 18 mgd, the Q90 flow was 13 mgd, and the Q100 flow was 7.1 mgd. The two main diversions off the 'Īao Stream are the 'Īao–Waikapū/'Īao–Maniania Ditches at an altitude of 780 feet, and the Spreckels Ditch at 260 feet. The United States Army Corps of Engineers channelized significant portions of 'Īao Stream's lower reaches and hardened the stream bed and banks with concrete for flood control and drainage. About 2.5 miles above the mouth of the Stream, the concrete channel includes a 20-foot vertical drop. USGS estimates that 'Īao Stream loses 6.3 mgd in reaches downstream of the 'Īao–Maniania ditch diversion that are not lined with concrete. In absence of ditch return flows or runoff during and following rainfall, 'Īao Stream is dry and does not flow continuously from mauka to makai.

The Waikapū Stream is the southern-most stream and the longest of the four streams; it is about 63,500 feet in length, with a watershed of about 9,000 acres. USGS, using record extension techniques, estimated the 1984–2005 flows above all diversions as follows: the Q50 flow was between 4.8 to 6.3 mgd, the Q70 flow was between 3.9 to 5.2 mgd, and the Q90 flow was between 3.3 to 4.6 mgd. The lowest recorded flow for Waikapū Stream was 3.3 mgd, in October 1912. There are three diversions off the Waikapū Stream: the South Side Waikapū Ditch (also known as the South Waikapū Ditch) near an altitude of 1,120 feet, the Waiheʻe Ditch, and the Reservoir 6 Ditch. The Waikapū Stream is commonly dry downstream of all diversions, both because of the diversions and because of infiltration losses into the streambed; the Stream does not flow continuously from mauka to makai.

2. *Ground Water*[6]

There are three types of ground water in Nā Wai 'Ehā water systems: dike-impounded, the basal freshwater lens, and perched. Dike-impounded ground waters occur at high elevations; basal freshwater lenses and perched waters occur at lower elevations and closer to the coast.

The dikes at higher elevations are low-permeability, so water builds up behind them. The upper reaches of Nā Wai 'Ehā streams intersect the dike-impounded ground water so the upper reaches have year-round streamflow, even during dry periods. The portions of the stream joined by the dike-impounded water are described as "gaining" because ground water contributes to stream-flow.

The basal freshwater lens system is contained in volcanic rocks and sedimentary deposits. Perched water also occurs in the sedimentary deposits. In the lower reaches of the streams where an unsaturated zone exists between the streams' channel bottoms and the water table, stream waters migrate from the stream beds to the basal lenses, and the streams are described as "losing." Some of the stream channels intersect the basal freshwater lens near the mouths of the streams, making the streams "gaining" in those areas.

The Commission considered the IIFS for Nā Wai 'Ehā with the WUPA for the high-level dike-impounded ground water. As the Hearings Officer, Dr. Lawrence H. Miike, explained, the Commission decided to combine the issues into one contested case hearing because the water systems are all connected and considering the WUPA and IIFS together would allow the Commission "to get a bigger picture and to be able to try to reach a more rational and reasonable decision...." One example of the interconnectedness of the high-level dike-impounded ground water and the surface waters is the tunnel system. Several tunnels tap dike-impounded ground water and discharge directly into the streams. In some cases, denial of a WUPA for dike-impounded ground

---

6. "'Ground water' means any water found beneath the surface of the earth, whether in perched supply, dike-confined, flowing, or perco-

lating in underground channels or streams, under artesian pressure or not, or otherwise." HRS § 174C–3.

water results in additional water contributing to streamflow.

### 3. Ditches

There are two primary and two secondary systems that distribute water diverted from Nā Wai 'Ehā. The primary systems are WWC's ditch system and HC & S's reservoir/ditch system. Nine active diversions feed the primary distribution system: two on Waihe'e River, one on North Waiehu Stream, one on South Waiehu Stream, two on 'Īao Stream, and three on Waikapū Stream. There are two major ditches in the system: the Waihe'e and Spreckels Ditches. The WWC distribution system involves eleven registered stream diversions, two major ditches, seven minor ditches, and sixteen reservoirs; HC & S shares in the cost and maintenance of portions of this system. HC & S also operates a diversion intake on South Waiehu Stream at the Spreckels Ditch, a diversion intake on 'Īao Stream at the Spreckels Ditch, and the Spreckels Ditch from Reservoir 25 to its terminus at HC & S's Reservoir 73. The waters that enter the distribution system travel by gravity flow in primary ditches through uplands into reservoirs that in turn deliver the water into smaller ditches for end use.

The secondary systems are the so-called "kuleana"[7] ditches/pipes that either have an intake directly in a stream or receive water from the primary systems and the MDWS water treatment plants. The Commission identified seventeen kuleana ditch/pipe systems. Fourteen kuleana systems are connected to the primary distribution systems; three kuleana intakes connect directly to the streams.

### B. Procedural History

On July 21, 2003, the Commission designated the 'Īao Aquifer System a Ground Water Management Area ("GWMA"). After a water source is designated as a GWMA, existing users have one year to file WUPA.

7. The term "kuleana" is used by the parties to describe the distribution system and users who were not charged for water delivery; whether the users have riparian or appurtenant rights had not been determined at the time of the Commission's hearings.

See Hawai'i Revised Statutes ("HRS") § 174C–50(c) (1993) ("An application for a permit to continue an existing use must be made within a period of one year from the effective date of designation.") The water code provides that the Commission may issue permits for existing reasonable and beneficial uses, and places the burden of proof on the applicant to show that it satisfies the relevant criteria. HRS §§ 174C–49(a), 174C–50 (1993). As discussed in the following subsection, several parties filed such WUPA for ground water sources.

The water code also provides that "[a]ny person with the proper standing may petition the commission to adopt an interim instream flow standard for streams in order to protect the public interest pending the establishment of a permanent instream flow standard." HRS § 174C–71(2)(A) (1993). Hui/MTF filed such a petition; it is the Commission's resolution of this petition that is currently before the court on appeal.

On March 13, 2008, during the pendency of the Hearings, the Commission also designated the four streams of Nā Wai 'Ehā a Surface Water Management Area ("SWMA"). Like the GWMA designation, the SWMA designation triggered WUPA requirements. The resolution of those WUPA are not currently before the court, but they are relevant because the Commission utilized estimates of expected surface water use permits in determining the IIFS for the water system.

### 1. Water Use Permit Applications

MDWS, HC & S, and WWC's predecessor in interest, Wailuku Agribusiness Company, Inc.,[8] filed timely WUPA for 'Īao Aquifer sources. Hui/MTF and OHA filed objections to the WUPA. The Commission held public hearings on the WUPA on October 28, 2004; April 22, 2005; and February 2, 2006. Prior to the close of the third hearing, several attendees, including MDWS, WWC, Hui/MTF, and OHA, verbally requested that the

8. WWC filed Requests to Transfer Wailuku Agribusiness's permits to WWC.

Commission hold a Contested Case Hearing ("CCH") regarding the WUPA. Subsequently, the parties filed written petitions to that effect.

### 2. *Petition to Amend Interim Instream Flow Standards*

In June of 2004, Hui/MTF filed a Petition to Amend Interim Instream Flow Standards. In its petition, Hui/MTF argued that the then-existing standards, which had been in place since 1988, lacked any scientific basis and merely preserved the status quo without addressing the public trust, environmental concerns, native Hawaiian practices, outdoor and recreational activities, or aesthetic and scenic values, as required by the water code. Hui/MTF requested that the Commission establish scientifically-based IIFS and order restoration of all streamflows not currently put to beneficial use.

HC & S and Wailuku Agribusiness Company filed comments to the petition, largely arguing that their use is reasonable and beneficial, that the petition did not prove the necessity of establishing new standards, and that the Petition did not show how native Hawaiian practitioners would use the water or how much they would need to use. Hui/MTF responded that the burden falls on the Commission, not on Hui/MTF, to determine reasonable IIFS and to protect instream public trust uses and native Hawaiian rights.

### 3. *Contested Case Hearing*

At its February 15, 2006 meeting, the Commission decided that a CCH would be held for the ground water WUPA and the IIFS together. On May 4, 2006, the Commission released a "Notice of a Combined Contested Case Hearing (CCH–MA–06–01) Concerning Water Use Permit Applications For Maui Department of Water Supply, Hawaiian Commercial and Sugar, and Wailuku Water Company, LLC; Iao Ground Water Management Area, Maui, and Petitions to Amend the Interim Instream Flow Standards for Iao, Waiehu, Waihee, & Waikapu Streams." One of the Commissioners, Dr. Lawrence Miike, was appointed Hearings Officer. After a hearing, Dr. Miike granted standing to five of the parties presently be-

fore the court: HC & S, Hui/MTF, MDWS, OHA, and WWC.

Dr. Miike held twenty-three days of hearings between December 3, 2007 and March 4, 2008; by the end of the evidentiary phase of the hearing, seventy-seven witnesses had testified and over six hundred exhibits had been accepted into evidence. After the conclusion of the Hearings, Dr. Miike reopened evidence, on motions of two parties, to admit two additional exhibits: HC & S offered a study it commissioned from John Ford, an environmental consultant, which had not been completed at the time of the Hearing, and OHA offered a portion of an Environmental Impact Statement Preparation Notice for the Wai'ale Water Treatment Facility. HC & S, MDWS, WWC, and Hui/MTF submitted proposed Findings of Fact and Conclusions of Law. OHA joined Hui/MTF's proposals.

### 4. *Dr. Miike's Proposed Findings of Fact, Conclusions of Law, Decision and Order*

On April 9, 2009, Dr. Miike released his proposed FOF/COL D & O ("Proposed FOF/COL"). The Proposed FOF/COL consisted of 617 FOF regarding Nā Wai 'Ehā's water systems, fish and wildlife habitats, traditional and customary native Hawaiian practices, users and uses, and the projected economic impact of restricting noninstream uses. The Proposed FOF/COL also included 297 COL, on topics including instream values, users and uses, alternative water resources, system losses, economic impacts of restricting noninstream uses, IIFS, and WUPA. Many of the Proposed FOF/COL were ultimately adopted by the Commission in the final FOF/COL, as discussed in subsequent sections, *infra.*

Dr. Miike's Proposed Decision amended the IIFS for all four streams, as follows: the IIFS for the Waihe'e River would be 14 mgd downstream of diversions; for North and South Waiehu Streams, the IIFS would be 2.2 mgd and 1.3 mgd, respectively; for 'Iao Stream, the IIFS would be 13 mgd; and for Waikapū Stream, the IIFS would be 4 mgd, with contingencies to adjust the IIFS or its point of measurement. The proposed IIFS limited diversions enough to increase stream-

flow to a level that should have established mauka-to-makai flow in all four streams. The Proposed FOF/COL also concluded that Well No. 7 is an alternative source for HC & S, and that it can supply 14 mgd of HC & S's water requirements.

The Commission permitted parties to file written Exceptions to Dr. Miike's Proposed FOF/COL and D & O; each party filed such Exceptions. On October 15, 2009, the Commission convened to hold a hearing on the parties' Exceptions.

In their written exceptions and their presentations to the Commission, Hui/MTF and OHA argued that the IIFS should be higher for several reasons. They argued that the Commission should allow fewer commercial diversions because the companies' actual water needs are lower than the Commission's estimates, that the diverting parties should be required to eliminate system waste by lining ditches and reservoirs, and that HC & S should be required to pump Well No. 7 to full capacity. Regarding kuleana rights, Hui/MTF and OHA claimed that while the provisions made for kuleana users were adequate for current and planned uses of kuleana users who testified, they were inadequate to provide for all kuleana users in the system. Furthermore, they argued that the Commission should not defer to future proceedings for determinations of appurtenant rights and the reasonable-beneficial uses of noninstream users.

MDWS objected to several of the Proposed FOF/COL. MDWS argued that the IIFS for ʻIao Stream would restrict diversions such that it could not operate its ʻIao Water Treatment Facility to serve domestic needs of Maui residents. MDWS also objected to several of the Proposed FOF/COL indicating that the IIFS should be set without consider-

ing "offstream public trust uses, such as the public water supply."

WWC's exceptions argued that the Proposed FOF/COL did not properly balance instream and noninstream uses, and were too severe in their limitations of noninstream uses. WWC argued that nothing in the water code required the Commission to establish mauka-to-makai streamflows, and that the Proposed FOF/COL's efforts to do so reflect an improper emphasis on instream values.

HC & S offered similar exceptions, arguing that the Proposed FOF/COL tipped the balance too sharply in favor of stream restoration. HC & S encouraged the Commission to consider the water system as a whole, instead of focusing on reestablishing mauka-to-makai streamflow in each individual stream. HC & S also argued that the Proposed FOF/COL did not adequately consider the economic impact of restricting HC & S's noninstream uses or of requiring HC & S to pump Well No. 7. HC & S emphasized that it employed about eight hundred workers on Maui, and that reduction in water "would jeopardize the viability of HC & S." If HC & S were to cease operation, HC & S argued, those eight hundred jobs, and the HC & S's other substantial contributions to the Maui economy would be lost.

5. *The Commission's Final Findings of Fact, Conclusions of Law, Decision and Order*

On June 10, 2010, the Commission released its final FOF/COL and D & O. The Commission reached 617 FOF and 276 COL, adopting most of the Proposed FOF/COL but revisiting some. Most notably, the D & O amended the IIFS for only the Waiheʻe River (to 10 mgd) and the North and South Waiehu Streams [9] (to 1.6 and 0.9 mgd, re-

---

**9.** The IIFS for South Waiehu Stream has not been implemented. Hui/MTF, OHA, MDWS, WWC, and HC & S entered into a series of stipulations suspending the implementation; the Commission approved each stipulation. The impetus for the stipulations appears to be complaints from kuleana users who did not participate in the CCH and who take water from the ditch system off South Waiehu Stream. South Waiehu Stream was one of the streams for which actual streamflow measurements were not avail-

able at the time of the hearings; the Commission utilized USGS estimates based on record extension techniques to set the IIFS. In the time since the first stipulation, the Commission has worked on collecting actual streamflow data, and it started the process of determining and quantifying appurtenant rights of users on South Waiehu Stream. HC & S repaired a portion of its diversion infrastructure, and the parties have discussed modifications to the ditch system, pending final determination of appurtenant rights.

spectively); it maintained the status quo, thereby not restricting any of the parties' diversions, for the ʻĪao and Waikapū Streams. It also lowered the amount of water HC & S was required to pump from Well No. 7 to 9.5 mgd, a significant decrease of 4.5 mgd from the Proposed FOF/COL.

Dr. Miike dissented from the decision. Dr. Miike agreed with the Commission majority regarding water requirements for kuleana users, MDWS, and WWC. Dr. Miike also agreed with most of the analysis regarding HC & S's irrigation requirements. The basis for Dr. Miike's dissent was the Commission majority's allocation of water between instream uses and HC & S's diversions. His strongest objection was to the Commission's treatment of Well No. 7; Dr. Miike would have required HC & S to pump higher quantities of water from the well during dry-weather conditions, thereby retaining more water in the streams for instream and downstream uses. Dr. Miike argued that the Commission's decision reflected a residual approach in that it set the IIFS as the amount of water remaining after satisfying all noninstream uses.

Last, Dr. Miike objected to the Commission majority's evaluation of the economic impact of restricting HC & S's water. He asserted that the Commission cannot assume that the Proposed FOF/COL would have resulted in HC & S's "doomsday scenario" in which the water restrictions render its entire operation impractical. Dr. Miike argued that the accurate point of analysis would be the economic effect of limiting availability of water to the 15 percent of HC & S's fields that are in west Maui. Dr. Miike noted that, rather than providing this analysis, HC & S "instead outlined the consequences if its entire 35,000 acre sugar operations were ended." As Dr. Miike explained:

> Absent an economic analysis by HC & S's, the Commission cannot assume that HC & S's doomsday scenario would result from an occasional 10.5 to 13.4 percent decrease of its irrigation requirements for 15 percent of its entire operations. Those decreases equate to only 1.6 to 2.0 percent of its irrigation requirements for its entire 35,000–acre operations, and then only on

an occasional basis. In the absence of any information supporting its doomsday scenario, the Commission could not assume that HC & S's assertions overcame the presumption in favor of the public trust resource, the streams of Nā Wai ʻEhā.

Dr. Miike concluded that the Commission majority "has failed in its duties under the Constitution and the State Water Code as trustee of the state's public water resources."

### 6. *Appellate Filings*

On July 14, 2010, OHA and Hui/MTF filed their Notices of Appeal. On July 30, 2010, MDWS filed its Notice of Cross–Appeal. On February 23, 2011, MDWS, OHA, and Hui/MTF filed their Opening Briefs in the Intermediate Court of Appeals. On April 18, 2011, Hui/MTF filed an application to transfer the case to the supreme court; OHA joined this motion. On June 23, 2011, this court accepted the application for transfer.

## III. STANDARDS OF REVIEW

### A. Judicial Review of the Water Commission's Decisions

■ The water code provides that "[j]udicial review of rules and orders of the commission under this chapter shall be governed by chapter 91. Trial de novo is not allowed on review of commission actions under this chapter." HRS § 174C–12 (1993). Chapter 91 articulates the standards of review applicable to appeals of agency decisions and provides:

> Upon review of the record the court may affirm the decision of the agency or remand the case with instructions for further proceedings; or it may reverse or modify the decision and order if the substantial rights of the petitioners may have been prejudiced because the administrative findings, conclusions, decisions, or orders are:
>
> (1) In violation of constitutional or statutory provisions; or
>
> (2) In excess of the statutory authority or jurisdiction of the agency; or
>
> (3) Made upon unlawful procedure; or
>
> (4) Affected by other error of law; or

(5) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or

(6) Arbitrary, or capricious, or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

HRS § 91–14(g) (1993). "This court's review is ... qualified by the principle that the agency's decision carries a presumption of validity, and appellant has the heavy burden of making a convincing showing that the decision is invalid because it is unjust and unreasonable in its consequences." *In re Wai'ola O Moloka'i, Inc.*, 103 Hawai'i 401, 420, 83 P.3d 664, 683 (2004) (citations, brackets omitted).

## B. Findings of Facts

■ "FOFs are reviewable under the clearly erroneous standard to determine if the agency decision was clearly erroneous in view of reliable, probative, and substantial evidence on the whole record." *Id.* at 421, 83 P.3d at 684 (citations, brackets omitted).

## C. Conclusions of Law

■ "COLs are freely reviewable to determine if the agency's decision was in violation of constitutional or statutory provisions, in excess of statutory authority or jurisdiction of agency, or affected by other error of law." *Id.* (citations, brackets omitted).

## D. Mixed Questions of Law and Fact

■ A COL that presents mixed questions of fact and law is reviewed under the clearly erroneous standard because the conclusion is dependent upon the facts and circumstances of the particular case. When mixed questions of law and fact are presented, an appellate court must give deference to the agency's expertise and experience in the particular field. The court should not substitute its own judgment for that of the agency.

*Waiāhole I*, 94 Hawai'i at 119, 9 P.3d at 431 (citations, brackets omitted).

An FOF or a mixed determination of law and fact is clearly erroneous when (1) the record lacks substantial evidence to support the finding or determination, or (2) despite substantial evidence to support the finding or determination, the appellate court is left with the definite and firm conviction that a mistake has been made. *Id.* (citation). "We have defined 'substantial evidence' as credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion." *Id.* (citation).

## E. The State Water Resources Trust

The public trust in state water resources is a constitutional doctrine, and as such, "the ultimate authority to interpret and defend the public trust in Hawai'i rests with the courts of this state." *Wai'ola*, 103 Hawai'i at 421, 83 P.3d at 684.

This is not to say that this court will supplant its judgment for that of the legislature or agency. However, it does mean that this court will take a 'close look' at the action to determine if it complies with the public trust doctrine and it will not act merely as a rubber stamp for agency or legislative action.

*Id.* at 422, 83 P.3d at 685.

## F. Constitutional Questions

■ "We answer questions of constitutional law by exercising our own independent constitutional judgment based on the facts of the case. Thus, we review questions of constitutional law under the right/wrong standard." *State v. Hanapi*, 89 Hawai'i 177, 182, 970 P.2d 485, 490 (1998) (citations omitted).

## IV. JURISDICTION

Before the court can consider the parties' points of error, it must first resolve a jurisdictional argument. *Kernan v. Tanaka*, 75 Haw. 1, 15, 856 P.2d 1207, 1215 (1993) (cert. denied, 510 U.S. 1119, 114 S.Ct. 1070, 127 L.Ed.2d 389 (1994)) ("Appellate courts have an obligation to insure they have jurisdiction to hear and determine each case.") The Commission, HC & S, and WWC argue that Hui/MTF and OHA do not have a right of appeal, and therefore the court has no jurisdiction in this matter. Hui/MTF and OHA both contend that the court's opinion in *Waiāhole I* resolves the issue and clearly establishes that the court has jurisdiction

over appeals of IIFS determinations. As explained below, the court holds that it has jurisdiction in this case, and takes this opportunity to elaborate on the jurisdictional analysis from *Waiāhole I.*

The water code provides that "[j]udicial review of rules and orders of the commission under this chapter shall be governed by chapter 91." HRS § 174C–12. HRS § 91–14, the portion of chapter 91 relating to judicial review, states that, "[a]ny person aggrieved by a final decision and order in a contested case ... is entitled to judicial review thereof under this chapter." HRS § 91–14(a) (1993). In previous cases interpreting this provision, the court has defined "contested case" as "an agency hearing that 1) is required by law and 2) determines the rights, duties, or privileges of specific parties." *Pele Defense Fund v. Puna Geothermal Venture,* 77 Hawai'i 64, 67–68, 881 P.2d 1210, 1213–14 (1994). Further, the court determined that a hearing is "required by law" if it is required by statute, by administrative rule, or by constitutional due process. *Id.* at 68, 881 P.2d at 1214.

In this case, neither statute nor administrative rule mandates a hearing to establish an IIFS. HRS § 174C–71 [10] governs the Commission's actions vis-a-vis the state's Instream Use Protection Program, and nothing in that statute requires the Commission to hold a hearing before establishing or amending an IIFS. In fact, the code indicates that the Commission need not hold a hearing; the Code defines the IIFS as "a temporary instream flow standard of immediate applicability, adopted by the commission without the necessity of a public hearing, and terminating upon the establishment of an instream flow standard." HRS § 174C–3. The Commission's administrative rules are identical to the water code in relevant regard, so there is no rule-based requirement to hold a hearing.[11]

 This does not foreclose judicial review of the Commission's actions, as there remains a third route whereby a hearing may be "required by law": there may be a constitutional due process requirement. In determining whether a party has a due process right to an administrative hearing, the court must first resolve whether the party's asserted interest is "'property' within the meaning of the due process clauses of the federal and state constitutions." *Sandy Beach Defense Fund v. City Council of City and Cnty. of Honolulu,* 70 Haw. 361, 376, 773 P.2d 250, 260 (1989) (citing *Aguiar v. Hawai'i Housing Auth.,* 55 Haw. 478, 495, 522 P.2d 1255, 1266 (1974)). "To have a property interest in a benefit, a person clearly must have more

---

10. HRS § 174C–71, Protection of Instream Uses, provides, in relevant part, that the Commission shall:

> (2) Establish interim instream flow standards;
> (A) Any person with the proper standing may petition the commission to adopt an interim instream flow standard for streams in order to protect the public interest pending the establishment of a permanent instream flow standard;
> (B) Any interim instream flow standard adopted under this section shall terminate upon the establishment of a permanent instream flow standard for the stream on which the interim standards were adopted;
> (C) A petition to adopt an interim instream flow standard under this section shall set forth data and information concerning the need to protect and conserve beneficial instream uses of water and any other relevant and reasonable information required by the commission;
> (D) In considering a petition to adopt an interim instream flow standard, the commission shall weigh the importance of the present or potential instream values with the importance of the present or potential uses of water for noninstream purposes, including the economic impact of restricting such uses;
> (E) The commission shall grant or reject a petition to adopt an interim instream flow standard under this section within one hundred eighty days of the date the petition is filed. The one hundred eighty days may be extended a maximum of one hundred eighty days at the request of the petitioner and subject to the approval of the commission;
> (F) Interim instream flow standards may be adopted on a stream-by-stream basis or may consist of a general instream flow standard applicable to all streams within a specified area [.]
> HRS § 174C–71(2) (1993).

11. As Hawai'i Administrative Rules § 13–169–2 states, an IIFS is "a temporary instream flow standard of immediate applicability, adopted by the commission without the necessity of a public hearing, and terminating upon the establishment of an instream flow standard." Haw. Admin. Rules § 13–169–2.

than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Id.* (quoting *Bd. of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972)).

The court has had several opportunities to interpret due process property interests as affected by the water code. In the case most similar to the current case, *Waiāhole I,* this court considered new and existing WUPA and IIFS for the Waiāhole ditch system, a water system that provides water from Oahu's windward side to the island's leeward side. *Waiāhole I,* 94 Hawai'i at 110, 9 P.3d at 422. *Waiāhole I* contains extensive analysis and interpretation of the water code, and will be discussed in subsequent sections of this opinion. Regarding jurisdiction, however, the opinion provides only brief analysis. First, the court explained that it had jurisdiction over the appeal of the existing WUPA because both the HRS and the administrative rules required a hearing as part of the WUPA process. *Waiāhole I,* 94 Hawai'i at 119–20 n. 15, 9 P.3d at 431–32 n. 15. Second, with regard to the petitions to amend the IIFS and the new WUPA, the court stated that "constitutional due process mandates a hearing in both instances because of the individual instream and offstream 'rights, duties, and privileges' at stake." *Id.* (quoting *Puna Geothermal,* 77 Hawai'i at 68, 881 P.2d at 1214).

The parties dispute the import of the above-quoted sentence. Hui/MTF argues that this "holding" from *Waiāhole I* "made clear that [the court] had independent jurisdiction over IIFS petitions." The Commission, HC & S, and WWC argue that the *Waiāhole I* court's citation to *Puna Geothermal* indicates that the court had jurisdiction over the IIFS in that case only because the appeal also challenged the Commission's resolution of WUPA; they argue that because no party appealed from the WUPA in the present case, *Waiāhole I* is distinguishable and the court, therefore, lacks jurisdiction.

First, a review of *Puna Geothermal.* There, the court considered whether it had jurisdiction over an appeal following the Department of Health's ("DOH") resolution of

Puna Geothermal Ventures's ("PGV") applications for permits to build a well field and a power plant. 77 Hawai'i at 66, 881 P.2d at 1212. The DOH held two "public informational hearings," denied PGV's request for a CCH, and ultimately granted PGV's permit applications. *Id.* When the Pele Defense Fund ("PDF") sought judicial review of the DOH's actions, PGV filed a motion to dismiss, arguing that the court lacked jurisdiction because there had been no contested case. *Id.* On appeal, this court concluded that PDF had a constitutional due process right to a hearing before the DOH. *Id.* at 68, 881 P.2d at 1214. The court held,

> as a matter of constitutional due process, an agency hearing is also required where the *issuance of a permit* implicating an applicant's property rights adversely affects the constitutionally protected rights of other interested persons who have followed the agency's rules governing participation in contested cases.

*Id.* (emphasis added). The court concluded that the hearings in that case satisfied the "contested case" requirement for purposes of judicial review under HRS § 91–14. *Id.* at 71, 881 P.2d at 1217.

■ The Commission, WWC, and HC & S argue that the *Waiāhole I* court's citation to *Puna Geothermal* indicates that the court exercised jurisdiction over the appeal of the IIFS only because the parties also appealed the Commission's resolution of permit applications. Hui/MTF reads *Waiāhole I* as holding that the court has independent jurisdiction to review IIFS. The court concludes that the jurisdictional language from *Waiāhole I* is susceptible to both interpretations. However, the court's due process cases indicate that the court has jurisdiction to hear Hui/MTF's appeal because the IIFS, independent of any WUPA, affects property interests of Hui/MTF's members.

John Duey, President of Hui O Nā Wai 'Ehā, testified that the Hui's members "live, work, and play in the areas of Nā Wai 'Ehā," and that the Hui is "committed to restoring these streams' natural and cultural values and protecting Maui's quality of life for present and future generations." 'Īao Stream runs through the property owned by Duey

and his wife, Marie Hoʻoululāhui Lindsey Duey. Marie is native Hawaiian; she gave their property her Hawaiian name: Hoʻoululāhui. Hoʻoululāhui contains at least seventeen ancient loʻi [12], but the Dueys currently cultivate only two small loʻi with stream water, which they take directly from, and return to, ʻĪao Stream. John testified that he would like to restore the remaining loʻi on his land, but that "[t]he only limiting factor is the availability of water."

Ron Sturtz, President of the Board of Directors of Maui Tomorrow Foundation, Inc., submitted a letter stating that the organization's supporters engage in traditional and customary gathering practices. One such supporter, Roselle Keliʻihonipua Bailey, a kuma hula and native Hawaiian practitioner, submitted written testimony explaining the gathering practices she would like to practice in ʻĪao Stream and its nearshore waters, and testifying that the lack of flowing water makes her practices impossible.

Kalo [13] farmer and Hui O Nā Wai ʻEhā member Hōkūao Pellegrino testified that his 2.175–acre farm, Nohoʻana, contains several restored ancient loʻi, ready to be cultivated. The Nohoʻana loʻi are irrigated via a traditional ʻauwai [14] that diverts water from Waikapū Stream, and the water that leaves the loʻi returns to the Stream. Pellegrino testified that he is only able to cultivate two of his loʻi at a time because of insufficient water in Waikapū Stream.

The interests of the Dueys, Roselle Bailey, and Hōkūao Pellegrino are selected examples of testimony presented to the Commission, but dozens of others testified about their similar interests. Indeed, in its FOF/COL D & O, the Commission found that "Cultural experts and community witnesses provided uncontroverted testimony regarding limita-

tions on Native Hawaiians' ability to exercise traditional and customary rights and practices in the greater Nā Wai ʻEhā area due to the lack of freshwater flowing in Nā Wai ʻEhā's streams and into the nearshore marine waters." The question before the court today, a question we answer in the affirmative [15], is whether these interests constitute "property interests" for the purpose of due process analysis.

The court has explained that a party has a property interest in the subject of litigation for purposes of due process analysis if the party has "more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Sandy Beach Defense Fund,* 70 Haw. at 376, 773 P.2d at 260. The court has cited with approval the U.S. Supreme Court's analysis that:

> Property interests, of course, are not created by the Constitution. Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits.

*Int'l Broth. of Painters and Allied Trades v. Befitel,* 104 Hawaiʻi 275, 283, 88 P.3d 647, 655 (2004) (quoting *Bd. of Regents v. Roth,* 408 U.S. 564, 576, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972)). *See also Aguiar v. Hawaiʻi Housing Auth.,* 55 Haw. 478, 496, 522 P.2d 1255, 1267 (1974) (citing federal authority to support the conclusion that "a benefit which one is entitled to receive by statute constitutes a constitutionally-protected property interest"). The interests asserted by Hui/MTF have a statutory basis in the water code. As stated in HRS § 174C–101,

---

12. "Loʻi" is defined as an "[i]rrigated terrace, especially for taro, but also for rice; paddy." Pukui & Elbert at 209.

13. "Kalo" is the Hawaiian word for taro. Pukui & Elbert at 123. "In Hawaiʻi, taro has been the staple from earliest times to the present, and here its culture developed greatly, including more than 300 forms. All parts of the plant are eaten, its starchy root principally as poi, and its leaves as lūʻau." *Id.*

14. "ʻAuwai" means "ditch or canal." Pukui & Elbert at 33.

15. Hui/MTF also has standing to pursue this appeal, having demonstrated that "their interests were injured" and that they were "involved in the administrative proceeding that culminated in the unfavorable decision." *Puna Geothermal,* 77 Hawaiʻi at 69, 881 P.2d at 1215 (quoting *Mahuiki v. Planning Comm'n,* 65 Haw. 506, 514–15, 654 P.2d 874, 879–80 (1982)).

(c) Traditional and customary rights of ahupuaʻa tenants who are descendants of native Hawaiians who inhabited the Hawaiian Islands prior to 1778 *shall not be abridged or denied by this chapter.* Such traditional and customary rights shall include, but not be limited to, *the cultivation or propagation of taro on one's own kuleana* and the gathering of hihiwai, opae, oʻopu, limu, thatch, ti leaf, aho cord, and medicinal plants for subsistence, cultural, and religious purposes.

(d) *The appurtenant water rights of kuleana and taro lands,* along with those traditional and customary rights assured in this section, *shall not be diminished or extinguished* by a failure to apply for or to receive a permit under this chapter.

HRS §§ 174C–101(c) and (d) (1993). HRS § 174C–63 is yet another section of the water code that entitles native Hawaiian farmers to their water; it states: "Appurtenant rights are preserved. Nothing in this part shall be construed to deny the exercise of an appurtenant right by the holder thereof at any time." HRS § 174C–63 (1993).

HC & S argues that these interests do not rise to the level of property for due process purposes, citing *Sandy Beach Defense Fund,* for support that native Hawaiian practices are similar to "aesthetic and environmental interests" which the court has held to be insufficient to establish a property interest. In that case, the City and County of Honolulu issued Special Management Area ("SMA") use permits for a proposed development. 70 Haw. at 364, 773 P.2d at 253. Area residents and community groups alleged that the County was required to hold a CCH before issuing the permits, expressing concerns "regarding the development's impact on coastal views, preservation of open space, traffic, potential flooding, and sewage treatment." *Id.* The supreme court held that the community groups were not entitled to a CCH because their "aesthetic and environmental" claims did not constitute "legitimate claims of entitlement." *Id.* at 376, 773 P.2d at 260. The court also noted that the community groups did not cite authorities to support their argument, and that none of the area residents owned property contiguous to the

development. *Id.* at 377, 773 P.2d at 261. *Sandy Beach* is readily distinguishable. First, the affected parties before the court today own or reside on land in the area of Nā Wai ʻEhā, and rely upon that water to exercise traditional and customary rights, including kalo farming. Second, as cited above, there is statutory authority found throughout the water code to support their entitlement to water for kalo farming.

HC & S also argues that downstream kalo farmers cannot assert property interests to more water than they currently use because it "would be a grave departure from the principle that 'the range of interests protected by procedural due process is not infinite.'" (quoting *Int'l Bd. of Painters & Allied Trades v. Befitel,* 104 Hawaiʻi at 283, 88 P.3d at 655). This argument is rejected for several reasons. First, as both Hui/MTF and OHA argue, the fact that HC & S and WWC have historically deprived downstream users of water does not negate those downstream users' interest in the water. Second, neither statute quoted above provides for abandonment of appurtenant rights; in fact, the text specifically protects against abandonment by stating that appurtenant rights will "not be diminished or extinguished by a failure to apply for or to receive a permit." HRS § 174C–101(d). Furthermore, as the court explained in *Waiāhole I,* "The constitution and Code, [ ... ] do not differentiate among 'protecting,' 'enhancing,' and 'restoring' public instream values [like native Hawaiian rights], or between preventing and undoing 'harm' thereto." 94 Hawaiʻi at 150, 9 P.3d at 462.

The court also disagrees with the Commission's, WWC's, and HC & S's argument that setting the IIFS in this case did not determine individual water rights. When the Commission issued a D & O retaining the existing IIFS for ʻĪao and Waikapū Streams, it necessarily affected the Dueys' and Pellegrino's access to water because it endorsed the upstream diversions that remove water from ʻĪao and Waikapū Streams, apparently finding that the "importance" of those diversions outweighed the importance of downstream uses. HRS § 174C–71(2)(D).

Though the conclusions above are sufficient to support today's holding, the analysis of one more case merits consideration. In *Ko'olau Agr. Co., Ltd. v. Comm'n On Water Resource Mgmt. ("Ko'olau Ag.")*, an agriculture company unsuccessfully sought review of the Commission's designation of several O'ahu aquifers as Water Management Areas ("WMA"). 83 Hawai'i 484, 486, 927 P.2d 1367, 1369 (1996). The court explained that the company did not have a property interest in whether the aquifers in question received the WMA designation. *Id.* at 493, 927 P.2d at 1376. In so concluding, the court drew a distinction between WMA designations, which do not require a hearing, and WUPA decisions, which do require hearings. As the court explained, this disparity in procedure is "eminently logical given the difference between the issues presented for decision." *Id.* First, the court noted the difference in analysis required before the two resolutions. When considering a WMA designation, the Commission must determine whether "the water resources in the area may be threatened by existing or proposed withdrawals or diversions of water." *Id.* (quoting HRS § 174C–41(a)). Contrast a WUPA, where the Commission's analysis is much more robust; the Commission must consider several factors when granting a WUPA, including whether the water use is "a reasonable-beneficial use as defined in [the Code];" whether the use is "consistent with the public interest;" and whether it is consistent with governmental land use plans. *Id.* at 492, 927 P.2d at 1375 (quoting HRS § 174C–48). Second, the court considered the necessity of judicial review. The court recognized that "the consequences of an erroneous [WMA] designation decision by the Commission do not indicate a need for judicial review because the rights of individual water users are fully protected in the permitting process." *Id.* at 493, 927 P.2d at 1376. And third, the court noted that WMA designations do not affect the interests of any potential water users; the impact of such a designation is only that the user's water source is subject to the Commission's regulation, which does not, in and of itself, affect the user's water rights. *Id.* Contrast a WUPA, where the outcome is

a permit directly specifying a user's rights to water. *Id.*

All parties cite *Ko'olau Ag.* for assistance on the question of whether there is a property interest at stake in this case. The Commission, HC & S, and WWC argue that an IIFS determination is similar to designating a WMA because neither directly determines property rights. The court concludes that each of the factors listed above counsel in favor of judicial review in this case. First, the analysis the Commission must undertake in setting an IIFS is complicated. The statute specifies the factors the Commission must consider:

> In considering a petition to adopt an interim instream flow standard, the commission shall weigh the importance of the present or potential instream values with the importance of the present or potential uses of water for noninstream purposes, including the economic impact of restricting such uses.

HRS § 174C–71(2)(D). As the voluminous record in this case readily establishes, each of these factors is complex and involves significant and thorough analysis and factfinding. Unlike establishing a WMA, the analysis supporting a determination of an IIFS requires more than a yes/no decision, but rather requires the Commission to weigh serious and significant concerns, including: "the need to protect and conserve beneficial instream uses of water," "the importance of the present or potential instream values," "the importance of the present or potential uses of water for noninstream purposes," and "the economic impact of restricting such uses." HRS § 174C–71(2)(C) and (D). Indeed, in *Waiāhole I*, the Commission itself advocated for due process rights in proceedings to determine IIFS. One of the Commission's own Orders, cited in the court's opinion with approval, states

> A petition to modify instream flows at … specific locations is a fact-intensive, individualized determination at each site that may directly affect downstream and offstream interests.… [I]ndividual claims may need to be examined. The site-specific inquiry required in this case is not compatible with rule making, but with a

method which provides the due process procedures necessary to assess individual interests.

94 Hawai'i at 152, 9 P.3d at 464.

Second, the ramifications of an erroneous IIFS could offend the public trust, and is simply too important to deprive parties of due process and judicial review. As the court stated in *Waiāhole I*, "[t]he public trust ... is a state constitutional doctrine. As with other state constitutional guarantees, the ultimate authority to interpret and defend the public trust in Hawai'i rests with the courts of this state." 94 Hawai'i at 143, 9 P.3d at 455. The courts serve an important function with regard to the water code; as the court noted in *Waiāhole I*, "[t]he check and balance of judicial review provides a level of protection against improvident dissipation of an irreplaceable res." *Id.* (quoting *Arizona Cent. for Law in Pub. Interest v. Hassell,* 172 Ariz. 356, 837 P.2d 158, 168–69 (App.1991), review dismissed, 172 Ariz. 356, 837 P.2d 158 (App.1992) (brackets and citation omitted)).

Finally, in *Ko'olau Ag.*, the court specified that there was little necessity for judicial review because the permitting process would adequately protect individual rights. 83 Hawai'i at 493, 927 P.2d at 1376. This protection does not exist in today's case for several reasons. First, as the Commission itself acknowledges, setting an IIFS is a final action and it would be "inappropriate for the Commission to reevaluate the IIFS during the upcoming surface water use permit proceedings." This argument indicates that downstream users cannot ask the Commission to raise the IIFS to a level that would accommodate a permit to fulfill their kuleana needs. Second, as the court noted in *Waiāhole I*, the water code envisions that "Once the Commission translates the public interest in instream flows into 'a certain and manageable quantity[, t]he reference to consistency with the public interest in the definition of reasonable beneficial use likewise becomes a reference to that quantity.'" 94 Hawai'i at 149, 9 P.3d at 461 (quoting Douglas W. MacDougal, *Private Hopes and Public Values in the "Reasonable Beneficial Use" of Hawai'i's Water: Is Balance Possible?,* 18 U. Haw. L.Rev. 1, 62 (1996)). In

short, the IIFS matter. They have both immediate and lasting impacts on individual water users. They are also an opportunity for the Commission to consider the needs of our state's water systems. "Under the [Water] Code, [ ... ] instream flow standards serve as the primary mechanism by which the Commission is to discharge its duty to protect and promote the entire range of public trust purposes dependent upon instream flows." 94 Hawai'i at 148, 9 P.3d at 460. The court therefore holds that Hui/MTF had a due process right to a hearing, and therefore has a right to judicial review, in this case.

## V. ANALYSIS OF POINTS OF ERROR

### A. This Court Must Dismiss MDWS's Cross–Appeal, As It Seeks Resolution of an Abstract Proposition of Law.

MDWS filed a cross-appeal in this case seeking "clarification" of several COL, in which the Commission articulated that it established the IIFS prior to considering noninstream uses, including MDWS's diversions for the public water supply. MDWS contends that *Waiāhole I* established a "higher status" for public trust uses as compared to commercial noninstream uses, and that municipal use, though a noninstream use, should be afforded higher status and preferential consideration as a public trust use.

Hui/MTF filed an answering brief to MDWS's opening brief; OHA joined the brief. In its answering brief, Hui/MTF argues that MDWS's point of error is not reviewable by the court because MDWS seeks clarification of language in the Commission's D & O but does not argue that the Commission's alleged error affected MDWS's rights or interests. Hui/MTF reasons that because MDWS sought and was issued water use permits in the amounts requested, any treatment of their point of error would be an "advisory opinion." Hui/MTF accordingly requests that the court dismiss MDWS's cross-appeal.

Hui/MTF's argument is well-taken. This court has recently affirmed its practice not to issue "advisory opinions on abstract

propositions of law." *Kemp v. State of Hawai'i Child Support Enforcement Agency,* 111 Hawai'i 367, 385, 141 P.3d 1014, 1032 (2006) (citing *Kona Old Hawaiian Trails Group v. Lyman,* 69 Haw. 81, 87, 734 P.2d 161, 165 (1987)). This is a longstanding value of the court.

> The duty of this court, as of every other judicial tribunal, is to decide actual controversies by a judgment which can be carried into effect, and not to give opinions upon moot questions or abstract propositions, or to declare principles or rules of law which cannot affect the matter in issue in the case before it.

*Wong v. Bd. of Regents,* 62 Haw. 391, 394–95, 616 P.2d 201, 204 (1980) (citing *Anderson v. Rawley Co.,* 27 Haw. 150, 152 (1923)) (further citations omitted).

MDWS's point of error seeks resolution of an abstract proposition because any possible resolution of MDWS's point of error would not affect MDWS's right—or any other party's right—to the water use permits issued by the Commission. MDWS sought permits for 1.042 mgd for the Kepaniwai Well (Well No. 5332–05), and 1.359 mgd for the 'Īao Tunnel (Well No. 5332–02). The Commission found that MDWS's applications met all the permitting criteria and awarded the permits in full. Analysis of MDWS's point of error would not affect this determination because MDWS's request was granted, even without the requested treatment as a public trust use. MDWS's cross-appeal is therefore dismissed.

**B. The Commission Failed To Enter Findings of Fact and Conclusions of Law Regarding The Effect Of Its Amended IIFS On Traditional And Customary Native Hawaiian Practices.**

OHA and Hui/MTF argue that the IIFS established by the Commission did not protect traditional and customary native Hawaiian rights to the extent feasible. More specifically, both parties contend that the Commission erred in failing to articulate FOF and COL regarding the impact of its decision on traditional and customary native Hawaiian rights. OHA also argues that the Commission failed to weigh traditional and customary rights when it balanced instream values and noninstream uses.

The Commission articulated a general conclusion of law relevant to this point of error:

> 19. In addition to appurtenant rights when practiced for subsistence, cultural and religious purposes, traditional and customary rights include, but are not limited to, kuleana water for domestic purposes, kalo cultivation, and other irrigation purposes, and the gathering of hihiwai, opae, o'opu, limu, thatch, ti leaf, aho cord, and medicinal plants for subsistence, cultural, and religious purposes.

COL 19 is, in large part, a quotation from HRS § 174C–101(c), the provision in the water code protecting native Hawaiian rights; it provides an illustrative list of the activities that can be protected under the water code. During the hearing, Hui/MTF and OHA presented several witnesses who testified about native Hawaiian practices specific to Nā Wai 'Ehā, and the Commission found several facts on the subject. First, as for historical practices, the Commission found several facts indicating a distinct connection between Nā Wai 'Ehā and Hawaiian history and culture. The Commission found:

> 34. Due to the profusion of fresh-flowing water in ancient times, Nā Wai 'Ehā supported one of the largest populations and was considered the most abundant area on Maui; it also figured centrally in Hawaiian history and culture in general.
>
> 35. The abundance of water in Nā Wai 'Ehā enabled extensive lo'i kalo (wetland kalo) complexes, including varieties favored for poi-making such as "throat-moistening lehua poi."
>
> [ . . . ]
>
> 40. In addition to extensive agricultural production, traditional and customary practices thrived in Nā Wai 'Ehā, including the gathering of upland resources, such as thatch and ti, and protein sources from the streams, including 'o'opu, 'ōpae, and hihiwai.
>
> [ . . . ]
>
> 43. The waters of Nā Wai 'Ehā were renowned for the traditional and custom-

ary practice of hiding the piko, or the naval cord of newborn babies. "[T]he spring Eleile contained an underwater cave where the people of the area would hide the piko (umbilical cords) of their babies after birth. . . . The location of where one buries or hides the piko is a traditional custom that represents Native Hawaiian cultural beliefs about an individual's connection to the land."

44. Upper ʻĪao Valley contained the royal residences of chiefs in both life and the afterlife. In a secret underwater cave, Native Hawaiians hid the bones of "all the ruling chiefs who had mana and strength, and the kupua, and all those attached to the ruling chiefs who were famous for their marvelous achievements. There were several hundred in all who were buried there." Thus, the burial of sacred chiefs required a deep freshwater body to ensure the utmost protection of their bones.

45. Nā Wai ʻEhā is home to several important heiau. Of particular significance are Halekiʻi and Pihana Heiau, located between Waiehu and ʻĪao Streams. These heiau were re-consecrated in 1776 as an offering before the famous battle between Hawaiʻi and Maui. It is said that Kalanikaukooluaole, a high chiefess and daughter of Kamehamehanui, bathed in the stream water near the heiau, before she entered the heiau.

[ . . . ]

54. The spiritual practice of hiʻuwai, also known as kapu kai, often occurred around the time of makahiki, when individuals "would go into the rivers or into the ocean in order to do a cleansing for the new year[.]" This type of cleansing, which required immersion in the water, was also conducted "before you start or end certain ceremonies[.]" For ceremonies dedicated to Kane, "having a hiʻuwai in a stream magnifies the mana[.]"

The Commission heard testimony explaining that native Hawaiian practices still continue in Nā Wai ʻEhā:

51. Despite significant challenges, some Native Hawaiian practitioners in Nā Wai ʻEhā continue to exercise traditional and customary rights and practices, including "gathering stream life such as hihiwai, ʻōpae, ʻoʻopu, and limu for subsistence and medicinal purposes," as well as "cultivating taro for religious and ceremonial uses, gathering materials for hula, lua (ancient Hawaiian martial arts), and art forms."

[ . . . ]

53. Kumu hula Akoni Akana gathers materials such as hau, palapalai, laʻī, and lauaʻe from Waiheʻe and Waiehu for hula ceremonies and performances. "As part of the protocol for gathering these items, we always soak the leaves we gather in the stream flow nearby. This practice necessitates a flowing stream."

[ . . . ]

55. Other practitioners would like to expand the scope of their traditional and customary practices and plan to do so if water is returned to the streams. For example, Hokulani Holt–Padilla testified that "[m]any families seek to reestablish the tradition of growing kalo" in Nā Wai ʻEhā.

The Commission also found facts to explain the connection between current traditional and customary practices and streamflow levels:

49. Cultural experts and community witnesses provided uncontroverted testimony regarding limitations on Native Hawaiians' ability to exercise traditional and customary rights and practices in the greater Nā Wai ʻEhā area due to the lack of freshwater flowing in Nā Wai ʻEhā's streams and into the nearshore marine waters.

50. " 'Oʻopu must once have been plentiful in Nā Wai ʻEhā streams; the wind in Waiheʻe is called ka makani kiliʻoʻopu, which means the wind that brings the faint odors of the ʻoʻopu." Today, however, "[i]t is very difficult to find ʻōpae, hihiwai, and ʻoʻopu in the streams of Nā Wai ʻEhā, large portions of which are frequently dry."

[ . . . ]

57. According to testimony, "Nā Wai ʻEhā continues to hold the potential to once again support enhanced traditional and customary rights and practices if sufficient water is restored." Restoring streamflow to Nā Wai ʻEhā "would enormously bene-

fit" Native Hawaiians and other communities who seek to reconnect with their culture and live a self-sustaining lifestyle, and more people would be able to engage in traditional and customary practices with more water.

58. Testimony contended that "Restoration of mauka to makai flow to the streams is critical to the perpetuation and practice of Hawaiian culture in Nā Wai ʻEhā." "If we are not able to maintain our connection to the land and water and teach future generations our cultural traditions, we lose who we are as a people."

59. According to testimony, "The return of the waters of Nā Wai ʻEhā to levels that can sustain the rights of native Hawaiians and Hawaiians to practice their culture will result in the betterment of the conditions of native Hawaiians and Hawaiians by restoring spiritual well-being and a state of ʻponoʼ (goodness, righteousness, balance) to the people and communities of Nā Wai ʻEhā."

60. Testimony contended that cold, free-flowing water is essential for kalo cultivation, which in turn is integral to the well-being, sustenance, and cultural and religious practices of native Hawaiians and Hawaiians. Kalo cultivation provides not only a source of food, but also spiritual sustenance, promotes community awareness and a connection to the land, and supports physical fitness and mental well-being.

OHA and Hui/MTF both argue that the Commission had a duty to make specific findings of fact and conclusions of law with regard to the effect of its D & O on traditional and customary-native Hawaiian practices. Their argument is grounded in *Ka Paʼakai O Ka'Aina v. Land Use Comm'n*, 94 Hawaiʻi 31, 7 P.3d 1068 (2000).

In *Ka Paʼakai O Ka'Aina*, native Hawaiian groups appealed the State Land Use Commission's ("LUC") grant of a land developer's petition to reclassify land in a conservation district to an urban district. 94 Hawaiʻi at 33, 7 P.3d at 1070. The LUC held hearings on the petition, and reached several findings of fact and conclusions of law regarding native Hawaiian practices. *Id.* at 36–37, 7 P.3d

at 1073–74. The LUC determined that the developer would develop and implement a Resource Management Plan ("RMP") to coordinate coastal access for the purpose of traditional and customary practices; the LUC specifically found that one family gathered salt in the area, and that the shoreline is used for fishing, gathering limu, ʻopihi, and other resources. *Id.* at 37, 7 P.3d at 1074. The LUC mandated that the RMP will preserve these practices, archaeological sites and the coastal trail, and required the developer to preserve and protect native Hawaiian rights. *Id.* at 38, 39, 7 P.3d at 1075, 1076. On appeal, this court recognized that Article XII, section 7 of the state constitution "places an affirmative duty on the State and its agencies to preserve and protect traditional and customary native Hawaiian rights," while giving the State and its agencies the power to discharge this duty. *Id.* at 45, 7 P.3d at 1082. The court then provided an "analytical framework" to guide the State in its decisions affecting native Hawaiian rights, specifying that the agency must, at a minimum, articulate:

(1) the identity and scope of "valued cultural, historical, or natural resources" in the petition area, including the extent to which traditional and customary native Hawaiian rights are exercised in the petition area; (2) the extent to which those resources-including traditional and customary native Hawaiian rights-will be affected or impaired by the proposed action; and (3) the feasible action, if any, to be taken by the LUC to reasonably protect native Hawaiian rights if they are found to exist.

*Id.* at 46–47, 7 P.3d at 1083–84 (internal footnotes omitted). The court held that the LUC failed to satisfy those criteria for several reasons: (1) the LUC did not enter definitive findings regarding the extent of the native Hawaiian practices, but rather delegated the determination to the developer; (2) the LUC did not enter findings about the practices undertaken outside the RMP, despite evidence that the area outside the RMP could require protection; (3) "the LUC made no specific findings or conclusions regarding the *effects on* or the *impairment of* any Article XII, section 7 uses, or the *feasibility*

*of the protection* of those uses." *Id.* at 48–49, 7 P.3d at 1085–86 (emphasis in original). As the court explained, "the promise of preserving and protecting customary and traditional rights would be illusory absent findings on the extent of their exercise, their impairment, and the feasibility of their protection." *Id.* at 50, 7 P.3d at 1087.

Hui/MTF and OHA argue that the Commission's FOF/COL D & O do not satisfy the analytical framework of *Ka Pa'akai O Ka'Aina.* They cite the Commission's own findings that the lack of freshwater in Nā Wai 'Ehā limits the native Hawaiian practices of kalo cultivation and gathering, and argue that the Commission did not fulfill its duty to protect native Hawaiian rights because "nothing in the Decision indicates that the majority even considered the feasibility of protecting those traditional and customary rights."

 The court concludes that Hui/MTF and OHA are correct; the Commission's FOF/COL D & O, while very thorough in several respects, including its documentation of the area's native Hawaiian practices, lacks findings or conclusions articulating *the effect* of the amended IIFS on the native Hawaiian practices of Nā Wai 'Ehā. It also lacks findings or conclusions explaining the feasibility of protecting the practices. This is particularly apparent with regard to kalo cultivation, considering the Commission's decision not to restore any streamflow to 'Iao and Waikapū Streams. In its FOF/COL D & O, the Commission identified seventeen kuleana ditch/pipe systems, and divided those seventeen into two categories: the fourteen that are connected to one of the primary distribution systems (and thus rely on diverted water for their kalo cultivation), and the three that divert water directly from a stream (and thus rely on sufficient instream flows from which to pull their water). While the Commission's analysis considered the needs of the former category of kuleana users, there was no mention of the kuleana users who access their water directly from the streams. This is particularly troublesome for the users who take from two of the ditches, described in the record as the Pellegrino and Duey Kuleana Ditches, which draw water directly from Waikapū and 'Iao Streams, respectively. The users on those Ditches testified that their water is insufficient, and urged the Commission to amend upward the IIFS for their streams so they could irrigate their lo'i kalo. The Commission's FOF/COL D & O justifies its decision not to restrict diversions from Waikapū and 'Iao Streams due to the streams' lack of potential to support certain native species, described as amphidromous.[16] The Commission does not state the effect of this decision, which is to deny the Pellegrino and Duey Ditch users the water they need to cultivate the lo'i kalo on their property; furthermore, the Commission did not articulate whether it would be feasible to return flow sufficient to support the kuleana.

In addition to neglecting this portion of the kalo cultivation analysis, the FOF/COL D & O does not provide any analysis of the decision's effect on gathering rights. HC & S argues that the Commission's FOF/COL were adequate on this point, reasoning that "if instream fauna populations increase as a result of the amended IIFS as [the Commission] anticipates they will, that would support gathering practices." This argument fails for two main reasons. First, the FOF/COL do not satisfy the analytical framework articulated in *Ka Pa'akai O Ka'Aina.* It appears as though the first step of analysis, identification of the scope of traditional and customary native Hawaiian rights, is satisfied by the above-quoted FOF regarding gathering rights, which identify the several items gathered from Nā Wai 'Ehā. However, subsequent steps of the analysis require the administrative agency to articulate "the extent to which those resources [ ... ] will be affected or impaired by the proposed action," and then to specify what feasible action can be taken to protect native Hawaiian rights. *Ka Pa'akai O Ka'Aina,* 94 Hawai'i at 47, 7 P.3d at 1084. The FOF/COL do not contain any information on these two steps of analysis. Furthermore, even if the court accepted HC & S's post hoc explanation to be adequate, this would only resolve rights to gather amphidromous species, but the Commission concluded that gathering rights in Nā Wai 'Ehā

**16.** A full discussion of this analysis follows in Section V.C.I.

also encompassed several other species. The Commission's analysis does not examine whether the amended IIFS impact these gathering rights, or whether any negative impact may be avoided.

Having concluded that the Commission did not discharge its duty with regard to the feasibility of protecting native Hawaiian rights, the court must vacate the Commission's FOF/COL D & O and remand to the Commission for further consideration of the effect the IIFS will have on native Hawaiian practices, as well as the feasibility of protecting the practices. Should the Commission determine that the amended IIFS will negatively impact protected native Hawaiian practices and that protection of those practices is feasible, the Commission may enter amended IIFS to reflect that protection.

C. **The Commission's D & O Does Not Adequately Justify Its Decision Not To Restore Streamflow To The ʻĪao And Waikapū Streams.**

Hui/MTF challenges the Commission's failure to restore flow to the ʻĪao and Waikapū Streams. Hui/MTF argues that such an action was not supported by the record and disregards all instream uses other than sustaining amphidromous species. Hui/MTF further contends that the Commission did not properly weigh the competing interests in this case, and that the Commission arbitrarily misused the USGS's temporary flow release figures.

1. *The Commission's Analysis Regarding Instream Use Is Incomplete.*

The Commission explained its reasoning in the FOF/COL D & O section titled "The Commission's Analysis and Conclusions." That section of analysis shows a clear emphasis placed on the potential to restore amphidromous species in the streams. This was a main area of controversy in the hearing; the parties presented the Commission with several expert witnesses, all promoting different opinions on the issue.

The term "amphidromous" describes species of fish that undergo regular, obligatory migration between fresh water and the sea at some stage in their life cycle other than the breeding period. Native Hawaiian amphidromous species exhibit "freshwater amphidromy," where spawning takes place in fresh water, and the newly hatched larvae are swept into the sea by stream currents. While in the sea, the larvae undergo development as zooplankton before returning to fresh water to grow to maturity. The Commission found that these species suffer in Nā Wai ʻEhā due to the disruption of natural flow caused by the offstream water diversions; the diversions degrade or destroy habitat, diminish food sources, diminish larval drift by capturing eggs and larvae, and impair flows necessary to transport larvae to the ocean. The Commission also found that discharge of sufficient duration and volume is necessary to attract and accommodate upstream migration of post-larval fish, mollusks, and crustaceans; there is a direct correlation between stream volume and recruitment, such that increased streamflow correlates with increased recruitment at the stream mouth.

Dr. Mark Eric Benbow, an Assistant Professor at Michigan State University, testified on behalf of Hui/MTF as an expert in aquatic biology, ecology, and the Central Maui streams. Dr. Benbow testified that the amphidromous life cycle requires continuous mauka-to-makai flow, though he acknowledged that he did not know the precise volume and duration necessary to sustain the species. Dr. Benbow reached his opinions after conducting multi-year studies of Central Maui streams in which he found that the largest migrations of species occur in streams with minimal or no diversions, while the greatest reductions in recruitment during drought occur in diverted streams. Dr. Benbow made two specific recommendations to the Commission: first, he recommended that the Commission require sufficient flow levels to increase the quantity and quality of habitat in order to have a functioning reproduction population of organisms; second, he recommended maintaining continuous mauka-to-makai flow in Nā Wai ʻEhā. Dr. Benbow testified that, without additional studies, he cannot recommend maintaining the streams at less than 75 percent of their median flow. As the Commission found, however, Ben-

bow's 75–percent figure was an "informed guess," and the precise volume and duration of streamflow needed to sustain the life cycle of amphidromous organisms is not known.

John Ford, Program Director and Office Lead for SWCA Environmental Consultants, testified on behalf of HC & S as an expert in aquatic biology, with specific emphasis on native species in Hawaiian streams. Ford presented a different account of the importance of mauka-to-makai flow for amphidromous species. Ford distinguished "ecological connectivity" from "physical connectivity"; the former is the term for streamflows sufficient to allow the normal distribution of a species within an entire watershed, the latter is the term for continuous flow from a specific stream's headwaters to its mouth. Ford noted that there are naturally interrupted and intermittent streams in Hawai'i with amphidromous organism populations, and suggested that amphidromous species therefore may not require the continuous physical connectivity of each stream to sustain their population.

HC & S retained Ford's consulting company, SWCA, to evaluate amphidromous species in Nā Wai 'Ehā. In 2007 and early 2008, SWCA performed a series of larval drift sampling to evaluate the reproduction of amphidromous species; this survey lasted one week in total, so the Commission found it was "just a snapshot" and could not support "broad extrapolations over time" or "to other streams." SWCA observed that Waihe'e River was the only stream in Nā Wai 'Ehā with significant reproductive populations of native amphidromous species. SWCA also observed amphidromous species in Waikapū and 'Īao Streams, which may be evidence of ecological connectivity as those streams do not have physical connectivity to the sea except during prolonged intense flooding events. There may be another explanation, however, as Dr. Benbow testified that he and Division of Aquatic Resources biologist Skippy Hau have planted specimens of amphidromous species above the diversions of those streams. SWCA concluded that ecological connectivity exists under diverted conditions in the Waihe'e River and Waiehu Stream. Ford opined that the addition of flow to

Waihe'e River and Waiehu Stream would be the most beneficial for increasing populations of native amphidromous species in Nā Wai 'Ehā. With regard to 'Īao Stream, SWCA's final conclusion was that the channelization "is the primary factor" impeding recruitment of amphidromous species. SWCA also found no definitive evidence that Waikapū Stream ever flowed continuously from mauka to makai.

The Commission's Final FOF/COL D & O accepted Ford's view of the streams with regard to amphidromous species. As the Commission explained in its final analysis section, it

> concluded that the restorative potentials are highest for Waihe'e River and Waiehu Stream. 'Īao Stream can be restored to enhance recruitment and increase stream life, but its reproductive potential is severely limited because of extensive channelization in the 2.5 miles immediately above its mouth. Waikapu Stream likely has minimal to no reproductive potential, because there probably was no pre-diversion continuous flow to the mouth, and even if there had been continuous flow, Kealia Pond and the delta below most likely inhibited recruitment.

Hui/MTF argues that the Commission's treatment of 'Īao and Waikapū Streams is not supported by the record and disregards all instream uses other than amphidromous species.

 In setting the IIFS, the Commission was charged with weighing "present or potential instream values." HRS § 174C–71(2)(D). The water code contains a definition of instream uses, as well as an illustrative list of examples. It provides:

> "Instream use" means beneficial uses of stream water for significant purposes which are located in the stream and which are achieved by leaving the water in the stream. Instream uses include, but are not limited to:
>
> (1) Maintenance of fish and wildlife habitats;
>
> (2) Outdoor recreational activities;

(3) Maintenance of ecosystems such as estuaries, wetlands, and stream vegetation;

(4) Aesthetic values such as waterfalls and scenic waterways;

(5) Navigation;

(6) Instream hydropower generation;

(7) Maintenance of water quality;

(8) The conveyance of irrigation and domestic water supplies to downstream points of diversion; and

(9) The protection of traditional and customary Hawaiian rights.

HRS § 174C–3. As Hui/MTF shows, the record contains substantial evidence that establishing mauka-to-makai flow in all of the streams of Nā Wai ʻEhā would support the public interest by fostering many of the statutorily-designated instream uses. Hui/MTF argues that the Commission focused on amphidromous species, a subset of parenthesis (1) in the statute, and disregarded evidence supporting the other instream uses.

HC & S replies that the Commission is not required to restore streamflow, or even to establish an IIFS, for each stream. The water code requires the Commission to establish IIFS in some instances; as the code provides, the Commission "shall" set an IIFS "in order to protect the public interest". HRS § 174C–71(2)(A). Accordingly, in resolving the petition to amend the IIFS for Nā Wai ʻEhā, the Commission was not precluded from retaining the existing IIFS in some or all of the streams, had it concluded that the public interest was sufficiently protected by the existing IIFS.

In undertaking a close review of the Commission's decision, it is apparent that the decision focuses on the flow standards as they relate to amphidromous species, and justifies the decision not to restore water to ʻĪao and Waikapū Streams due to the conclusion that those streams show limited "reproductive potential" for amphidromous species. HC & S, the Commission, and WWC draw the court's attention to the evidence in the record, especially the SWCA evaluation reviewed *supra*, that supports the Commission's conclusion. However, Hui/MTF's point of error does not merely contend that

the Commission's decision is not supported by the record; it also alleges that the Commission erred in disregarding the evidence of other instream uses. In *Waiāhole I*, this court held that where "the record demonstrates considerable conflict or uncertainty in the evidence, the agency must articulate its factual analysis with reasonable clarity, giving some reason for discounting the evidence rejected." *Waiāhole I*, 94 Hawaiʻi at 163–64, 9 P.3d at 475–76. In its FOF/COL D & O, the Commission does not explain its focus on amphidromous species above the evidence of other instream uses. Even if the ʻĪao and Waikapū Streams may not support amphidromous species, evidence that they can support other instream uses must be weighed against noninstream uses, as required by HRS § 174C–71(2)(D). The Commission erred in not considering this evidence; on remand, the Commission must undertake and articulate this analysis. *Waiāhole I*, 94 Hawaiʻi at 158, 9 P.3d at 470 (remanding where the Commission "made invalid, inadequate, or incomplete findings.") (citation).

2. *The Commission Did Not Err In Using USGS Data As A Starting Point For Analysis.*

■ In federal fiscal year 2006, the USGS initiated a study of Nā Wai ʻEhā. The study consisted of eight parts: (1) compiling and analyzing existing information relevant to the Waiheʻe River, and Waiehu, ʻĪao, and Waikapū Streams, (2) conducting baseline reconnaissance surveys of the streams to identify sites of diversion and return flow and significant gaining and losing reaches, (3) establishing low-flow partial-record stations in reaches with flowing water to characterize natural and current diverted flows in Nā Wai ʻEhā streams, (4) establishing temperature-monitoring sites in reaches with flowing water to provide information on temperature variations for diverted and undiverted conditions, (5) monitoring the frequency of dry days in selected reaches of the diverted streams to establish the number of days during which continuous mauka-to-makai flow is available for the upstream movement of native species, (6) surveying the presence or absence of native and non-native aquatic species in selected stream reaches to provide

baseline data for assessing effects of stream-flow restoration, (7) collecting macrohabitat, microhabitat, and channel-geometry information in selected study reaches downstream from existing diversions to characterize the effects of diversions on habitat for native stream macrofauna, and (8) analyzing data and producing a report summarizing the study findings.

Photographic information from cameras mounted at three selected sites downstream of all diversions established that from September 2006 to July 2007, North Waiehu Stream was dry about 79 percent of the time, ʻĪao Stream was dry about 70 percent of the time, and Waikapū Stream was dry about 37 percent of the time. At the time of the Commission's decision, USGS had requested, as part of its study, to partially or fully restore mauka-to-makai flow to Waiheʻe River, Waiehu Stream, and ʻĪao Stream [17] to allow measurements of streamflow, infiltration, and physical habitat for different flow conditions in sections of the stream that are commonly dry due to diversions. The proposal sought to release water into the streams in three phases, each involving a higher flow than the last; each phase would be maintained for about a month and long enough to allow flow conditions to stabilize for observation.

For Waiheʻe Stream, USGS proposed flows near the coast of 6.5 mgd, 13 mgd, and 26 mgd; this would require flows just downstream of the Spreckels Ditch diversion of 10 mgd, 17 mgd, and 30 mgd, respectively, for each of the three phases. For North and South Waiehu Streams, USGS proposed flows near the coast [18] of 0.6 mgd, 1.6 mgd, and 2.6 mgd. USGS estimated that this would require the following flows: South Waiehu Stream at Spreckels Ditch would be 0.9 mgd, 1.3 mgd, and 1.6 mgd, respectively; North Waiehu Stream at the North Waiehu Ditch would be 1.6 mgd, 2.2 mgd, and 2.9 mgd, respectively. For ʻĪao Stream, USGS proposed flows near the coast of 3.2 mgd, 9.7

mgd, and 16 mgd; this would require flows just downstream of the ʻĪao–Maniania Ditch diversion of 9.5 mgd, 16 mgd, and 22 mgd, respectively. For the Waikapū Stream, USGS deferred controlled releases entirely.

With regard to the USGS controlled release proposals, the Commission specifically found:

606. "The results [following the controlled releases] are intended to be used along with other biological and hydrological information in development, negotiations, or mediated settlements for instream flow requirements." (Gingerich and Wolff, 2005).

The quote originated in a 2005 USGS Study of Nā Wai ʻEhā; HC & S's biologist, Thomas R. Payne, quoted that language to make his greater point that the USGS controlled releases would not be, in his opinion, conclusive to determine IIFS. This is because the controlled releases are designed to study the effect of flow conditions on habitat, not to predict the biological response of the stream to the flow condition; therefore, the scientists have to infer the effect of streamflow on population, "without any direct quantification or prediction of individual species." In Payne's words, "considerable work remains to be done before defensible instream flow standards could be recommended from [the controlled release] studies alone."

In its Final FOF/COL [19] the Commission concluded that:

The most credible proposals for amending the IIFS are USGS's proposed controlled flows. Of the three proposed phases, the [first] phase, totaling 12.5 mgd and comprised of 10.0 mgd for Waiheʻe River, 1.6 mgd for North Waiehu Stream, and 0.9 mgd for South Waiehu Stream, provide the best balance between instream values and offstream uses, and are the only viable IIFS when stream flows are low and all available practical alternatives are in use.

17. USGS Hydrologist Delwyn Oki stated that controlled releases would be helpful for Waikapu Stream, too, and could be developed in the future.

18. Recall that the North and South Waiehu Streams join downstream of diversions and flow together until reaching the sea.

19. Dr. Miike's Proposed FOF/COL set different IIFS, and did not reach this finding.

Hui/MTF argues that the Commission "arbitrarily misused" USGS's temporary flow release figures, noting that the USGS's figures were not proposals for IIFS, but rather a proposal for scientific study of the area. Hui/MTF argues that USGS certainly did not consider instream values, and adoption of USGS flow levels could not possibly discharge the Commission's duty to balance instream values and noninstream uses. OHA shares Hui/MTF's criticism; it describes the above-quoted COL as "inexplicabl[e]."

In making their argument, Hui/MTF and OHA appear to misstate the Commission's actual treatment of the USGS figures. Even though COL 261, quoted above, suggests that the Commission simply adopted the USGS figures, the entirety of the FOF/COL D & O actually indicate that the Commission merely utilized the USGS figures as a starting point. First, the Commission explained the utility of the USGS figures; the figures "were chosen to correspond to specified flows at the stream mouths, after adjusting for losses into the stream beds in the lower reaches of each stream." As described earlier, the Commission focused its analysis on establishing mauka-to-makai streamflow in streams that would support amphidromous species; for this the USGS estimation of loss in the streams' losing reaches is helpful data. Second, the Commission did not simply adopt the USGS figures, but rather adapted one of the three USGS figures as part of its analysis; the USGS proposed release for 'Īao Stream was 9.5 mgd, but the Commission decided not to limit diversions of that stream based on its conclusion that restoration was unlikely to support amphidromous species. Even though, as explained above, this reasoning does not adequately discharge its duties in this case, the Commission did not err in utilizing the USGS figures as a starting point for its analysis.

## D. The Commission Violated The Public Trust In Its Treatment Of Diversions.

Hui/MTF argues that the Commission erred in its estimation of HC & S, MDWS, and WWC's diversions. Hui/MTF alleges that the Commission did not hold the diverters to their burden of proof and then "penal-ized the public trust" for the absence of data, that the Commission failed to consider variable offstream demands in setting the IIFS, and that the Commission did not properly require the diverters to justify system losses. Both Hui/MTF and OHA argue that the Commission erred in its consideration of Well No. 7; Hui/MTF also argues that the Commission erred in its consideration of recycled water as an alternative source. Finally, Hui/MTF contends that the Commission erred in calculating HC & S's acreages. The following sections consider each argument in turn.

1. *The Commission Did Not Err In Articulating The Burden Of Proof In Determining An IIFS.*

▮▮▮▮ Hui/MTF argues that the Commission erred because it did not hold the diverting parties to a burden of proof; they argue that *Waiāhole I* requires noninstream users to justify their diversions in light of the water uses protected by the public trust. The flaw of their argument is that the portions of *Waiāhole I* that they cite apply to the WUPA process. In the context of IIFS petitions, the water code does not place a burden of proof on any particular party; instead, the water code and our case law interpreting the code have affirmed the Commission's duty to establish IIFS that "protect instream values to the extent practicable" and "protect the public interest." *In re Water Use Permit Applications "Waiāhole II"*, 105 Hawai'i 1, 11, 93 P.3d 643, 653 (2004); HRS § 174C–71 (2)(A). Accordingly, our review of the Commission's analysis of the stream diversions must focus on whether or not the Commission properly discharged this duty. Where the Commission's decisionmaking evinces "a level of openness, diligence, and foresight commensurate with the high priority these rights command under the laws of our state," the decision satisfies close look review governing public trust resources. *Wai'ola*, 103 Hawai'i at 422, 83 P.3d at 685.

2. *The Commission Did Not Err In Using Dr. Fares's Model Of Irrigation Requirements As A Starting Point For Analysis.*

▮▮▮ Hui/MTF argues that the Commission erred in its treatment of testimony from

Dr. Ali Fares, a hydrologist who testified as an expert witness for Hui/MTF, OHA, and MDWS. Dr. Fares is an Associate Professor in the Department of Natural Resources and Environmental Management at the University of Hawai'i, Mānoa. Dr. Fares testified regarding his estimation of the optimal irrigation requirements for HC & S's sugar cane fields. Dr. Fares's model considered historical rainfall data, evapotranspiration or pan evaporation data [20], and data regarding the soil; he then calculated, over the historical period covered by the rainfall data, how much irrigation water would have been required to grow the sugar crop. Dr. Fares statistically analyzed the results to calculate the average amount of irrigation water needed in the wettest year and the driest year, as well as the amount of water that would have supplied the irrigation requirement between the two extremes. Dr. Fares calculated the optimal irrigation requirements using the 80 percent probability standard because it's the industry standard utilized in both government and the private sector. Under the 80 percent probability standard, water meeting or exceeding requirements is available four out of every five days.

HC & S employees testified that they used a different model called a water balance model, which differs from Fares's model in that it uses "real-time data" collected from four rain stations and two evaporation stations located in the west Maui fields. The Commission found that real-time data is more reliable than long-term daily averages to calculate irrigation requirements.

Both models also consider irrigation efficiency, or the percentage of water that is actually delivered to the plants, as opposed to the amount that is channeled through, and possibly lost in, the irrigation system. Fares used an 85 percent irrigation efficiency figure for his calculations; this is industry standard. HC & S's estimations takes into account the different types of tubing, the length of tubes, and variations in topography; HC & S's estimations utilize an 80 percent efficiency standard.

dard. The Commission accepted Fares's use of 85 percent irrigation efficiency.

HC & S stressed the importance of basing water management on actual field conditions, rather than models. The Commission found that Fares had not personally visited the HC & S fields or inspected the HC & S irrigation system; he also never studied actual water usage for sugar cane. Moreover, HC & S representatives testified that Fares's model does not account for several factors increasing water usage, including water run through irrigation lines to detect leaks and irrigation water that is "lost" because it is applied just before it rains. HC & S also testified that it is impractical to assume that HC & S can irrigate to restore soil moisture exactly when necessary; this is not always the case for several reasons, including the facts that only a fraction of the fields actually receive water at any given time, and sometimes fertilizers and herbicides preclude watering.

In its FOF/COL D & O, the Commission accepted Fares's estimates of irrigation requirements, but added five percent to account for the above-listed factors identified by HC & S that Fares's model does not incorporate. Hui/MTF argue that this was error because the five percent increase is "random" and accounts for "unsubstantiated excuses." HC & S responds that the Commission was not limited to choosing between Dr. Fares's model and HC & S's estimates, but rather that the Commission was empowered to utilize the information presented as it saw fit, as long as its decision was supported by the evidence.

The court has held that, due to the fact that the Commission must articulate an IIFS at an "early planning stage" of water management, the Commission "need only reasonably estimate instream and offstream demands." *Waiāhole I*, 94 Hawai'i at 155 n. 60, 9 P.3d at 467 n. 60. The court also explained that the IIFS may be based "not only on scientifically proven facts, but also on future predictions, generalized assumptions, and policy judgments." *Waiāhole I*, 94 Hawai'i at 155, 9 P.3d at 467. In this case, the

**20.** Evotranspiration (or evapo-transpiration) is the loss of water from the soil by evaporation and by transpiration from plants growing in the soil. Pan evaporation is a measurement of water from an open pan, which can be correlated to the water demands of a specific crop.

Commission concluded, based on the above-listed facts showing an incongruity between Fares's model and field conditions, that the model would be insufficient to quantify actual irrigation requirements. The Commission then added five percent to Fares's figures to account for this difference. The Commission fully explained its logic in predicting the irrigation requirements, and it settled on a figure that is a small deviation from the Hui/MTF expert's proposal. Faced with the question of whether the record lacks substantial evidence to support the estimates, the answer must be no; the court therefore concludes that the Commission did not err in its use of Fares's model numbers as a starting point in articulating irrigation requirements for HC & S's fields.

### 3. *The Commission Erred In Calculating HC & S's Acreage.*

██ Hui/MTF argues that the Commission erred in including fields 921 and 922 when calculating HC & S's acreage. Hui/MTF alleges error on two grounds: first, the Commission wrongfully took judicial notice of facts affecting an alternative water source for the fields, and second, the soil quality of fields 921 and 922 is poor and it is unreasonable to provide fresh water to cultivate them.

As the Commission found, fields 921 and 922 are sandy "scrub land" that HC & S had never cultivated until sometime between 1995 and 1997 when it entered into an agreement with Maui Land and Pine ("MLP"), under which MLP delivered wastewater from its pineapple cannery to irrigate the fields for seed cane. After the close of evidence, the Commission took judicial notice of newspaper reports that: (1) MLP announced that it would cease pineapple operations, (2) Haliimaile Pineapple Company would "revive" the fresh fruit operations, and (3) this "should not result in a restoration of the wastewater source." Hui/MTF argues that it was error for the Commission to take judicial notice of these three "facts".

Hawai'i Rules of Evidence ("HRE") Rule 201, limits the scope of judicial notice to facts "not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court, or (2)

capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." HRE Rule 201(b). In this case, the Commission took judicial notice of facts presented in two newspaper articles. There is precedent for taking judicial notice of facts as reported by newspapers. *Application of Pioneer Mill Co.*, 53 Haw. 496, 497 n. 1, 497 P.2d 549, 551 n. 1 (taking judicial notice that a land court judge had announced his candidacy for public office, based upon newspaper articles submitted by the parties). In this case, however, the Commission went further than taking notice of facts reported in newspapers: it predicted the impact of those facts on HC & S's water supply. HRE Rule 201 does not permit the Commission to take judicial notice of a possible effect of a change in ownership in the pineapple cannery. First, this prediction fits neither prong of the relevant rule of evidence; the effect of the change of ownership on HC & S's water supply is neither "generally known within the territorial jurisdiction" nor "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." HRE Rule 201(b). Second, the prediction that wastewater will no longer be available is purely speculative. In fact, one of the Commission's FOF contradicts this speculation, stating "due to the shutdown of MLP's cannery operation, MLP mill wastewater will only be able to supply approximately half of the irrigation requirements of Fields 921 and 922 in the future." Furthermore, it is entirely possible that the company that "revived" operations also "revived" the practice of providing wastewater to HC & S. Hui/MTF are correct that the Commission's taking judicial notice in this instance was improper.

Hui/MTF also argues that the Commission erred in permitting HC & S to include fields 921 and 922 in its acreage because it is marginal farm land, or, as found by the Commission, "sandy 'scrub land.'" Hui/MTF argues that the burden is on HC & S to show "the propriety of draining water from public streams" to irrigate this land which had been uncultivated until a wastewater source was available.

The Commission found that fields 921 and 922 are similar to field 920, another "sandy 'scrub land'" field on which HC & S ceased cultivation because it "has a very sandy soil and has consumed more water than other fields." The Commission also explicitly excluded field 920 from HC & S's acreage and water duty calculations, "because it has consumed more water because of the porosity of its sandy soil and its use for seed cane." HC & S points to testimony from HC & S's agronomist that HC & S is able to grow sugar on those fields because the sandy area has loam soil underneath it, thus permitting HC & S to achieve "good crop growth." Though HC & S draws the court's attention to this testimony in its briefing, this testimony is not included in the Commission's FOF/COL D & O. In fact, the Commission found no explicit facts regarding the propriety of cultivating the fields; instead the Commission included fields 921 and 922 in HC & S's acreage without explanation. As evinced by HC & S's and the Commission's treatment of field 920, the wisdom of irrigating fields 921 and 922 with Nā Wai 'Ehā water is questionable. The record does not contain sufficient analysis to support the conclusion that fields 921 and 922 should be treated differently from field 920. Similarly, the record does not contain sufficient analysis showing that the Commission considered these fields with "a level of openness, diligence, and foresight" required when authorizing the diversion of our public trust res. On remand, the Commission must reevaluate its determination that HC & S should be permitted to divert Nā Wai 'Ehā water to irrigate fields 921 and 922.

### 4. The Commission Erred In Its Treatment Of Some Of The Diverters' System Losses.

 Hui/MTF also argues that the Commission erred in failing to hold HC & S and WWC to their burdens of proof regarding losses. Hui/MTF contends that diverting parties bear a burden of justifying losses and adopting practicable mitigation. WWC argues that there is no burden of proof on diverting parties in an IIFS proceeding; WWC also notes that "[n]othing within HRS § 174C–71(2) mandates that the Commission consider or not consider system losses. Likewise nothing within the public trust doctrine mandates that the Commission consider or not consider system losses." HC & S responds that "some system loss, such as evaporation from open ditches and reservoirs, is unavoidable and not unreasonable," and that the Commission's determination of system losses is reasonable and not clearly erroneous.

With regard to losses, the Commission found:

375. The great majority of WWC's ditches are open and unlined. All of WWC's reservoirs are unlined.

376. WWC did not address the feasibility of minimizing the losses from its system except to state that it "may ... in the future" have plans to line the unlined portions of their system.

[ ... ]

423. HC & S estimates that it loses 6–8 mgd through seepage from the Waiale reservoir, depending on the level of the reservoir. Seepage throughout the rest of the HC & S ditch and reservoir system is estimated to be 3–4 mgd.

[ ... ]

425. HC & S acknowledges that "high density polyethylene lining could negate much of the seepage, not all of it" and that concrete lining "is obviously another option." HC & S has no estimates of the cost to line Waiale Reservoir or the other reservoirs and ditches and has undertaken no engineering or financial analysis of what it would take to reduce the losses.

The Commission concluded that WWC and HC & S have "not established the lack of practicable mitigating measures to address these losses." The Commission then "assum[ed]" that "losses could be halved" by lining most of WWC's reservoirs, and concluded that WWC's reasonable losses are 2.0 mgd. The Commission also deemed HC & S's reasonable losses to be 2.0 mgd, after estimating that HC & S could line the Waiale Reservoir to prevent 6–8 mgd, and, like WWC, could halve remaining losses.

First, in considering these losses, it is necessary to recognize the magnitude of the

losses. If the Commission's estimates are correct and system losses run between 13–16 mgd[21], then the minimal estimation of that loss is approximately twice the 6.84 mgd the Commission estimated for deliveries to all kuleana system users in Nā Wai ʻEhā. The lowest estimation of losses, 13 mgd, is higher than the total volume that the final IIFS restore to the Waiheʻe and Waiehu Streams.[22] Briefly stated, losses in the water system of Nā Wai ʻEhā are massive. The Commission's order that HC & S line the Waiale Reservoir to prevent a large portion of these losses is commendable and shows the "diligence" and "foresight" expected of the Commission in its management of the public trust.

Second, WWC contends that the Commission, when setting an IIFS, does not have to consider system losses. The Commission does not respond to the argument in its answering brief, but the water code indicates that a diverter's system losses may factor into the Commission's estimations of noninstream uses when it sets an IIFS. The statute articulating the IIFS standards mandates that the Commission "weigh the importance of the present or potential instream values with the importance of the present or potential uses of water for noninstream purposes, including the economic impact of restricting such uses[.]" HRS § 174C–71(2)(D). The plain meaning of the word "importance" requires the Commission to judge the value of a party's noninstream use against the other present or potential uses. The value of diverting water, only to lose the water due to avoidable or unreasonable circumstances is unlikely to outweigh the value of retaining the water for instream uses. Therefore, the Commission did not err in considering losses.

However, it appears that the Commission erred in its articulation of the burden of proof regarding losses. The Commission's FOF/COL D & O twice cites *Waiāhole I* and *Waiāhole II* for authority that "[o]ffstream users have the burden to prove that any system losses are reasonable-beneficial by establishing the lack of practicable mitigation measures, including repairs, maintenance, and lining of ditches and reservoirs." The Commission erred placing the burden of proof on the parties in the IIFS proceeding, as the authorities cited by the Commission apply in the context of a WUPA. In *Waiāhole I*, the cited discussion of losses considered Waiāhole Irrigation Company's ("WIC") request for 2.0 mgd to compensate for the losses of its ditch system. 94 Hawaiʻi at 118, 9 P.3d at 430. There, the Commission denied WIC's request, but suggested that WIC could draw "non-regulated" surface water to cover the losses; on appeal, this court concluded that the Commission's suggestion was erroneous for several reasons, and held that the Commission must consider the 2.0 mgd as a " 'use' pursuant to the permitting process." 94 Hawaiʻi at 118, 173, 9 P.3d at 430, 485. On remand, the Commission found that "[o]perational losses are a normal component of any water delivery system" and therefore issued a permit to WIC's successor in interest, Agribusiness Development Corporation ("ADC"), to cover the losses. *Waiāhole II*, 105 Hawaiʻi at 27, 93 P.3d at 669. When that decision returned to this court on further appeal, this court held that the Commission's decision was incomplete because it did not include findings that ADC met its burden as a permit holder pursuant to HRS § 174C–49(a)[23]. *Id.* This burden is

---

21. This includes 6–8 mgd for the Waiale Reservoir, 3–4 mgd for HC & S's water system, and 4 mgd for WWC's water system.

22. This includes 10 mgd for Waiheʻe Stream, 1.6 mgd for North Waiehu Stream, and 0.9 mgd for South Waiehu Stream, for a total of 12.5 mgd.

23. HRS § 174C–49(a) states that "[t]o obtain a permit pursuant to this part, *the applicant shall establish* that the proposed use of water:

(1) Can be accommodated with the available water source;

(2) Is a reasonable-beneficial use as defined in section 174C–3;

(3) Will not interfere with any existing legal use of water;

(4) Is consistent with the public interest;

(5) Is consistent with state and county general plans and land use designations;

(6) Is consistent with county land use plans and policies; and

(7) Will not interfere with the rights of the department of Hawaiian home lands as provided in section 221 of the Hawaiian Homes Commission Act.

HRS § 174C–49(a) (1993).

articulated in the WUPA statute, but is absent from the statutes governing IIFS. The Commission erred when it imposed a WUPA burden on the diverting parties in the IIFS CCH. As noted above, the burden in setting an IIFS is on the Commission to "protect instream values to the extent practicable." *Waiāhole II*, 105 Hawai'i at 11, 93 P.3d at 653; HRS § 174C–71(2)(A).

The court concludes that the Commission did not meet this burden when it "assum[ed]" that WWC's and HC & S's losses could be halved. As discussed above, the court has held that, due to the fact that the Commission must articulate an IIFS at an "early planning stage," the Commission "need only reasonably estimate instream and offstream demands." *Waiāhole I*, 94 Hawai'i at 155 n. 60, 9 P.3d at 467 n. 60. Though reasonable estimates are permitted at this stage, the Commission did not provide *any* analysis on how it reached that figure to show that it had "reasonably estimate[d]" that half of the losses could be eliminated. In choosing a number that appears to be arbitrary, the Commission could have significantly over- or underestimated the potential for mitigation of losses in HC & S's and WWC's water systems. On remand, the Commission must "reasonably estimate" losses, mindful of its duty to "protect instream values to the extent practicable."

### 5. *The Commission Erred In Its Consideration Of HC & S's Well No. 7.*

Hui/MTF argues that the Commission arbitrarily minimized Well No. 7's potential contributions. OHA raises a similar challenge regarding Well No. 7; it contends that the Commission did not properly weigh HC & S's potential use from the well. More specifically, OHA claims that HC & S did not demonstrate that Well No. 7 is not a practicable alternative, and that the Commission's lowering of Well No. 7's yield was arbitrary and capricious.

Well No. 7 is the only one of HC & S's sixteen brackish water wells on its plantation that is able to introduce water into HC & S's internal ditch system. From 1927 until the 1980s, Well No. 7 was HC & S's primary source of irrigation water for the 3,650–acre Waihe'e–Hopoi Fields; HC & S pumped an average of about 21 mgd from Well No. 7 until 1988, when a competing sugar company ceased operations, freeing up a great amount of Nā Wai 'Ehā water for HC & S use. For the past twenty-five years, HC & S has minimized use of Well No. 7, but it has occasionally used the well; in fact, it used the well heavily on two occasions: for six months from June through November of 1996, HC & S pumped an average of 25 mgd, and for six months from May through October 2000, HC & S pumped an average of 18.9 mgd.

Well No. 7 is currently configured with three pumps: pumps 7A and 7B are at water level and can each pump 17.5 mgd to ground level, for a total of 35 mgd, which it can distribute to about 800 acres of the 3,650 acres of the Waihe'e–Hopoi Fields. The third pump, Pump 7C, is a booster pump at ground level that HC & S claims can pump 14 mgd [24] from pump 7A to Waihe'e Ditch for distribution to all of the Waihe'e–Hopoi Fields except for the 175–acre Field 715.

During the hearings, HC & S offered four explanations for its argument that it would be impracticable to rely heavily on water pumped from Well No. 7. First, HC & S estimates that it would incur an estimated $1 million dollars in capital costs to install new pipelines and pumps. Second, HC & S claims that it does not have adequate electrical power to run the pumps on a consistent and sustained basis because of its power contract with Maui Electric Company ("MECO"). HC & S estimates it would incur costs of $777,650 to upgrade its pumps and electrical equipment to meet MECO's standards for servicing such equipment; HC & S also claims it would cost $7,440 per day for energy to run Well No. 7, and that HC & S would lose $1.8 million in revenues under its contract with MECO as well as a decrease in HC & S's avoided cost rate and penalties

---

**24.** The Commission's FOF indicate suspicion about the accuracy of this figure. FOF 497 states, "According to HC & S, as currently configured, Well No. 7 can supply only 14 mgd to the Waihe'e–Hopoi Fields, with the exception of Field 715. However, HC & S's records do not indicate that Well. No. 7 was ever configured differently than its current configuration."

three times the power rate for power it does not deliver. Third, HC & S claims that increased pumping would exacerbate the degree to which sustainable yield is already being exceeded and reduce the recharge from the imported surface water that sustains the Kahului aquifer. Fourth, HC & S claims that increased pumping of the well would increase the salinity of the water.

The Commission's Final D & O considered the first three factors listed above (the capital costs, energy costs, and aquifer recharge) and determined that HC & S must pump only 9.5 mgd from Well No. 7. The Commission determined that Well No. 7 is an alternative that most likely would not be available on a daily basis, citing the uncertainties about the recharge rate and electrical power. In determining that HC & S must pump 9.5 mgd, the Commission required that HC & S pay additional energy costs to pump the water, but did not require HC & S to accrue any capital costs. The D & O requires HC & S to provide monthly ground water use reports documenting the volume of water pumped from Well No. 7, along with ground water levels and salinity measurements.

In his dissent, Dr. Miike criticized the Commission majority for its treatment of Well No. 7, writing that the 9.5 mgd figure is "without any credible foundation." This is a main point of error on appeal for Hui/MTF and OHA; they argue that the Commission arbitrarily minimized Well No. 7's potential contributions as an alternative source to Nā Wai 'Ehā water.

The Commission's response is contradictory and makes it clear that guidance is necessary in this area. First, the Commission responds that "neither the statutes nor the administrative rules require an analysis of practicable alternatives in setting the IIFS." The Commission then asserts that Well No. 7 "had a place" in the IIFS analysis because it is a consideration when weighing instream values with offstream purposes when establishing the IIFS.

The analysis with regard to alternative sources is similar to the analysis with regard to system losses, *supra.* The water code requires the Commission to "weigh the importance of the present or potential instream

values with the importance of the present or potential uses of water for noninstream purposes, including the economic impact of restricting such uses[.]" HRS § 174C–71(2)(D). The plain meaning of the word "importance" requires the Commission to judge the value of a party's noninstream use against the other present or potential uses. Furthermore, as the water code's Declaration of Policy explains, "[t]he state water code shall be liberally interpreted to obtain maximum beneficial use of the waters of the State. . . ." HRS § 174C–2(c) (1993). Allowing a water user to divert water from the public trust res when that user has exclusive access to an alternative water source that is currently un- or under-used would not effect the Legislature's policy as expressed in the water code. This suggests that the Commission's second argument is correct; Well No. 7, as an alternative source, "has a place" in the analysis of setting an IIFS because the availability of alternative water sources necessarily diminishes the "importance" of diverting Nā Wai 'Ehā water for noninstream use.

 Hui/MTF, OHA, HC & S, and WWC do not dispute the relevance of Well No. 7 water to the IIFS analysis; they do, however, disagree on whether the diverting party bears a burden of proof with regard to this point of analysis. Hui/MTF argues that HC & S bears a burden to prove that using Well No. 7 is not practicable, and that the Commission is "duty bound" to hold HC & S to its burden. OHA agrees that the burden falls to HC & S to demonstrate that Well No. 7 is not a practicable alternative. HC & S and WWC both argue that the burden falls to the Commission to determine IIFS that best serve the public interest. The Commission's FOF/COL D & O does not specify a burden of proof for alternative sources, as it did for system losses. In its introduction, however, the Commission does specify a general standard that "[f]or those seeking private, commercial uses of water, there is a higher level of scrutiny. In practical terms, this means that the burden ultimately lies with those seeking or approving such uses to justify them in light of the purposes protected by the trust." More specific to alternative

sources, the Commission stated that it "is not obliged to ensure that any particular user enjoys a subsidy or guaranteed access to less expensive water sources when alternatives are available and public values are at stake," and also that "[a]n applicant's inability to afford an alternative source of water, standing alone, does not render that alternative impracticable."

In evaluating Well No. 7 and HC & S's four arguments listed above, the Commission found the following:

494. [ ... ] From 1927 until additional Nā Wai 'Ehā water became available in the 1980s, HC & S's primary source of irrigation water for its Waihe'e–Hopoi Fields was Well No. 7, [ ... ] a brackish water well.

495. Between 1927 and 1985, HC & S pumped an average of about 21 mgd from Well No. 7. Since the additional Nā Wai 'Ehā flows became available. HC & S has minimized its use of Well No. 7 but used it heavily on to occasions: e.g., for the six-month period from June through November of 1996, an average of 25 mgd was pumped; and for the six-month period from May through October of 2000, an average of 18.9 mgd was pumped.

[ ... ]

497. According to HC & S, as currently configured, Well No. 7 can supply only 14 mgd to the Waihe'e–Hopoi Fields, with the exception of Field 715. However, HC & S's records do not indicate that Well No. 7 was ever configured differently than its current configuration.

498. HC & S estimates that it would cost approximately $525,000 to add another booster pump and additional distribution pipeline to increase the volume that can be pumped from Well No. 7 to HC & S's Waihe'e Ditch from 14 mgd to 28 mgd; and the cost of an additional pipeline to reach Field 715 would be $475,000.

499. HC & S also claims that it does not have adequate electrical power to run the pumps for Well No. 7 on a consistent and sustained basis because of its power contract with Maui Electric Company ("MECO") and limitations of its capacity to generate electricity through its system of burning bagasse and other supplemental fuels in its power plant and the operation of its hydro power turbines on its ditch system which are supplied by East Maui water[.]

500. HC & S also claims that any increased pumping of water from the Kahului aquifer to replace surface water being imported from the West Maui Ditch System would both exacerbate the degree to which the sustainable yield is already being exceeded and reduce the recharge from imported surface water that sustains the aquifer.

These findings of fact are plainly descriptions of testimony. In its conclusions of law section examining "Reasonable Offstream Uses," the Commission restated several of these "findings," indicating that the Commission adopted the testimony as fact. The Commission then stated

The combined facts that the current sustainable yield of the aquifer is already being exceeded; that increased pumping from Well No. 7 may exacerbate that strain; and that the historically higher levels of pumping occurred during a period where furrow irrigation methods were affecting recharge rates for the aquifer, the practical alternative from Well No. 7 is lower than historic rates. Considering these uncertainties in combination with the Commission's decision to place the full burden of remedying losses immediately upon HC & S, discussed intra, the practical alternative from Well No. 7 is deemed 9.5 mgd. This alternative will not require capital costs, only the costs of pumping.

The Commission erred in adopting HC & S's testimony without any assessment of the evidence on the record that contradicted HC & S's arguments. As the court explained in *Waiāhole I*, where "the record demonstrates considerable conflict or uncertainty in the evidence, the agency must articulate its factual analysis with reasonable clarity, giving some reason for discounting the evidence rejected." 94 Hawai'i at 163–64, 9 P.3d at 475–76. The record shows that the Commission did not explain its analysis with "reasonable clarity" regarding any of the "facts" recited above.

For example, OHA shows that, with regard to HC & S's claim that pumping Well No. 7 would result in a diminished aquifer, HC & S had represented the exact opposite to the Commission in another context but around the same time as the hearings in this case. OHA's exhibit C–90 is a letter dated January 11, 2008 to the Commission from HC & S's Senior Vice President, Rick Volner, regarding the Public Review Draft Water Resource Protection Plan ("WRPP") for parts of West Maui, including the Kahului aquifer. In its letter, HC & S states that it has five wells in the Kahului aquifer and eleven wells in the Pa'ia aquifer. HC & S writes

> Over the last twenty years, the daily average rate of withdrawal, by year, for all 16 of these wells combined has ranged from approximately 40 mgd to as much as 112 mgd far in excess of the combined sustainable yield of between 7 and 8 mgd for the Kahului and Pa'ia aquifers recommended in the Draft WRPP. Several of these wells have been in operation for more than a hundred years, and all have been in place and operated for many decades without any long term deterioration in water quality.

Though these written comments contradict the evidence it presented regarding its inability to pump Well No. 7 due to the alleged recharge problem, the Commission does not explain why it disregarded the written comments in favor of HC & S's evidence supporting the existence of a recharge problem.

The Commission attempted to analyze the economic impact of requiring HC & S to augment Nā Wai 'Ehā water with water from Well No. 7. HC & S claimed that the economic consequences of reduced allowable diversion or increased requirements to pump Well No. 7 would result in HC & S discontinuing all operations on Maui. The Commission found that:

> HC & S had not "done any economic analysis on how a reduction of available surface water in this case would force HC & S to shut down"; Mr. Holiday[, President of HC & S's Agricultural Group,] "[could not] say yes or no" when asked whether shifting 9 mgd of Nā Wai 'Ehā surface water to

another purpose would prevent HC & S from being viable, but testified that HC & S is "assuming" that impact "for planning purposes."

As the Commission recited in its FOF/COL, Catherine Chan–Halbrendt, Professor in the Department of Natural Resources and Environmental Management at the University of Hawai'i, Mānoa, testified that "the lack of any economic analysis, or the data required to conduct such an analysis, prevents anyone, including this Commission, from evaluating HC & S's claims of economic impact." The Commission agreed that the record was insufficient, stating "It would have been more helpful to the Commission if either or both parties had provided information on incremental decreases in surface water to the 5,000 acres of HC & S's West Maui Fields." Nonetheless, the Commission stated that "the lack of such analyses does not prohibit the Commission from its duty of weighing instream values with non-instream uses."

The record shows, however, that the Commission did not merely weigh instream values with noninstream uses; rather, the Commission's own explanation of how it arrived at the 9.5 mgd requirement shows that cost to HC & S was the determinative factor. The Commission concluded first that there were uncertainties regarding the aquifer recharge, and that therefore "the practical alternative from Well No. 7 is lower than historic rates." That is, even though the Commission found that historical rates for Well No. 7 showed that "[b]etween 1927 and 1985, HC & S pumped an average of about 21 mgd from Well No. 7," the Commission decided that a lower number would be more appropriate. Then, in determining that lower number, the Commission explained:

> Considering these uncertainties [regarding aquifer recharge] *in combination with the Commission's decision to place the full burden of remedying losses immediately upon HC & S,* discussed intra, the practical alternative from Well No. 7 is deemed 9.5 mgd. *This alternative will not require capital costs, only the costs of pumping.*

(emphasis added). That is, since the Commission already required HC & S to pay to eliminate some of its system losses, it would

not require HC & S to incur any capital costs to improve Well No. 7.

The Commission erred when it made its decision regarding Well No. 7 based on cost while explicitly acknowledging that it did not have the data it needed to truly analyze cost. "[T]he Commission must not relegate itself to the role of a mere 'umpire passively calling balls and strikes for adversaries appearing before it,' but instead must take the initiative in considering, protecting, and advancing public rights in the resource at every stage of the planning and decisionmaking process." *Waiāhole I*, 94 Hawai'i at 143, 9 P.3d at 455 (citations). When such critical information is missing, the Commission must "take the initiative" to obtain the information it needs. Where the Commission's decisionmaking does not display "a level of openness, diligence, and foresight commensurate with the high priority these rights command under the laws of our state," the decision cannot stand. *Wai'ola*, 103 Hawai'i at 422, 83 P.3d at 685. On remand, the Commission must revisit its analysis of Well No. 7 as an alternative source to diverting Nā Wai 'Ehā water, as explained in this opinion.

6. *The Commission Erred In Its Consideration of Recycled Wastewater.*

■ Hui/MTF argues that the Commission erred in failing to consider the practicability of using recycled wastewater from the Wailuku/Kahului wastewater treatment plant. In its FOF/COL D & O, the Commission concluded that at least 5 mgd of recycled wastewater "is currently disposed of via underground injection." In response to Hui/MTF's urging that HC & S be required to utilize this water, the Commission found that "the County currently has no existing infrastructure to deliver recycled wastewater to HC & S's fields." The Commission also

heard testimony that "private parties could construct their own pipeline to the plant." The Commission appears to have concluded that this alternative did not merit consideration, based solely on the current lack of infrastructure. This decision does not evince "a level of openness, diligence, and foresight commensurate with the high priority these rights command under the laws of our state." *Wai'ola*, 103 Hawai'i at 422, 83 P.3d at 685. The recycled wastewater was quantified as "at least 5 mgd"; 5 mgd is nearly enough water to satisfy all kuleana users in Nā Wai 'Ehā and would be a significant contribution to HC & S's water needs. On remand, the Commission must evaluate this alternative with "openness, diligence, and foresight" to determine whether it is a viable alternative to diverting Nā Wai 'Ehā water.

## VI. CONCLUSION

As explained in Section V.A., *supra*, MDWS's cross-appeal is dismissed.

We recognize and appreciate the substantial time, energy, and diligence that the Commission, Dr. Miike, and the parties have invested in this case. However, for the reasons stated above, the Commission on Water Resource Management's June 10, 2010 Findings of Fact, Conclusions of Law, Decision and Order is hereby vacated and remanded to the Commission for further proceedings consistent with this opinion.

Concurring Opinion by ACOBA, J.

I concur in remanding this case to the Commission on Water Resource Management (the Commission), but write separately to address two issues. First, in connection with subject matter jurisdiction, I would hold that: (1) jurisdiction over the claims of Petitioners–Appellants[1] Hui O Nā Wai 'Ehā

---

1. Hui/MTF are separate organizations that filed joint briefs. In a Petition to the Commission to Amend Interim Instream Flow Standards dated June 25, 2004, the Community Groups described themselves in part as follows:

Hui O Nā Wai 'Ehā is a community-based organization established to promote the conservation and ˙ appropriate management of Hawaii's natural and cultural resources ... and related traditional and customary [n]ative Hawaiian practices, educational opportuni-

ties, and scientific activities. Hui supporters live, work, and play in the areas surrounding Nā Wai 'Ehā and rely on, routinely use, or hope to use Nā Wai 'Ehā and their nearshore marine waters for fishing, swimming, agriculture, aquaculture, research, photography, educational programs, aesthetic enjoyment, traditional and customary [n]ative Hawaiian practices, and other recreational, scientific, cultural, educational, and religious activities.

(Hui) and Maui Tomorrow Foundation, Inc. (MTF), and the Office of Hawaiian Affairs (OHA) (collectively, Petitioners) does not arise under *Ko'olau Agricultural Co. v. Commission on Water Resource Management*, 83 Hawai'i 484, 927 P.2d 1367 (1996), because Petitioners seek to vindicate rights as to the setting of an interim instream flow standard (IIFS) [2] but "[i]t is only at the permitting stage that property interests of applicants are potentially affected," and a due process hearing is mandated, *id.* at 496, 927 P.2d 1367; (2) jurisdiction over the claims of Petitioners who are native Hawaiians arises independently under the State Water Code, Hawai'i Revised Statutes (HRS) chapter 174C, and also under article XII, section 7 of the Hawai'i Constitution [3] in light of specific provisions therein protecting native Hawaiian rights; (3) jurisdiction could have been invoked under *Pele Defense Fund v. Puna Geothermal Venture*, 77 Hawai'i 64, 881 P.2d 1210 (1994), had Petitioners claimed under HRS chapter 174C and article XI, section 1 of the Hawai'i Constitution [4] that their constitutional rights were adversely affected by the permit applications (WUPAs) of Hawaiian

Commercial and Sugar Company (HC & S), Wailuku Water Company (WWC), and the Maui Department of Water Supply (MDWS) in the combined contested case hearing [5] held by the Commission; and (4)(a) jurisdiction arises under the public trust doctrine embodied in Article XI, sections 1 and 7 of the Hawai'i Constitution as implemented through provisions of HRS chapter 174C affording judicial review under HRS chapter 91; however, (b) standing to sue to enforce the public trust doctrine is uncertain under the reference to *"individual* instream and offstream rights, duties, and privileges" in *In re Water Use Permit Applications*, 94 Hawai'i 97, 9 P.3d 409 (2000) (*Waiāhole I* ) (emphasis added); (c) but absent consideration of the effect the IIFS may have on protected instream uses, the Commission's setting of the IIFS may violate the principles of preserving the right to water for "the common good," *McBryde Sugar Co. v. Robinson*, 54 Haw. 174, 186, 504 P.2d 1330, 1342 (1973), and of preventing "private water rights" from injuriously affecting [ ] the rights of others," *Robinson v. Ariyoshi*, 65 Haw. 641, 649, n. 8, 658 P.2d 287, 295 n. 8 (1982); (d) consistent

[MTF], a community based-organization[,] is dedicated to protecting Maui's precious natural areas and prime open space for recreational use and aesthetic value, promoting the concept of ecologically sound development, and preserving the opportunity for rural lifestyles[.] [MTF] ... conduct[s] community forums and workshops, provide[s] input and testimony, ... and carr[ies] out litigation as necessary[.][MTF]'s supporters rely on, routinely use, or hope to use Nā Wai 'Ehā and their nearshore marine waters for fishing, swimming, agriculture, aquaculture, research, photography, educational programs, aesthetic enjoyment, traditional and customary [n]ative Hawaiian practices, and other recreational, scientific, cultural, educational and religious activities.

2. The State Water Code defines an "instream flow standard" as "a quantity or flow of water or depth of water which is required to be present at a specific location in a stream system at certain specified times of the year to protect fishery, wildlife, recreational, aesthetic, scenic, and other beneficial instream uses." HRS § 174C-3. An "[i]nterim instream flow standard" means "a temporary instream flow standard of immediate applicability, adopted by the commission without the necessity of a public hearing, and terminating upon the establishment of an instream flow standard." *Id. See In re Water Use Permit Appli-*

*cations*, 94 Hawai'i 97, 148 n. 48, 9 P.3d 409, 460 n. 48 (2000) (*Waiāhole I* ).

3. Article XII, section 7 of the Hawai'i Constitution states:

The State reaffirms and shall protect all rights, customarily and traditionally exercised for subsistence, cultural and religious purposes and possessed by ahupua'a tenants who are descendants of native Hawaiians who inhabited the Hawaiian Islands prior to 1778, subject to the right of the State to regulate those rights.

4. Article XI, section 1 of the Hawai'i Constitution states:

For the benefit of present and future generations, the State and its political subdivisions shall conserve and protect Hawaii's natural beauty and all natural resources, including land, water, air, minerals and energy sources, and shall promote the development and utilization of these resources in a manner consistent with their conservation and in furtherance of the self-sufficiency of the State. All public natural resources are held in trust by the State for the benefit of the People.

5. A " 'contested case' is a proceeding in which the legal rights, duties, or privileges of specific parties are required by law to be determined after an opportunity for an agency hearing." HRS § 91-1(5).

with such principles, a public trust claim raised by members of the public who are affected by potential harm to the public trust should be cognizable; (e) Petitioners, as members of the public who are affected by the setting of an IIFS, were entitled to a contested case hearing in order to protect the public trust.

Second, with respect to the Commission's decision, I would hold that (1) the Commission failed to adhere to the balancing formula set out in *Waiāhole I* because it did not actually apply a "presumption in favor of public use, access, and enjoyment[,]" 94 Hawai'i at 142, 9 P.3d at 454; (2) the Commission failed to hold HC & S's proposed private commercial use to a "higher level of scrutiny[,]" *id.*; (3) the Commission "compromise[d] public rights in the resource . . . [without] a level of openness, diligence, and foresight commensurate with the high priority these rights command under the laws of our state[,]" *id.* at 143, 9 P.3d at 455, when it failed to justify its decision not to restore any water to 'Iao and Waikapū Streams, even though all parties agreed that some water should be restored to 'Iao, and all parties except HC & S agreed that some water should be restored to Waikapū; and (4) the Commission failed to address the effect of the amended IIFS on native Hawaiian practices and to protect the rights of those additional kuleana users who did not testify at the contested case hearing but who nevertheless are afforded protection under HRS § 174C–101 and article XI, section 7 of the Hawai'i Constitution.

## I.

This case involves appellate review of the June 10, 2010 Findings of Fact (findings), Conclusions of Law (conclusions), and Decision and Order (D & O) of the Commission resulting from its December 2, 2007 to March 4, 2008 combined contested case hearing. In its D & O, the Commission considered WUPAs for ground water use [6] and IIFS for the Nā Wai 'Ehā ("the four great waters of Maui") comprised of the Waihe'e River and the Waiehu, 'Iao, and Waikapū streams. The Commission's D & O amended the IIFS for the Waihe'e River and the Waiehu stream, but retained the existing IIFS for the 'Iao and Waikapū streams as measured before off-stream diversions.[7]

## II.

Before reaching the issues raised by the parties, this court must first resolve whether it has subject matter jurisdiction. *Kernan v. Tanaka*, 75 Haw. 1, 15, 856 P.2d 1207, 1215 (1993) ("Appellate courts have an obligation to insure they have jurisdiction to hear and determine each case"). Jurisdiction is, *inter alia*, "to have power over the subject matter given by the laws of the sovereignty in which the tribunal exists." *The King v. Lee Fook*, 7 Haw. 249 (1888).[8] *See Puna Geothermal*, 77 Hawai'i at 67, 881 P.2d at 1213 ("subject matter jurisdiction is concerned with whether the court has the power to hear a case"); *see also Alaka'i Na Keiki, Inc. v. Matayoshi*, 127 Hawai'i 233, 277 P.3d 327 (2012) (stating that "the courts have subject matter jurisdiction over 'civil actions and proceedings,' and it is presumed that the courts have jurisdiction, unless the legislature 'expressly' provides otherwise by statute" (citing *Sherman v. Sawyer*, 63 Haw. 55, 58, 621 P.2d 346, 349 (1980))). The existence of subject matter jurisdiction is a question of law that is reviewable *de novo* under the right/wrong standard. *Kaniakapupu v. Land Use Comm'n*, 111 Hawai'i 124, 131, 139 P.3d 712, 719

---

6. HRS § 174C–3 defines "ground water" as "any water found beneath the surface of earth, whether in perched supply, dike-confined, flowing, or percolating in underground channels or streams, under artesian pressure or not, or otherwise."

7. It should be noted that despite the temporality suggested in the term "interim," the IIFS in this case has not been modified into a permanent IFS in almost twenty-five years, since 1988. Thus, under the circumstances, the IIFS practicably operates as a permanent instream flow standard.

8. On the other hand, standing is "whether the plaintiff has alleged such a personal stake in the outcome of the controversy as to warrant his or her invocation of the court's remedial powers on his or her behalf." *Hanabusa v. Lingle*, 119 Hawai'i 341, 347, 198 P.3d 604, 610 (2008) (citing *In re Application of Matson Navigation Co. v. Fed. Deposit Ins. Corp.*, 81 Hawai'i 270, 275, 916 P.2d 680, 685 (1996)).

(2006). "If a court lacks jurisdiction over the subject matter of a proceeding, any judgment rendered in that proceeding is invalid. Therefore, such a question is valid at any stage of the case." *Id.* at 132, 139 P.3d at 720.

### III.

Petitioners contend that the Commission's IIFS determination is subject to appellate review because of the "rights, duties, and privileges at stake." *Waiāhole I*, 94 Hawai'i at 119 n. 15, 9 P.3d at 431 n. 15. They rely largely on *Waiāhole I* to establish that the court has jurisdiction over appeals of IIFS determinations. In so doing, Hui/MTF maintain that "water use involves rights and interests distinct from the 'property' interests in land." (Quoting *Robinson*, 65 Haw. at 667 658 P.2d at 305–06 ("[A] simple private ownership model of property is conceptually incompatible with the actualities of natural water courses.")). Regarding the meaning of due process in relation to water resources, Hui/MTF assert that "[p]rotectable due process interests … stem from an independent source … that secure certain benefits and that support claims of entitlement to those benefits." (Citing *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); *Puna Geothermal*, 77 Hawai'i at 68, 881 P.2d at 1214).

Hui/MTF assert claims of entitlement to Nā Wai 'Ehā stream water flows, including native Hawaiian traditional and customary rights, appurtenant rights, and public trust rights. Therefore, because "due process requires a hearing to resolve … conflicting claims for Nā Wai 'Ehā water" and because the parties "sought to have the legal rights, duties, or privileges [in water] in which [they] held an interest declared over the objections of other landowners and residents" a hearing was required. (Quoting

*Puna Geothermal,* 77 Hawai'i at 68, 881 P.2d at 1214).

OHA supports Hui/MTF's claim that "[n]ative Hawaiian traditional and customary rights and kuleana rights, among others," were impaired by diversion of Nā Wai 'Ehā waters by WWC and HC & S and asserts that "[c]onstitutional due process mandates a hearing whenever the claimant seeks to protect a 'property interest,' which does not mean a vested property right, but rather is a 'benefit to which the claimant is legally entitled.'" (Citing *Puna Geothermal* 77 Hawai'i at 68, 881 P.2d at 1214). According to OHA, inasmuch as "the contested case hearing on the IIFS petition was required by constitutional due process because of the individual rights, duties, and privileges at stake, and because the contested case hearing was required by law, this court has appellate jurisdiction to review the majority's decision pursuant to HRS § 91–14."

On the other hand, the Commission, WWC, and HC & S (collectively, Respondents) argue that the IIFS determination is not subject to appellate review because it has no impact on property rights, and an IIFS is an agency determination that does not afford Hui/MTF and OHA a right of appeal. The Commission focuses on the first four requirements needed to appeal a contested case hearing under HRS § 91–14 as laid out in *Public Access Shoreline Hawai'i v. Hawai'i Cnty. Planning Commission,* 79 Hawai'i 425, 903 P.2d 1246 (1995) ("*PASH*").[9] According to the Commission, there is no statutory requirement to hold a contested case hearing. Additionally, there was no constitutional due process requirement to hold a hearing. Citing *Puna Geothermal,* the Commission agreed that if the issuance of a permit affects a person's property rights, and the person has standing, then there is a right to a contested case hearing.[10] However, the

---

**9.** The four requirements from *PASH* that the Commission sets out in its brief are: (1) that the unfavorable agency action is a contested case hearing that was required by law and determined the 'rights, duties, and privileges' of specific parties; (2) the action represents a final decision and order or a preliminary ruling such that deferral of review would deprive claimant of ade-

quate relief; (3) the claimant followed the applicable agency rules and, therefore, was involved in the contested case; and (4) the claimant's legal interests were injured such that the claimant has standing to appeal the agency decision. *PASH*, 79 Hawai'i at 431, 903 P.2d at 1252.

**10.** In *Puna Geothermal*, this court determined that when the issuance of a permit implicates

Commission asserts that, in this case, the ground water permits "should not be used to piggyback jurisdiction when they are not before this court."

The Commission further argues that specific rights, duties, or privileges were not determined because "the purpose of the IIFS [under HRS § 174C–71(2) ] was to 'protect the public interest pending the establishment of a permanent instream flow standard.'" In amending the IIFS, the Commission states that it "did not determine how much water Hui/MTF and OHA, the County, kuleana users, or any other person was entitled to take from the streams." Instead, it set the IIFS at a particular location and at a specific rate for each waterway. Thus, the Commission argues that this appeal should be dismissed for lack of jurisdiction.

HC & S and WWC also recite that the hearing was not required by law, and that no rights, duties, or privileges were at stake. HC & S asserts that Hui/MTF do not have a sufficiently vested property interest in the IIFS determination. According to HC & S, aside from cultivating taro, native Hawaiian practices are not considered "property interests" under the Hawai'i Constitution, and Hui/MTF are attempting to expand practices currently within the purview of the due process clause beyond existing precedent.

WWC additionally maintains that Hui/MTF have no private cause of action under the state constitution to enforce environmental laws such as the protection or enhancement of natural resources. Like the Commission, WWC also references *Puna Geothermal* and asserts that no property rights are involved because no permits are at issue. Additionally, WWC analogizes the setting of an IIFS to the designation of a water management area (WMA) in *Ko'olau,*

where a contested case hearing was not required.[11]

Elaborating on footnote 15 of *Waiāhole I,* 94 Hawai'i at 119 n. 15, 9 P.3d at 431 n. 15, the majority states that this court has jurisdiction based on constitutional due process because the IIFS, independent of any WUPA, affects property interests of Hui/MTF's members. (Majority at 240, 287 P.3d at 141.) The majority also holds that traditional and customary native Hawaiian rights constitute a "property interest" for purposes of due process hearing analysis. (Majority at 241–42, 287 P.3d at 142–43.) According to the majority, setting an IIFS requires a hearing because it involves the same analysis in *Ko'olau* for WUPAs which require hearings. (Majority at 242–44, 287 P.3d at 143–45.) The majority concludes that "an erroneous IIFS ... is simply too important to deprive parties of due process and judicial review." (Majority at 244, 287 P.3d at 145.) Arguably, several grounds may support this court's jurisdiction.

## IV.

### A.

In determining whether a party's claim of deprivation of property without due process is entitled to a hearing, this court must first resolve whether the party's asserted interest is "'property' within the meaning of the due process clause of the federal and state constitutions." *Sandy Beach Def. Fund v. City and Cnty. of Honolulu,* 70 Haw. 361, 376, 773 P.2d 250, 260 (1960).[12] Under the Hawai'i Constitution, procedural due process rights are violated when "(1) a particular interest which a claimant seeks to protect is 'property' within the meaning of the due process clauses of the federal or state constitutions, and (2) those property interest[s] are not adequately protected by specific procedures." *Troyer v. Adams,* 102 Hawai'i 399, 435, 77

---

constitutional rights of other interested parties who have followed the agency's rules governing participation in contested cases and thereby have standing, then such interested parties have a right to a contested case hearing. A jurisdictional analysis under *Puna Geothermal* follows in section VI, *infra.*

11. The application of *Ko'olau* to this case is further discussed in section IV, *infra.*

12. The Hawai'i Constitution states, "[n]o person shall be deprived of life, liberty or property without due process of law...." Haw. Const. art. I, § 5. The United States Constitution states, "[n]o person shall be ... deprived of life, liberty, or property, without due process of law...." U.S. Const. amend. 5.

P.3d 83, 120 (2003) (Acoba, J., dissenting) (citing *Sandy Beach,* 70 Haw. at 376, 773 P.2d at 260). Additionally,

> Once it is determined that a valid property interest is at stake, it must be determined whether proper procedural due process was afforded the claimant. The basic elements of procedural due process require notice and an opportunity to be heard at a meaningful time and in a meaningful manner before governmental deprivation of property interest.

*Id.* Hence, "[c]onstitutional due process protections mandate a hearing whenever the claimant seeks to protect a 'property interest,' in other words, a benefit to which the claimant is legitimately entitled." *Puna Geothermal,* 77 Hawai'i at 66, 881 P.2d at 1212.

Under the federal constitution, "[t]he Fourteenth Amendment's procedural [due process] protection of property is a safeguard of the security of interests that a person has already acquired in specific benefits. These interests-property interests-may take many forms." *In re Int'l Brotherhood of Painters and Allied Trades v. Befitel,* 104 Hawai'i 275, 283, 88 P.3d 647, 655 (2004) (citing *Bd. of Regents of State Colls. v. Roth,* 408 U.S. 564, 576, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972)). Thus, as recounted by Hui/MTF, "[p]roperty interests . . . are not created by the Constitution. Rather they are created and their dimensions defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits."

However, the "range of property interests protected by due process is not infinite." *Id.* "To have a property interest in a benefit, a person must clearly have more than an ab-stract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Sandy Beach,* 70 Haw. at 377, 773 P.2d at 260. "A person's interest in a benefit constitutes a 'legitimate claim of entitlement' if it is supported by contractual or statutory language that might be invoked in a hearing." *Alejado v. City and Cnty. of Honolulu,* 89 Hawai'i 221, 227, 971 P.2d 310, 316 (1998).

In *Ko'olau,* this court held that "[i]t is *only at the permitting stage that property interests of applicants are potentially affected,* and, thus, the contested case hearing procedures of HRS chapter 91 [pertaining to administrative agencies] are required to satisfy due process." 83 Hawai'i at 496, 927 P.2d at 1379 (emphasis added). There, Ko'olau Ag requested judicial review of the Commission's designation of several Oahu aquifers as water management areas. *Id.* at 486, 927 P.2d at 1370. A water management area means a geographic area that has been designated pursuant to HRS § 174C-41 [13] as requiring management of the ground or surface water resource or both. HRS § 174C-3.

In *Ko'olau,* the Sierra Club Legal Defense Fund submitted a petition pursuant to HRS § 174C-41(b) to the Commission to designate five Windward Oahu aquifers [14] as WMAs under the State Water Code. [15] *Ko'olau,* 83 Hawai'i at 487, 927 P.2d at 1370. The Commission voted to designate all five aquifer systems as WMAs. *Id.* Ko'olau Ag challenged the Commission's decision, alleging, *inter alia,* that the Commission violated its due process rights because it failed to conduct the designation process in accordance with HRS chapter 91 governing contested cases. [16]

---

**13.** HRS § 174C–41 states in relevant part that "[w]hen it can be reasonably determined, after conducting scientific investigations and research, that the water resources in an area may be threatened by existing or proposed withdrawals or diversions of water, the commission shall designate the area for the purpose of establishing administrative control over the withdrawals and diversions of ground and surface waters in the area to ensure reasonable-beneficial use of the water resources in the public interest."

**14.** An aquifer is a "water-bearing stratum of permeable rock, sand, or gravel." *Merriam–Webster Dictionary* 58 (10th ed.1993).

**15.** HRS § 174C–41(b) states in relevant part that "[t]he designation of a water management area by the commission may be initiated by the chairperson or by written petition."

**16.** The majority uses *Ko'olau* to suggest that the factors for establishing a WUPA in *Ko'olau* "counsel in favor of judicial review in this case."

*Id.* This court held that Ko'olau Ag did not have a property interest in whether or not the aquifers received the WMA designation, and therefore it was not entitled to a contested case hearing under chapter 91. *Id.*

*Ko'olau* held WUPA decisions do require contested case hearings, while WMA designations do not require hearings:

> The difference between procedures governing WMA designations, on the one hand, and permit applications, on the other, is eminently logical given the difference between the issues presented for decision. *At the permitting stage, the Commission is required to determine the respective rights of water users; because recognized property interests could be affected, applicants' due process rights are implicated and contested case hearings pursuant to HRS chapter 91 are required ... Designation of a WMA, unlike water use permitting neither affects any property interest of existing or potential water users nor requires the determination of any individualized facts.* Designation requires a determination, "after conducting scientific investigations and research, that the water resources in an area may be threatened by existing or proposed withdrawals or diversions of water[.]" HRS § 174C–41(a) ... *It is only at the permitting stage that property interests of applicants are potentially affected, and, thus, the contested*

(Majority at 243, 287 P.3d at 144.) The *Ko'olau* court held that, in deciding a WUPA, the Commission must consider several factors, including whether the water is a "reasonable-beneficial use as defined in [the State Water Code]"; whether the use is "consistent with the public interest"; and whether it is consistent with governmental land use plans. *Ko'olau* 83 Hawai'i at 492, 927 P.2d at 1375. The majority likens the analysis for a WUPA to the IIFS in this case, stating, "[u]nlike establishing a WMA, the analysis supporting the determination of an IIFS requires more than a yes/no decision." (Majority at 243, 287 P.3d at 144.) According to the majority, "the ramifications of an erroneous IIFS could offend the public trust, and is simply too important to deprive parties of due process and judicial review." (Majority at 244, 287 P.3d at 145.) However, an IIFS determination is more akin to a WMA designation than a WUPA decision because, as with a WMA designation, the legislature did not intend for an IIFS to be the subject of a contested case hearing under chapter 91. This is further discussed in section B, *infra.*

*case hearing procedures of HRS chapter 91 are required to satisfy due process. Id.* at 496, 927 P.2d at 1367 (emphases added). Although WUPAs were not at issue in that case, the *Ko'olau* court made the distinction between WUPAs and WMAs because WUPAs were the next step in the process. This court explained that "[o]nce an area is designated as a WMA, '[n]o person shall make any withdrawal, diversion, impoundment, or consumptive use of water ... without first obtaining a permit from the Commission." *Id.* at 492, 927 P.2d at 1375 (quoting HRS § 174C–48). Permit applications, and not WMAs, triggered the contested case hearing provisions of HRS chapter 91 because "the Commission is required to determine the respective rights of water users [and] ... recognized property interests could be affected." Therefore "applicants' due process rights are implicated and contested case hearings pursuant to HRS chapter 91 are required." *Id.* Correlatively, then, contested case hearings were not required for WMA designations under *Ko'olau.*

### B.

*Ko'olau* determined that the legislature did not intend that a WMA designation proceeding be conducted as a chapter 91 contested case hearing because "the statutory designation procedure [for a WMA] conflicts with the contested case hearing procedures outlined in chapter 91." *Ko'olau,* 83 Hawai'i at 495–96, 927 P.2d at 1378–79.[17] Similarly

17. The statutory designation procedure is described in HRS § 174C–41. The following section, HRS § 174C–42, indicates that notice and a public hearing are required, and states that "[w]hen a recommendation for designation of a water management area has been accepted, the commission shall hold a public hearing at a location in the vicinity of the area proposed for designation and give public notice of he hearing [.]" While a public hearing is required in a WMA, *Ko'olau* established that this is not the equivalent of a contested case hearing. *Ko'olau* stated:

> *As we interpret the Code, the legislature did not intend that a WMA designation proceeding be conducted as a Chapter 91 contested case hearing.* The legislature, instead, designated a statutory process that is specific to the designation of WMAs and mandated that "chapter 91 shall apply except where it conflicts with this chapter."

*Ko'olau,* 83 Hawai'i at 495–496, 927 P.2d at 1378–79 (emphasis added). Therefore, under

here, it does not appear that the legislature intended that setting an IIFS be conducted as a chapter 91 contested case hearing. The State Water Code in HRS chapter 174C defines an interim instream flow standard as "a temporary instream flow standard of immediate applicability, *adopted by the commission without the necessity of a public hearing,* and terminating upon the establishment of an instream flow standard." HRS § 174C-3 (emphasis added).

Analogous to a WMA designation, the statutory definition of an IIFS indicates that the legislature did not require a hearing in the setting of an IIFS. Under *Ko'olau* then, Petitioners in this case would be required to claim a permit granting specific rights to water in order to invoke a contested case hearing under HRS chapter 91. Petitioners do not make such a claim. Therefore applying *Ko'olau,* they do not have a sufficient property interest for purposes of a due process claim, and are not entitled to a hearing under HRS chapter 91 on that ground. Like Sierra Club Legal Defense Fund, Hui/MTF and OHA are not applying for permits in the instant case. Accordingly, *Ko'olau* would countenance that Petitioners' property interests are not affected.

Although we have recognized that "[d]ue process is flexible and calls for such procedural protections as the particular situation demands," *Ko'olau,* 83 Hawai'i at 496, 927 P.2d at 1379 (citation omitted), both HRS § 174C(3) (indicating that the definition of an IIFS does not require a public hearing) and

*Ko'olau* instruct that a contested case hearing does not apply in setting an IIFS. *Ko'olau* is clear that it is "only at the permitting stage that property interests are potentially affected." *Ko'olau,* 83 Hawai'i at 496, 927 P.2d at 1379. Pursuant to *Ko'olau,* as with a WMA designation, establishing an IIFS does not constitute a sufficient property interest for purposes of traditional due process analysis, and does not trigger the requirement of a contested case hearing under HRS chapter 91.

## V.

However, both HRS chapter 174 and article XI, section 7 of the Hawai'i Constitution constitute independent bases for this court's jurisdiction over native Hawaiian claims. In its D & O, the Commission found that "[c]ultural experts and community witnesses provided uncontroverted testimony regarding limitations on native Hawaiians' ability to exercise traditional and customary rights and practices due to lack of freshwater flowing from streams." [18] Approximately fifty witnesses came forward with proof of their appurtenant water rights, native Hawaiian traditional and customary rights, and/or riparian rights to Nā Wai 'Ehā waters for, among other things, the cultivation of taro and other crops. Among them were OHA beneficiaries [19] with unchallenged evidence that their kuleana parcels on 'Īao and Waikapū streams were planted in taro at the time of the Mahele.[20] *Id.*

---

*Ko'olau,* the HRS § 174C-41 statutory procedure must be followed when designating a WMA.

**18.** The majority refers to specific individuals who cultivate taro and otherwise use the land and water surrounding Nā Wai 'Ehā for native Hawaiian traditional and customary uses.

**19.** Although no specific definition of "OHA beneficiary" exists, OHA serves "all Hawaiians regardless of blood quantum." Office of Hawaiian Affairs, http://www.oha.org/about/early-days-oha-oha-beginning (last visited July 5, 2012). The 1978 Constitutional Convention incorporated the establishment of OHA as a public trust into the state constitution with the mandate to better the conditions of both native Hawaiians and the Hawaiian community in general. OHA is funded with a pro rata share of revenues from state lands designated as "ceded." Office of Hawaiian

Affairs, http://www.oha.org/about/history (last visited July 5, 2012).

**20.** The Great Mahele of 1848 divided the lands between the chiefs and the King. *Kalipi v. Hawaiian Trust Co.,* 66 Haw. 1, 7, 656 P.2d 745, 749 (1982). "Two years later, ... commoners were permitted to obtain fee simple title to the lands which they had cultivated[,]" under HRS § 7–1. *Kalipi,* 66 Haw. at 7, 656 P.2d at 749. HRS § 7–1 (2009 Repl.) states:

Where the landlords have obtained, or may hereafter obtain, allodial titles to their lands, the people on each of their lands shall not be deprived of the right to take firewood, house-timber, aho cord, thatch, or ki leaf, from the land on which they live, for their own private use, but they shall not have a right to take such article to sell for profit. *The people shall also have a right to drinking water, and running*

### A.

Independent of a due process entitlement claim, HRS chapter 174C statutorily protects kuleana [21] users' appurtenant rights to water. HRS § 174C–101(c) provides that "traditional and customary rights of ahapua'a tenants who are descendants of native Hawaiians ... shall not be abridged or denied by this chapter. Such ... rights shall include, but not be limited to, the cultivation or propagation of taro on one's own kuleana...." Additionally, HRS § 174C–101(d) states that "[t]he appurtenant water rights of kuleana and taro lands, along with those traditional and customary rights assured in this section, shall not be diminished or extinguished by a failure to apply for or to receive a permit under this chapter." Further, HRS § 174C–63 states that "[a]ppurtenant rights are preserved. Nothing in this part shall be construed to deny the exercise of an appurtenant right by the holder thereof *at any time*." HRS § 174C–63 (emphasis added). Thus, by virtue of HRS § 174C–101, appurtenant water rights to kuleana users are legally protected. The right to grow taro, then, shall not be abridged or denied. Appurtenant rights for such purposes may not be diminished or extinguished by the failure to obtain a permit. Such appurtenant rights may be exercised at any time. HRS § 174C–63.

The broad reference to "any time" denotes that any Commission decision setting an IIFS would be subject to the provisions of HRS § 174C–63 and HRS §§ 174C–101(c)–(d).[22] It follows that kuleana owners may, at any time, assert that these rights have been infringed. Hui/MTF (to the extent its members qualify as native Hawaiians) and OHA thus have a legitimate right under HRS § 174C to bring a claim that kuleana and appurtenant water rights protected by HRS § 174C–63 and HRS §§ 174C–101(c)-(d) have been abridged by a decision of the Commission.

HRS § 174C–12 further instructs that "[j]udicial review of rules and orders of the commission under this chapter shall be governed by chapter 91." Under chapter 91, "[a]ny person aggrieved by a final decision and order in a contested case ... is entitled to judicial review thereof under this chapter." HRS § 91–14(a).[23] HRS § 91–14(g)(1) specifically provides for judicial review of an agency decision if it is, *inter alia,* "[i]n violation of constitutional or statutory provisions." Because Hui/MTF and OHA claim the Commission's decision violates HRS § 174C–63 and HRS §§ 174C–101(c)–(d), they are entitled to judicial review under HRS § 91–14(a).[24] Consequently, jurisdiction over the

---

*water, and the right of way.* The springs of water, running water, and roads shall be free to all, on all lands granted in fee simple; provided that this shall not be applicable to wells and watercourses, which individuals have made for their own use. (Emphasis added.)

**21.** "Kuleana" is a term used by the parties to describe the property of users who were not charged for water delivery; whether they have riparian or appurtenant rights was not determined at the hearing. OHA asserts that "kuleana rights are property rights, akin to appurtenant rights" and that "kuleana rights are exercised by individual right holders, compared to other public trust rights which are available to the larger community." OHA also maintains that "appurtenant rights are a kind of customary right based on water use since 'time immemorial' which attaches to land that was receiving water during the Mahele in the mid–1800s." (Citing *Peck v. Bailey,* 8 Haw. 658, 661 (1867)).

**22.** HRS § 174C–71(2)(D) confirms this, directing the Commission, when setting the IIFS, to weigh "present or potential instream values." Among

the instream uses defined in the Water Code is "[t]he protection of traditional and customary Hawaiian rights." HRS § 174C–3(9).

**23.** HRS § 91–14(a) states, "[a]ny person aggrieved by a final decision and order in a contested case or by a preliminary ruling of the nature that deferral of review pending entry of a subsequent final decision would deprive appellant of adequate relief is entitled to judicial review thereof under this chapter."

**24.** HRS § 91–14(g), which establishes judicial review of agency rules and orders, states:

Upon review of the record, the court may affirm the decision of the agency or remand the case with instructions for further proceedings; or it may reverse or modify the decision and order if the substantial rights of the petitioners may have been prejudiced because the administrative findings, conclusions, decisions, or orders are:
(1) *In violation of constitutional or statutory provisions;*
(2) In excess of the statutory authority or jurisdiction of the agency; or

Commission's decision with respect to rights asserted under HRS § 174C–101(c)–(d) is available pursuant to HRS § 91–14.

Moreover, as noted, HRS § 174C–101(d) specifically protects the water rights of kuleana owners, regardless of a "failure to apply for or to receive a permit." This creates a statutory exception to the *Ko'olau* requirement that a contested case hearing is available only "at the permitting stage [where] property interests are affected." *Ko'olau*, 83 Hawai'i at 496, 927 P.2d at 1379. Accordingly, Petitioners, as kuleana water users, do not need to obtain a permit in order to obtain judicial review under HRS chapter 91 because their rights "shall not be diminished or extinguished by a failure to apply for or to receive a permit" under HRS § 174C–101(d). By virtue of statute alone, Petitioners who are native Hawaiian are entitled to a contested case hearing under HRS § 91–14, without the need to establish a due process property claim.

B.

Independent of HRS chapter 174C, article XII, section 7 of the Hawai'i Constitution provides specific protection for native Hawaiian traditional and customary rights. It states that "[t]he State reaffirms and *shall protect all rights, customarily and traditionally exercised for subsistence, cultural and religious purposes* and possessed by ahupua'a tenants who are descendants of native Hawaiians who inhabited the Hawaiian Islands prior to 1778, subject to the right of the State to regulate such rights." Haw. Const. art. XII § 7 (emphasis added). These "[t]raditional and customary rights *shall include*, but are not limited to, *the cultivation or propagation of taro on one's own kuleana* and the gathering of hihiwai, opae, o'opu, limo, thatch, ti leaf, aho cord, and medicinal plants for subsistence, cultural, and religious purposes." HRS § 174C–101(c) (emphases added).

In the past, we have exercised jurisdiction over claims brought by native Hawaiians asserting that their constitutionally protected rights have been infringed. In *Kalipi v. Hawaiian Trust Co.*, 66 Haw. 1, 656 P.2d 745 (1982), the plaintiff, who was a native Hawaiian, brought suit claiming the right to enter upon the defendants' undeveloped lands to gather natural products necessary for certain traditional native Hawaiian practices. *Id.* at 3–4, 656 P.2d at 747. This court considered the plaintiff's claim on the merits, implicitly assuming that the plaintiff would have a right to sue to enforce his native Hawaiian rights, and thus that this court would have jurisdiction over that claim. In doing so, this "court's obligation to preserve and enforce such traditional rights [as] . . . a part of our Hawai'i State Constitution," article XII, section 7 was affirmed. *Kalipi*, 66 Haw. at 4–5, 656 P.2d at 748. While *Kalipi* relied in part on HRS § 7–1 pertaining to gathering rights, it recognized that "the balance" between "traditional rights" and the "modern system of land tenure" was "struck, consistent with . . . [the] constitutional mandate" and the statute. 66 Haw. at 4–8, 656 P.2d at 748–49.

Here, likewise, where native Hawaiian Petitioners claim that their native Hawaiian rights are adversely affected by the Commission's decision to restore a limited amount of water to the Waihe'e River and North and South Waiheu Streams, and no water to the 'Iao and Waikapū Streams, they may sue to enforce their rights under article XII, section 7 of the Hawai'i Constitution. *Cf. Kaleikini v. Thielen*, 124 Hawai'i 1, 31, 237 P.3d 1067, 1097 (2010) (Acoba, J., concurring) ("native Hawaiians . . . have equal rights to a contested case hearing where these [traditional and customary] practices are adversely affected."). Petitioners' ability to exercise traditional and customary rights such as the cultivation of taro is necessarily dependent on how much water is available in the Nā Wai 'Ehā water system. The Commission's decision concerning the setting of the IIFS pursuant to HRS § 174C–3 (listing the protec-

(3) Made upon unlawful procedure; or
(4) Affected by other error of law; or
(5) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or

(6) Arbitrary and capricious, or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

tion of traditional and customary Hawaiian rights as an "instream use") and HRS § 174C–71 therefore affect native Hawaiian Petitioners in the exercise of their rights. Because such Petitioners can allege the Commission's decision under these statutes adversely affected their constitutional rights under article XII, section 7, they have a legitimate claim of entitlement under the Constitution and would be entitled to a due process hearing on their claim.[25] Cf. Alejado, 89 Hawai'i at 226–227, 971 P.2d at 315–316 (contractual or statutory claim of entitlement is a basis for due process hearing).

Inasmuch as a contested case hearing, pursuant to HRS chapter 91, was convened by the Commission, the article XII, section 7 claim may be afforded review through that process. See Kaleikini, 124 Hawai'i at 43, 237 P.3d at 1109 (Acoba, J., concurring) ("[A]s a[n]ative Hawaiian practicing the native and customary traditions ... Petitioner was already entitled to a contested case hearing because it was 'required by law' under constitutional due process.").[26] Accordingly, this court would have subject matter jurisdiction pursuant to HRS § 174C–3, HRS § 174C–71 and article XII, section 7 of the Hawai'i Constitution. Cf. Kalipi, 66 Haw. 1, 656 P.2d 745.

## VI.

### A.

In Puna Geothermal, this court stated that, "as a matter of constitutional due process, an agency hearing is also required where the issuance of a permit implicating[ an applicant's property rights adversely affects the constitutionally protected rights of other interested persons who have followed the agency's rules governing participation in contested cases." 77 Hawai'i at 68, 881 P.2d at 1214.[27] In that case, Puna Geothermal Venture (PGV) applied for Department of Health (DOH) Authority to Construct (ATC) permits to build a well field and power plant. Id. at 66, 881 P.2d at 1210. In its "discretionary authority," (emphasis in original), the DOH held two "public informational hearings," in which various individuals testified after requesting contested case hearings. Id. at 66, 881 P.2d at 1272. The DOH denied the contested case hearing requests after the Attorney General's office decided there was "no legal mandate to grant a contested case hearing." Id.

The DOH ultimately granted PGV's permit applications. Id. Pele Defense Fund (PDF), a Hawai'i nonprofit organization formed to defend native Hawaiian rights and other named parties (collectively, Appellees) re-

25. Native Hawaiians are "[t]hose persons who are 'descendants of native Hawaiians' who inhabited the islands prior to 1778' and who assert otherwise valid customary and traditional Hawaiian rights under HRS § 1–1 [and who] are entitled to protection regardless of their blood quantum." PASH, 79 Hawai'i at 449, 903 P.2d at 1270 (citing Haw. Const., art. XII, § 7) (emphasis in original).

26. "[A]n appellate court or judge is empowered to review constitutional questions if justice requires it, even if the issue is not raised by the parties." Fujioka v. Kam, 55 Haw. 7, 9, 514 P.2d 568, 570 (1973); see State v. Pratt, 127 Hawai'i 206, 277 P.3d 300 (2012) (Acoba, J., concurring and dissenting, joined by McKenna, J.) ("It was proper for Judge Leonard to consider whether Petitioner's activities were traditional and native Hawaiian practices, if she chose to, because that issue was germane to the application of article XII, section 7 ... she was not required to accept what she deemed to be an erroneous proposition of law that was ... central to the question [of] ... whether [Petitioner's] conduct was constitutionally protected.").

27. The Commission, WWC, and HC & S assert that Puna Geothermal indicates that there is no jurisdiction in this case. These groups argue that Puna Geothermal is distinguishable in that it involved an appeal of Puna Geothermal Venture's permits, whereas in the instant case the permits of MDWS, WWC, and HC & S were not appealed. According to the Respondents, there are no grounds for jurisdiction because it is the IIFS, and not the WUPAs, that are at issue in this case.

In response, Hui/MTF and OHA cite Waiāhole I. The Waiāhole I court cited Puna Geothermal when it held that, "with respect to petitions to amend interim instream flow standards[,] ... constitutional due process mandates a hearing ... because of the individual instream and offstream 'rights, duties, and privileges' at stake.' " 94 Hawai'i at 143 n. 15, 9 P.3d at 455 n. 15 (citing Puna Geothermal, 77 Hawai'i at 68, 881 P.2d at 1214). Therefore, according to Hui/MTF, irrespective of a permit requirement in Puna Geothermal, in Waiāhole I, this court "made clear that it had independent jurisdiction over IIFS petitions."

quested judicial review of the DOH decision pursuant to HRS § 91–14, HRS § 603–21.8 [28] and Hawai'i Rules of Civil Procedure (HRCP) Rule 72.[29] *Id.*

Before the circuit court, Appellees "alleged that allowing PGV's activities to proceed under the authority of the ATC permits would expose [Appellees] to 'potential harm including diminished property values, deterioration of air quality, odor nuisance, and possible physical injury resulting from the permitted operations.' " *Puna Geothermal,* 77 Hawai'i at 70, 881 P.2d at 1216. PGV moved to dismiss, urging that there were no grounds for circuit court jurisdiction. *Id.* at 66, 881 P.2d at 1212. The circuit court denied PVG's motion to dismiss, stayed the permits, and granted an interlocutory appeal as to the matter of jurisdiction. *Id.* at 67, 881 P.2d at 1213.

On appeal, this court noted that a discretionary hearing "[could] not be a 'contested case' [under HRS chapter 91] because it fails to meet the 'required by law' test," and the public hearings were not required by statute or rule. *Id.* at 68, 881 P.2d at 1214. Consequently, "the remaining question [in the case was] whether the hearings were required by constitutional due process." *Id.* This court said that "[c]onstitutional due process protections mandate[d] a hearing whenever the claimant seeks to protect a 'property interest,' in other words, a benefit to which the claimant is legitimately entitled." *Id.* (citing

*Aguiar v. Hawai'i Housing Auth.,* 55 Haw. 478, 495, 522 P.2d 1255, 1267 (1974); *Sandy Beach,* 70 Haw. at 361, 773 P.2d at 260). Thus, the "dispositive issue ... [was] whether [PGV's] interest [in obtaining an ATC] permit ... constitute[d] a 'property' interest such that the agency hearing was a 'contested case' pursuant to HRS § 91–14(a)." *Id.* (citing *Bush,* 76 Hawai'i 128, 136, 870 P.2d 1272, 1280 (1994)).

Because PGV "sought to have the legal rights, duties, or privileges of land in which it held an interest declared over the objections of other landowners and residents of Puna," [30] this court concluded that the public hearings held by the DOH were contested cases required by constitutional due process. *Id.* at 68, 881 P.2d at 1214. Therefore, this court held that appellate jurisdiction was proper under HRS § 91–14. *Puna Geothermal,* 77 Hawai'i at 71, 881 P.2d at 1218. As to Appellees, this court stated in connection with their standing to sue that Appellees must "demonstrate ... their interests were injured and that they were involved in the administrative proceedings that culminated in the enforceable decision." *Id.* at 69, 881 P.2d at 1216. *Puna Geothermal* held that Appellees "clearly demonstrated an 'injury in fact.' " *Id.* at 70, 881 P.2d at 1216.

Further, to reiterate, this court held that "as a *matter of constitutional due process, an agency hearing is also required where the*

---

28. HRS § 603–21.8 provides that "[t]he several circuit courts shall have jurisdiction of all causes that may properly come before them on any appeal allowed by law from any other court or agency."

29. HRCP Rule 72 provides that "[w]here a right of determination or review in a circuit court is allowed by statute, any person adversely affected by the decision, order or action of a governmental official or body other than a court, may appeal from such a decision, order or action by filing a notice of appeal in the circuit court having jurisdiction of the matter."

30. The majority states:

The Commission, WWC, and HC & S argue that the *Waiāhole I* court's citation to *Puna Geothermal* indicates that the court exercised jurisdiction over the appeal of the IIFS only because the parties also appealed the Commission's resolution of permit applications. Hui/

MTF reads *Waiāhole I* as holding that the court has independent jurisdiction to review IIFS. This court concludes that the jurisdictional language from *Waiāhole I* is susceptible to both interpretations. However, the court's due process cases indicate that the court has jurisdiction to hear Hui/MTF's appeal because the IIFS, independent of any WUPA, affects property interests of Hui/MTF's members.

(Majority at 240, 287 P.3d at 141.)

The majority does not discuss *Puna Geothermal* further, and instead moves to a discussion of *Sandy Beach* for the proposition that Petitioners have a legitimate expectation in water for taro farming, and of *Ko'olau* and of the public trust doctrine to establish that IIFSs do affect interests protected by the constitution and due process. In contrast to the majority position, *Puna Geothermal* should be read as permitting jurisdiction over an appeal by persons whose constitutional rights are claimed to be affected by a permit request which is itself the subject of a contested case hearing.

*issuance* of a permit implicating an applicant's property rights adversely affects the constitutionally protected rights of other interested persons who have followed the agency's rules governing participation in contested cases." *Id.* (emphasis added). Since the DOH's issuance of a permit to PGV required a contested case hearing, the claims of other interested persons, whose constitutionally protected rights were allegedly affected, i.e. Appellees, were also entitled to a contested case hearing. *Id.* Consequently, *due process compelled a contested case hearing to address whether the constitutional rights of Appellees were infringed. Id.*

### B.

Applying *Puna Geothermal* to this case, Hui/MTF and OHA would be entitled to a contested case hearing as a matter of due process if they claimed that their constitutional rights were adversely affected by the permit applications of MDWS, WWC, and HC & S.[31] A contested case hearing regarding the WUPAs had been requested by MDWS, WWC, Hui/MTF, and OHA. MDWS and WWC were entitled to a contested case hearing on the WUPAs. Thus, at that point, rights involved in the issuance of permits were at issue. Although the WUPAs are not at issue on certiorari, it appears they were at the time that the contested case hearing was initially requested.

The Commission decided to hold a combined contested case hearing for the WUPAs and the IIFS because the Nā Wai ʻEhā water systems are interconnected. The Hearings Officer explained that considering the WUPAs and IIFS together would allow the Commission to "get a bigger picture and be able

to try to reach a more rational and reasonable decision." Because the water systems are interconnected, the Commission believed it would be most appropriate to join consideration of the WUPAs and IIFS in the same proceeding. Inasmuch as the Commission held a combined contested case hearing, there was the potential question of whether rights granted by issuance of permits in the WUPA process might adversely affect Petitioners' constitutional rights in the IIFS determination.

Thus, in this case, the Commission held a contested case hearing for WUPAs and IIFS rather than discretionary hearings as had occurred in *Puna Geothermal.* However, in *Puna Geothermal,* PGV's ATC permit application implicated a property right, entitling it to a contested case hearing as a matter of constitutional due process. 77 Hawaiʻi at 70, 881 P.2d at 1216. Here, the ground water permit use applications of MDWS, WWC, and HC & S for diked, high-level well and tunnel sources from the Nā Wai ʻEhā streams are analogous to the permit applications of PGV.[32] In *Puna Geothermal,* because PGV's ATC permit allegedly "adversely affect[ed] the constitutionally protected rights of other interested parties (i.e. Appellees)," a contested case hearing was also mandated for Appellees as a matter of due process. *Puna Geothermal,* 77 Hawaiʻi at 68, 881 P.2d at 1214. Similarly, if the applications for issuance of the ground water use permits of MDWS, WWC, and HC & S were alleged to adversely affect Petitioners' constitutionally protected rights, Petitioners would be entitled to a contested case hearing as a matter of due process.[33] In that event, applying

31. The majority does not apply *Puna Geothermal.* However, it acknowledges that the jurisdictional language in *Waiāhole I,* which references *Puna Geothermal,* is unclear. The majority concludes that the IIFS, independent of any WUPA, does in fact affect the property interests of Hui/MTF's members. (Majority at 240, 287 P.3d at 141.) Additionally, the majority decides that these interests constitute property interests for the purposes of due process analysis. (Majority at 241–43, 287 P.3d at 142–44.)

32. The Commission awarded the MDWS ground water use permits for 1.042 million gallons per day (mgd) from the Kepaniwai Well and 1.359 mgd from the Iao Tunnel, subject to the Commis-

sion's standard ground water permit conditions. The Commission awarded HC & S a one year ground water use permit for 0.1 mgd from the Iao Tunnel.

33. It may be argued that *Puna Geothermal* differs from this case in that *Puna Geothermal* involved an appeal of PGV's permits, whereas here the granting of the permits of MDWS, WWC, and HC & S was not appealed. The IIFS and not the WUPAs are at issue on certiorari. However, the Commission consolidated the WUPAs and IIFS proceedings. By joining the WUPAs, the property rights of MDWS, WWC, and HC & S would be involved in the same proceedings as the constitu-

*Puna Geothermal,* a contested case hearing as to all Petitioners would be constitutionally mandated, vesting this court with subject matter jurisdiction over the combined contested case hearing.[34]

## VII.

*Waiāhole I* involved the Waiāhole Ditch System, a major irrigation infrastructure which collects fresh surface water and dike-impounded ground water on the island of Oahu. 94 Hawai'i at 110, 9 P.3d at 422. As in this case, the Commission in *Waiāhole I* decided *sua sponte* to hold a combined contested case hearing for both WUPAs and the IIFS although it was not "required by law." [35] Also, in both cases, the parties appealed the Commission's decision regarding petitions to amend interim instream flow standards. *Id.* at 119, 9 P.3d at 431.

Before embarking on a discussion of the issues in *Waiāhole I,* this court stated in footnote 15 of that opinion that, "[a]s a threshold matter, we ... have jurisdiction to entertain this appeal." *Id.* at 119 n. 15, 9 P.3d at 431 n. 15. It was said that, "[p]ursuant to HRS § 174C–12, HRS chapter 91 governs our review of the Commission's decisions." *Waiāhole I,* 94 Hawai'i at 119 n. 15, 9 P.3d at 431 n. 15. HRS § 91–14(a) allows judicial review of a final decision and order in a contested case. "A contested case is an

agency hearing that is 1) required by law and 2) determines the rights, duties, or privileges of specific parties." *Waiāhole I,* 94 Hawai'i at 119 n. 15, 9 P.3d at 431 n. 15.

To reiterate, *Waiāhole I* further states that, "*while the statutes and rules do not require a hearing with respect to petitions to amend interim instream flow standards, constitutional due process mandates a hearing ... because of the 'rights, duties, and privileges' at stake. See Puna Geothermal,* 77 Hawai'i at 68, 881 P.2d at 1214." *Waiāhole I,* 94 Hawai'i at 119, n. 15, 9 P.3d at 431, n. 15 (emphasis added). Without further elaboration on this point, *Waiāhole I* concludes that rights duties and privileges are involved in an IIFS, and so constitutional due process requires a hearing where an IIFS is involved.[36]

In contrast to *Ko'olau,* this court in *Waiāhole I* did not specify what rights, duties, and privileges were at stake in that case; it simply concluded that "individual instream" uses might be affected in setting an IIFS and so mandated that IIFS be subjected to contested case hearings. *Waiāhole I,* 94 Hawai'i at 119 n. 15, 9 P.3d at 431 n. 15. In the absence of more guidance from this court, Petitioners attempt to show that they have sufficient rights, duties, and privileges

---

tional rights asserted by Petitioners in connection with the IIFS.

**34.** It may appear that the holding in *Puna Geothermal* conflicts with the subsequent holding in *Ko'olau. Puna Geothermal* established that a contested case hearing is required by law when the property interests of permit applicant allegedly intersect with the constitutional rights of other interested parties. *Puna Geothermal,* 77 Hawai'i at 68, 881 P.2d at 1214. But *Ko'olau* restricts such contested case hearings because it is "only at the permitting stage that property interests are potentially affected." *Ko'olau,* 83 Hawai'i at 484, 927 P.2d at 1379.

The two holdings can be reconciled. Because the Commission held a combined contested case hearing to consider WUPAs, in essence this case is "at the permitting stage" where property interests are potentially affected as *Ko'olau* requires. If the permits of MDWS, WWC, and HC & S allegedly affected the constitutionally protected rights of Petitioners, under *Puna Geothermal,* constitutional due process would mandate a con-

tested case hearing for Petitioners. Consequently, under HRS § 91–14, the claims of all Petitioners as to the IIFS would be afforded judicial review and this court would have subject matter jurisdiction.

**35.** At the hearing in *Waiāhole I,* the Commission considered WUPAs for various leeward offstream purposes, petitions to amend the IIFS for windward streams affected by the ditch, and water reservation petitions for both instream and offstream uses. *Waiāhole I,* 94 Hawai'i at 110, 9 P.3d at 422.

**36.** Additionally, HRS § 174C–60 was read to "provide for direct appeal to the supreme court from the ... combined case hearing in its entirety." *Id.* HRS § 174C–60 states, "[a]ny other law to the contrary not withstanding, including chapter 91, any contested case hearing under this section shall be appealed upon the record directly to the supreme court for final decision." This would not appear to be a basis for jurisdiction of this case but refers to the procedure to follow, assuming jurisdiction exists in the first place.

that are affected by the IIFS so as to require a hearing for purposes of due process.[37]

*Waiāhole I* is precedent, and thus we should not depart from it "without some compelling justification." *State v. Garcia,* 96 Hawai'i 200, 206, 29 P.3d 919, 925 (2001)(citing *Hilton v. South Carolina Pub. Ry. Comm'n,* 502 U.S. 197, 202, 112 S.Ct. 560, 116 L.Ed.2d 560 (1991) (emphasis omitted)).[38] However, *Waiāhole I*'s brief treatment of jurisdiction in footnote 15, which created a *sui generis* [39] basis for jurisdiction, requires additional support. The fact that a contested case hearing was not required by statute or rule, both in this case and in *Waiāhole I,* weighs against a contested case hearing rather than in favor of one.

## VIII.

Article XI, section 1 of the Hawai'i Constitution provides that all public natural resources are held in trust by the State:

For the benefit of present and future generations, the State and its political subdivisions shall conserve and protect Hawaii's natural beauty and all natural resources, including land, water, air, minerals and energy sources, and shall promote the development and utilization of these resources in a manner consistent with their conservation and in furtherance of the self-sufficiency of the State.

*All public natural resources are held in trust by the State* for the benefit of the people.

(Emphasis added.) [40] Article XI, section 7 of the Hawai'i Constitution concerns water resources specifically, and states:

The State has an obligation to protect, control and regulate the use of Hawaii's water resources for the benefit of its people.

*The legislature shall provide for a water resources agency which, as provided by law,* shall set overall water conservation, quality and use policies; define beneficial

**37.** The HC & S brief indicates that the Commission could have used "any number of procedural vehicles, including procedures patterned after a contested case hearing." It analogizes the hearing in this case to a "discretionary hearing" which are "not contested case hearings because they are not required by law." *Id.* (citing *Lingle v. HGEA,* 107 Hawai'i 178, 184, 111 P.3d 587, 593 (2005)). In contrast, OHA contends that there are no other methods of resolution because "[r]ulemaking and contested case adjudication are the only alternatives available to [the Commission] pursuant to the Code."

Related to this issue, at the outset of its answering brief, HC & S references a similar case dealing with the setting of interim instream flow standards for streams in East Maui that is currently pending in the Intermediate Court of Appeals (*In re Petition to Amend Interim Instream Flow Standards for Waikamoi, Puohokamoa, Haipuaena, Punalau/Kolea, Honomau, West Wailuaiki, East Wailuaiki, Kopiliula, Puakaa, Waiohue, Paakea, Kapaula, and Hanawai Streams,* No. CAAP 10–0000161, the "East Maui Appeal"). In that case, the Commission did not utilize a contested case hearing and therefore its decision is not subject to judicial review. *Id.* OHA attempts to distinguish this case from the East Maui Appeal, and relies on *Waiāhole I* to suggest that the proper resolution for an IIFS in both cases is via a contested case hearing. OHA contends that in the East Maui Appeal, the Commission in fact created a "legal nonentity" by adopting a process which is "neither rulemaking nor contested case [hearing]." *Id.* However, that case is not before

us and has no bearing on the outcome of the case at hand.

**38.** As we have indicated, the benefit of stare decisis is that it "furnishes a clear guide for the conduct of individuals, to enable them to plan their affairs with assurance against untoward surprise; ... eliminates the need to relitigate every relevant position in every case; and. maintains public faith in the judiciary as a source of impersonal and reasoned judgements." *State v. Garcia,* 96 Hawai'i 200, 205, 29 P.3d 919, 925 (2001) (citing *Moragne v. States Marine Lines, Inc.,* 398 U.S. 375, 403, 90 S.Ct. 1772, 26 L.Ed.2d 339 (1970)). We have also established that "a court should not overrule its earlier decisions unless the most cogent reasons and inescapable logic require it." *Id.* (citing *Hilton v. South Carolina Pub. Ry. Comm'n,* 502 U.S. 197, 202, 112 S.Ct. 560, 116 L.Ed.2d 560 (1991)). "When the court reexamines a prior holding, its judgment is customarily informed by a series of prudential and pragmatic considerations designed to test the consistency of overruling a prior decision with the ideal of the rule of law." *Id.* (citing *Planned Parenthood of Southeastern Pennsylvania v. Casey,* 505 U.S. 833, 854, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992)).

**39.** *"Sui generis"* means a legal concept that is "of its own kind or class, unique or peculiar." *Black's Law Dictionary* 1572 (9th ed.2009).

**40.** These provisions are repeated here for the convenience of the reader.

and reasonable uses; protect ground and surface water resources, watersheds and natural stream environments; establish criteria for water use priorities while assuring appurtenant rights and existing correlative and riparian uses and establish procedures for regulating all uses of Hawaii's water resources.

(Emphasis added.)

Accordingly, *Waiāhole I* held that "[a]rticle XI, section 1 and article XI, section 7 adopt the public trust doctrine as a fundamental principle of constitutional law in Hawai'i." *Waiāhole I*, 94 Hawai'i at 132, 9 P.3d at 444. The public trust doctrine embodied in article XI, sections 1 and 7 of the Hawai'i Constitution is implemented through chapter 174C. *In re Contested Case Hearing on Water Use Permit Application*, 116 Hawai'i 481, 174 P.3d 320 (2007) ("It is now well established that the public trust doctrine is a fundamental principle of constitutional law in Hawai'i, and that its principles permeate the State Water Code.") (internal citations omitted).[41] As noted, *supra*, HRS § 174C–12 affords "[j]udicial review of rules and orders of the [Commission]" under chapter 91, and "[a]ny person aggrieved ... in a contested case ... is entitled to judicial review...." *See Waiāhole I*, 94 Hawai'i at 119 n. 15, 9 P.3d at 431 n. 15 ("Pursuant to HRS § 174C–12, HRS chapter 91 governs our review of the Commission's decision."). HRS § 91–14(g)(1) specifically provides for judicial review of an agency decision if it is, *inter alia*, "[i]n violation of constitutional or statutory provisions." Consequently, jurisdiction over the Commission's decision with respect to the IIFS is available pursuant to HRS § 91–14.

## IX.

The public trust doctrine arose in the regulation of navigable waters, as discussed in *Waiāhole I*.[42] 94 Hawai'i at 127–28, 9 P.3d at 439–40. The modern version of the doctrine originated in *Illinois Central Railroad Co. v. Illinois*, 146 U.S. 387, 13 S.Ct. 110, 36 L.Ed. 1018 (1892). In that case, the state legislature conveyed land submerged in Lake Michigan to a railroad. *Id.* at 442–43, 13 S.Ct. 110. The Court held that the state's title in such lands was held in trust for the people of the state. *Id.* at 453, 13 S.Ct. 110. It said: "The state can no more abdicate its trust over property in which the whole people are interested ... so as to leave them entirely under the use and control of private parties ... than it can abdicate its police powers[.]" *Id.*

As *Waiāhole I* further explained, this court adopted the public trust doctrine in *King v. Oahu Railway & Land Co.*, 11 Haw. 717 (1899). In *King*, this court agreed that "[t]he people of Hawai'i hold the absolute rights to all its navigable waters and the soils under them for their own common use. The lands under the navigable waters in and around the territory of the Hawaiian Government are held in trust for the public uses of navigation." *Waiāhole I*, 94 Hawai'i at 128, 9 P.3d at 440 (quoting *King*, 11 Haw. at 725). It may be inferred from the foregoing that where a public trust exists the state has an inherent obligation to manage public resources to preserve them for the people and to protect the common good.

## X.

However, in *Waiāhole I*, this court said that constitutional due process mandated a hearing with respect to petitions to amend IIFS "because of the *individual* instream and offstream 'rights, duties, and privileges' at stake." *Waiāhole I*, 94 Hawai'i at 119 n. 15, 9 P.3d at 431 n. 15 (emphasis added). This proposition necessarily raised the question of who can bring suit to enforce the

---

**41.** *See also In re Wai'ola O Molokai, Inc.*, 103 Hawai'i 401, 429, 83 P.3d 664, 692 (2004) ("[T]his court traced the historical development of the public trust doctrine in Hawai'i and reasoned therefrom that ... the legislature, pursuant to the constitutional mandate of article XI, section 7, incorporated public trust principles into the [State Water] Code."); *Waiāhole I*, 94 Hawai'i at 130, 9 P.3d at 442 ("[T]he legislature appears to have engrafted the [public trust doctrine] wholesale in the [State Water] Code.").

**42.** The majority addresses the public trust briefly in its jurisdictional analysis, stating that "the ramifications of an erroneous IIFS could offend the public trust, and is *simply too important* to deprive parties of due process and judicial re-

public trust. Under our precedent, individuals may sue to vindicate the rights of the public if the individual can demonstrate that he or she has suffered an "injury in fact." *Akau v. Olohana Corp.,* 65 Haw. 383, 388–89, 652 P.2d 1130, 1134 (1982). This court has held "that a member of the public has standing to sue to enforce the rights of the public even though [that person's] injury is not different in kind from the public's generally, if he [or she] can show that he [or she] has suffered an injury in fact, and that the concerns of a multiplicity of suits are satisfied by any means, including a class action." *Hawaii's Thousand Friends v. Anderson,* 70 Haw. 276, 283, 768 P.2d 1293, 1299 (1989).

For example, in *Akau,* 65 Haw. at 384–85, 652 P.2d at 1132, the plaintiffs brought a class action to enforce alleged rights-of-way along once public trails to the beach that crossed the defendants' property. The plaintiff class was composed of Hawai'i residents who used or were deterred from using the trails and of all persons who owned land or resided in the area and used or were deterred from using the trails. *Id.* The defendants alleged that only the State could bring an action against landowners to enforce the public's right of beach access. *Id.* at 386, 652 P.2d at 1133. This court held that the plaintiffs had standing, explaining that "[c]laims of harm to public trust property is another area where courts are expanding standing," and that "[t]his court has been in step with the trend away from the special injury rule towards the view that a plaintiff, if injured, has standing." *Id.* at 387–88, 652 P.2d at 1134 (citations omitted). Otherwise, it would be "unjust to deny members of the public the

ability to enforce the public's rights when they are injured." *Id.* at 388, 652 P.2d at 1134. This court held, therefore, that "a member of the public has standing to sue to enforce the rights of the public even though his injury is not different in kind from the public's generally, if he can show that he has suffered an injury in fact[.]" *Id.*

For standing purposes, injury in fact requires a showing that the plaintiff has suffered actual or threatened injury as a result of the defendant's conduct, that the injury is traceable to the alleged action, and that the injury is likely to be remedied by a favorable judicial decision. *Id.* at 389, 652 P.2d at 1134–35. However, *Waiāhole I* did not mention the requirement of an injury in fact, rendering the reference to *"individual* instream and offstream 'rights, duties, and privileges[,]' " *see Waiāhole I,* 94 Hawai'i at 119 n. 15, 9 P.3d at 409 n. 15, ambiguous.[43]

Assuming the necessity of applying an injury in fact test to Petitioners, Joseph Alueta (Alueta), a member of Hui, did submit testimony that he and his wife, who is native Hawaiian, live on property that borders Waihe'e Stream. Alueta stated that he and his family seek water from the Waihe'e Stream to grow taro and to generate hydroelectricity for their home. He also testified that additional water from the stream was needed in order for his children "to play [in the stream] and [for his family] simply [to] enjoy the sounds and beauty of the stream flow." However, this is not possible in the stream's "artificially diminished condition." Alueta's testimony may satisfy the three-prong injury-in-fact test.[44] Similarly, there is testimo-

view." (Majority at 244, 287 P.3d at 145) (emphasis added).

43. *Waiāhole I* cites *Puna Geothermal* for the proposition that a hearing was required because of the "rights, duties, and privileges" at stake. However, in *Puna Geothermal,* in contrast to *Waiāhole I,* there was a specific interest identified and a particular party, i.e. PVG, whose rights were at stake. As noted *supra,* PGV "sought to have the legal rights, duties, or privileges of land in which it held an interest declared over the objections of other landowners and residents of Puna," and for that reason a contested case hearing was required. *Puna Geothermal,* 77 Hawai'i at 70, 881 P.2d at 1216. *Waiāhole I* used the "rights, duties, and privileges" language, which in *Puna Geothermal* described the

interests of PVG, and ascribed it to the undifferentiated interests of the various community organizations that sought to have the Commission amend the IIFS.

44. First, as a nearby landowner, Alueta claims his children have been denied the opportunity to play in the stream and his family has been denied enjoyment of the sounds and beauty of the Nā Wai 'Ehā waters. Accordingly, Alueta and his family could have sufficiently alleged actual injury. *See Akau,* 65 Haw. at 389, 652 P.2d at 1134–35. Further, the injury alleged by Alueta may be "traceable to the alleged action," in this case, the diversion of the Nā Wai 'Ehā waters and the Commission's alleged failure to protect the instream flow of the Nā Wai 'Ehā. *See id.* Finally, Alueta's injury is redressable, and likely to be

ny in the record from several plaintiffs who are native Hawaiian and who claim they need more water from the Nā Wai 'Ehā system in order to grow taro and to exercise their native Hawaiian rights. While independent grounds based in HRS Chapter 174C and article XII, section 7 exist for invoking jurisdiction over such claims, *see* discussion *supra*, native Hawaiians are also cloaked with the rights of the public in general in the public trust, *see Waiāhole I*, 94 Hawai'i at 136, 9 P.3d at 448 ("[E]xercise of [n]ative Hawaiian and traditional and customary water rights [is] a public trust purpose").

In environmental cases, and in particular as to standing in those cases, this court has stated that "in applying this three-part test in cases involving environmental concerns and native Hawaiian rights," this court's opinions have moved "from 'legal right' to 'injury in fact' as the . . . standard . . . for judging whether a plaintiff's stake in a dispute is sufficient to invoke judicial intervention[,] from 'economic harm . . . [to inclusion of] '[a]esthetic and environmental well-being'

as interests deserving of protection, . . . and to the recognition that 'a member of the public has standing to . . . enforce the rights of the public even though his [or her] injury is not different in kind from the public's generally, if he [or she] can show that he [or she] has suffered an injury in fact[.]' " *Sierra Club v. Hawai'i Tourism Authority ex rel. Bd. of Dirs.*, 100 Hawai'i 242, 251, 59 P.3d 877, 886 (2002) (plurality opinion) (citations omitted). However, "while the basis for standing has expanded in cases implicating environmental concerns and native Hawaiian rights, plaintiffs must still satisfy the injury-in-fact test."[45] *Id.*

## XI.

The testimony of the members of Hui/MTF who are not native Hawaiians, other than Alueta, did not establish individual injury in fact claims that represented similar interests in the general public in connection with the various public trust purposes. The State Water Code lists several protected instream uses, which

remedied by a favorable judicial decision insofar as requiring the Commission account for the public trust could ostensibly ensure that Nā Wai 'Ehā waters are protected to the greatest extent possible. *See id.* As such, the testimony of Alueta could be sufficient to establish injury in fact.

**45.** In *Sierra Club*, the plurality noted many other cases in which injuries were sufficiently concrete to establish injury in fact. *See Sierra Club v. Hawai'i Tourism Authority ex rel. Bd. of Dirs.*, 100 Hawai'i 242, 251, 59 P.3d 877, 886 (2002) (plurality opinion) (citing *Ka Pa'akai O Ka'aina v. Land Use Comm'n*, 94 Hawai'i 31, 35–36, 7 P.3d 1068, 1072–73 (2000) (petitioner had standing to challenge land use reclassification to build 530 single family homes, 500 low-rise multi-family units, a 36-hole golf course, an 11-acre commercial center, a 3-acre recreation club, and a golf clubhouse on historic lava flow region associated with native Hawaiian culture and history, linked to King Kamehameha I, Kameeiamoku, and his twin brother); *Mahuiki v. Planning Comm'n*, 65 Haw. 506, 515, 654 P.2d 874, 880 (1982) (petitioners, adjacent landowners, had standing to invoke judicial review to challenge "decision to permit the construction of multi-family housing units on undeveloped land in the special management area" because injury was considered "personal" or "special"); *Akau*, 65 Haw. at 384, 390, 652 P.2d at 1132, 1135 (plaintiffs had standing to bring class action to enforce rights-of-way along once public trails to the beach that crossed defendants' property because "difficulty in getting to the beach hampers the use and enjoyment of it

and may prevent or discourage use in some instances"); *Life of the Land v. Land Use Comm'n*, 61 Haw. 3, 8, 594 P.2d 1079, 1082 (1979) (plaintiff had standing to challenge development project for which variance or modification was sought to include a high density multiple-family dwelling because "urbanization w[ould] destroy beaches and open space now enjoyed by members and decrease agricultural land presently used for the production of needed food supplies," where members resided in "immediate vicinity" of construction area); *East Diamond Head Ass'n. v. Zoning Bd. of Appeals*, 52 Haw. 518, 521–22, 479 P.2d 796, 798–99 (1971) (appellants had standing to challenge movie operation that interfered with the enjoyment of their property because "evidence of an increase in noise, traffic, and congestion . . . inconvenience by electrical and telephone work crews, and a fear that studio's facilities would permanently remain and detract from the aesthetic residential character of the neighborhood" showed that each appellant was a "person aggrieved"); *Dalton v. City and Cnty. of Honolulu*, 51 Haw. 400, 403, 462 P.2d 199, 202 (1969) (petitioners living across the street from proposed highrise apartment building site had standing because restricted scenic view, limited open space, and increased population in the area created a "concrete interest" in a "legal relation") (internal quotation marks and citation omitted)).

include, but are not limited to: (1) Maintenance of fish and wildlife habitats; (2) Outdoor recreational activities; (3) Maintenance of ecosystems such as estuaries, wetlands, and stream vegetation; (4) Aesthetic value such as waterfalls and scenic waterways; (5) Navigation; (6) Instream hydropower generation; (7) Maintenance of water quality; (8) The conveyance of irrigation and domestic water supplies to downstream points of diversion; and (9) The protection of traditional and customary Hawaiian rights.

HRS § 174C–3. In particular, the definition of instream flow standard states that it is "a quantity or flow of water or depth of water which is required to be present at a specific location in a stream system at certain specified times of the year *to protect fishery, wildlife, recreational, aesthetic, scenic, and other beneficial instream uses.*" HRS § 174C–3 (emphasis added). Likewise, HRS § 174–2 provides:

> The [S]tate [W]ater [C]ode shall be liberally interpreted to obtain maximum beneficial use of the waters of the State for purposes such as domestic uses, aquaculture uses, irrigation and other agricultural uses, power development, and commercial and industrial uses. However, *adequate provision shall be made for the protection of traditional and customary Hawaiian rights, the protection and procreation of fish and wildlife, the maintenance of proper ecological balance and scenic beauty, and the preservation and enhancement of waters of the State for municipal uses, public recreation, public water supply, agriculture, and navigation.*

(Emphasis added.) Here, individuals did not assert denial of the several uses of the waters, such as the protection of fish and wildlife [46] uses, and except for Alueta, perhaps, did not attempt to prove injury in fact as a basis for standing.

In *Sierra Club*, the plaintiffs claimed that an environmental assessment (EA) should have been conducted by Respondent Hawai'i Tourism Authority (HTA) prior to its letting of a contract for tourism marketing services. *Sierra Club*, 100 Hawai'i at 242, 59 P.3d at 877 (plurality opinion). The plurality concluded that plaintiff's affidavits concerning "traffic congestion and crowded recreation areas lack sufficient specificity to be accepted as factual allegations of injury," because "[i]nsofar as the affidavits assert that the persons observed in recreational areas were tourists, the affiants fail[ed] to present any facts demonstrating the basis for their conclusions, much less that the presence of such tourists was the result of the HTA's marketing program." *Id.* at 251, 59 P.3d at 886. Here, it does not appear that Petitioners focused on establishing injury in fact with respect to the instream protected uses of water listed in the State Water Code. It would seem, that, as in *Sierra Club*, that Petitioners' allegations may be insufficient to establish injury in fact.

### XII.

However, the legal nature of water is that it is not subject to private ownership but rather that its dominant purpose is use for the common good. In *McBryde* this court observed that the right to water, being one of the most important usufruct [47] of lands, was said to be "specifically and definitely reserved for the people of Hawai'i for their common good in all of the land grants." 54 Haw. at 186, 504 P.2d at 1338. *McBryde* held that "right to water was not intended to be, could not be, and was not transferred ... and the ownership of water in natural watercourses and streams and rivers remained in the people of Hawai'i for their common good." *Id.* at 186–87, 504 P.2d at 1339. Consequently, "[n]o one may acquire property to running water in a natural watercourse; [ ] flowing water was publici juris; and [ ] it was common property to be used by all who

---

46. However, Mr. Stanley J. Faustino, a native Hawaiian, testified that additional surface water was necessary in order to protect various fish species that were gathered by native Hawaiians for their traditional practices.

47. "Usufruct" is defined as "a right for a certain period to use and enjoy the fruits of another's property without damaging or diminishing it, but allowing for any natural deterioration in the property over time." *Black's Law Dictionary* 164.

had a right of access to it, as usufruct of the watercourse." *Id.* at 187, 504 P.2d at 1339. Therefore, water, by its nature, is inherently intended for public use, and not subject to ownership by private interests to the exclusion of the public.

In *Robinson,* this court elaborated on this concept. "[A] change in any aspect of the utilization of a private water right has always been understood as dependent upon such a change not injuriously affecting the rights of others." *Robinson,* 65 Haw. at 650 n. 8, 658 P.2d at 295 n. 8. *Robinson* concluded that because water is intended for public use, "[t]he rights of others which were to be respected were not limited to a specified quantity of water." *Id.* "Instead, the scope and nature of such rights also included interests in the means of any diversion and the purposes to which the water was applied." *Id.* "These private usufructory interests were not so broad as to include any inherent enforceable right to transmit water beyond the lands to which such private interests appertained." *Id.* at 648, 658 P.2d at 295.

### XIII.

The consequence of setting an IIFS without regard to the public trust uses of the waters affected is that it may be too late to protect the public interest during the permitting process. The Commission argues that the IIFS does not affect individual rights because the IIFS only establishes the flow of water in streams and not how much water individuals may divert from the streams. But the quantity of water that must be left in a stream pursuant to the IIFS determination will necessarily affect the amount of water that will be diverted for off stream uses and the amount that is left for instream uses. Absent consideration of the effect the IIFS may have on protected instream uses, the Commission's setting of the IIFS may violate the principles stated in *McBryde* and *Robinson* of preserving the right to water for the "common good," *McBryde,* 54 Haw. at 186, 504 P.2d at 1338, and of preventing "private water rights" from "injuriously affecting [ ] the rights of others," *Robinson,* 65 Haw. at 649 n. 8, 658 P.2d at 295 n. 8.

The injury in fact test relates essentially to individual harm and therefore emphasizes the private interest in water. *See Akau,* 65 Haw. at 389, 652 P.2d at 1134–35 (individual harm must be shown to establish injury in fact). Such a formulation would appear ill-suited as a basis for determining standing to sue to vindicate the public trust doctrine. With respect to the public trust, the common good is at stake, and this court is duty-bound to protect the public interest. *See Waiāhole I,* 94 Hawai'i at 143, 9 P.3d at 455 ("Just as private trustees are judicially accountable to their beneficiaries for dispositions of the res, so the legislative and executive branches are judicially accountable for the dispositions of the public trust.... The check and balance of judicial review provides a level of protection against improvident dissipation of an irreplaceable res.") (quoting *Arizona Cent. for Law in Pub. Interest v. Hassell,* 172 Ariz. 356, 837 P.2d 158, 168–69 (App.1991)).

The rationale in two California cases, *National Audubon Society v. Superior Court,* 33 Cal.3d 419, 189 Cal.Rptr. 346, 658 P.2d 709 (1983), and *Marks v. Whitney,* 6 Cal.3d 251, 98 Cal.Rptr. 790, 491 P.2d 374 (1971), the first of which is cited approvingly by *Waiāhole I,* as "the leading decision applying the public trust to water resources[,]" 94 Hawai'i at 140, 9 P.3d at 452, best conforms to the principles embodied in *McBryde* and *Robinson.* In *Audubon,* the plaintiffs, an organization of bird watchers, filed suit to enjoin the Water and Power Department of the City of Los Angeles (the Department) from diverting four of five streams flowing into a lake. *See Audubon,* 189 Cal.Rptr. 346, 658 P.2d at 712. This caused the level of the lake to drop and compromised the scenic beauty and ecological value of the lake. *Id.* The California Supreme Court entertained the suit and held that the state had to "bear in mind its duty as trustee to consider the effect of the taking on the public trust, and to preserve, so far as consistent with the public interest, the uses protected by the trust." *Id.* (internal citation omitted). In a footnote, that court noted that the Department had argued that plaintiffs lacked standing, but it rejected the Department's argument:

Judicial decisions ... have greatly expanded the right of a member of the public to

sue as a taxpayer or private attorney general. (*See Van Atta v. Scott* (1980) 27 Cal.3d 424, 447–450, 166 Cal.Rptr. 149, 613 P.2d 210, and cases there cited.) *Consistently with these decisions, Marks v. Whitney, supra,* 6 Cal.3d 251, 98 Cal.Rptr. 790, 491 P.2d 374, *expressly held that any member of the general public* (p. 261, 98 Cal.Rptr. 790, 491 P.2d 374*) has standing to raise a claim of harm to the public trust.* (Pp. 261–262, 98 Cal.Rptr. 790, 491 P.2d 374; see also *Environmental Defense Fund, Inc. v. East Bay Mun. Utility Dist.* (1980) 26 Cal.3d 183, 161 Cal.Rptr. 466, 605 P.2d 1, in which we permitted a public interest organization to sue to enjoin allegedly unreasonable uses of water.) *We conclude that plaintiffs have standing to sue to protect the public trust.*

*Id.* at 717 n. 11. (emphases added). That court ultimately held that the state must reconsider the allocation of the waters in the streams and the lake, taking into account the impact on the lake's environment. *Id.* at 729.

In *Marks,* cited in *Audubon,* the California Supreme Court held that members of the public had standing to enforce the public trust. *Marks,* 98 Cal.Rptr. 790, 491 P.2d at 381. In that case, the plaintiff brought a quiet title action to settle a boundary line dispute. *Id.* at 377. Defendant objected on the ground that his rights as a littoral owner [48] and as a member of the public in the adjacent tidelands and navigable waters covering them would be injured. *Id.* The trial court concluded that the defendant did not have standing, as a member of the public, to raise the public trust issue. *Id.* The California Supreme Court reversed, stating that members of the public had been permitted to bring actions "to enforce a public right to use a beach access route"; to quiet title to private and public easements in a public beach; and to restrain improper filling of a bay and to secure a general declaration of the rights of the people to the waterways and wildlife areas of the bay. *Id.* at 381 (internal citations omitted). Members of the public had also been allowed to assert "the public trust easement for hunting, fishing and navigation

. . . and to navigate on shallow navigable waters in small boats[.]" *Id.* at 381 (internal citations omitted).

Pursuant to the rationale in these cases, a public trust claim can be raised by members of the public who are affected by potential harm to the public trust. *Waiāhole I*'s express approval of *Audubon, see* 94 Hawai'i at 140, 9 P.3d at 452, a case holding that "any member of the general public has standing to raise a claim of harm to the public trust[,]" 189 Cal.Rptr. 346, 658 P.2d at 717 n. 11 (citation omitted), furnishes a basis for *Waiāhole I*'s view of jurisdiction in this case. *Audubon* and *Waiāhole I,* by implication, do not require a showing that plaintiffs have suffered injury in fact. Instead, "any member of the general public" had standing to raise a claim of harm to the public trust. *Id.*

When Petitioners asked the Commission to set the IIFS claiming that the current level of surface water in the Nā Wai 'Ehā system was injurious to interests protected by the public trust, they, as "member[s] of the general public," asserted "a claim of harm to the public trust." *Id. Cf. Mahuiki v. Planning Comm'n,* 65 Haw. 506, 654 P.2d 874 (1982) ("Where the interests at stake are in the realm of environmental concerns we have not been inclined to foreclose challenges to administrative determinations through restrictive applications of standing requirements.") (internal citation and quotation marks omitted). Petitioners, thus, as members of the public who are affected by the setting of an IIFS, were entitled to a contested case hearing of their claim that amending the IIFS was necessary in order to protect the public trust. Accordingly, this court has subject matter jurisdiction, *see* discussion *supra,* and Petitioners have standing to sue.

## XIV.

With respect to evaluating the merits of the Commission's D & O, the Commission must (1) "begin with a presumption in favor of public use, access, and enjoyment[,]" *Waiāhole I,* 94 Hawai'i at 142, 9 P.3d at 454;

---

48. "Littoral" is defined as "of or relating to the coast or shore of an ocean, sea, or lake."

*Black's Law Dictionary* 1018.

(2) hold private commercial uses to a "higher level of scrutiny[,]" *id.;* and (3) make its decision "with a level of openness, diligence, and foresight commensurate with the high priority [public rights in a resource] command under the laws of our state[,]" *id.* at 143, 9 P.3d at 455. In my view, the Commission did not adequately adhere to this formula when coming to its conclusions, and failed to demonstrate the basis for its rulings on several important issues.

## XV.

An administrative agency's findings and conclusions must be (1) reasonably clear to enable the parties and the reviewing court to ascertain the basis of the agency's decision, *see In re Water Use Permit Applications,* 105 Hawai'i 1, 27, 93 P.3d 643, 669 (2004) (Acoba, J., concurring) (*Waiāhole II*) (" 'Findings and conclusions by an administrative agency must be reasonably clear to enable the parties and the court to ascertain the basis of the agency's decision.' ") (quoting *Igawa v. Koa House Rest.,* 97 Hawai'i 402, 412, 38 P.3d 570, 580 (2001) (Acoba, J., concurring)); (2) sufficient to enable the reviewing court to track the steps by which the agency reached its decision, *id.* at 27, 93 P.3d at 669 (Acoba, J., concurring) (" 'An agency's findings must be sufficient to allow the reviewing court to track the steps by which the agency reached its decision.' ") (quoting *Kilauea Neighborhood Ass'n v. Land Use Comm'n,* 7 Haw.App. 227, 230, 751 P.2d 1031, 1034 (1988)); and (3) expressly set out to assure reasoned decision making by the agency took place, *see Nakamura v. State,* 98 Hawai'i 263, 276, 47 P.3d 730, 743 (2002) (Acoba, J., concurring and dissenting) ("[T]he purpose behind requiring agencies to expressly set out their findings is 'to assure reasoned decision making by the agency and enable judicial review of agency decisions.' ") (quoting *In re Application of Hawaii Elec.*

*Light Co.,* 60 Haw. 625, 642, 594 P.2d 612, 623 (1979)).

Furthermore, "[c]larity in an agency's decision is all the more essential where the agency acts as a public trustee and 'is duty bound to demonstrate that it has properly exercised the discretion vested in it by the constitution and the statute.' " *Waiāhole II,* 105 Hawai'i at 11, 93 P.3d at 653 (quoting *Save Ourselves v. Louisiana Env't Control Comm'n,* 452 So.2d 1152, 1159–60 (La.1984)). In the instant case, respectfully, the Commission does not appear to have applied the precepts set forth in *Waiāhole I.* Therefore, it cannot be concluded with confidence that the Commission gave adequate and proper consideration to several important issues.

## XVI.

### A.

The balancing process that weighs public against private purposes must "begin with a presumption in favor of public use, access, and enjoyment." *Waiāhole I,* 94 Hawai'i at 142, 9 P.3d at 454 (citing *State v. Zimring,* 58 Haw. 106, 121, 566 P.2d 725, 735 (1977) ("The State as trustee has the duty to protect and maintain the trust [resource] and regulate its use. Presumptively, this duty is to be implemented by devoting the [resource] to actual public uses, e.g., recreation.")). Furthermore, where uncertainty about present or potential threats of serious damage or environmental degradation exists, "a trustee's duty to protect the resource mitigates in favor of choosing presumptions that also protect the resource." [49] *Id.* at 154, 9 P.3d at 466 (citing *Lead Indus. Ass'n v. EPA,* 647 F.2d 1130, 1152–56 (D.C.Cir.1976) (relying on the statutory "margin of safety" requirement in rejecting the argument that the agency could only authorize standards designed to protect "clearly harmful health effects")).

This court therefore concluded that "where uncertainty exists, a trustee's duty to protect the resource mitigates in favor of choosing presumptions that also protect the resource." *Id.* at 154, 9 P.3d at 466 (citing *Lead Indus. Ass'n v. EPA,* 647 F.2d 1130, 1152–1156 (D.C.Cir.1980)).

49. In *Waiāhole I,* this court adopted the view that the "lack of full scientific certainty does not extinguish the presumption in favor of public trust purposes or vitiate the Commission's affirmative duty to protect such purposes wherever feasible.... Uncertainty regarding the exact level of protection necessary justifies neither the least protection feasible nor the absence of protection." 94 Hawai'i at 157, 9 P.3d at 467.

However, here the Commission merely recited the law, stating that "there is also a presumption in favor of the streams, whose maintenance in their natural states is a public trust purpose[.]" This recitation, without further explanation of how that presumption affected the Commission's decision with respect to restoring stream flows for public use, access, and enjoyment, does not amount to an actual application of the required standard. The Commission had a duty to expressly set forth findings and conclusions from which this court can ascertain the presumption was applied in favor of the public by the Commission and track the steps the Commission followed in balancing that with private interests. *See Waiāhole II*, 105 Hawai'i at 27, 93 P.3d at 669 (Acoba, J., concurring); *see also Nakamura*, 98 Hawai'i at 276, 47 P.3d at 743 (Acoba, J., concurring and dissenting). The Commission's role as a public trustee for the Nā Wai 'Ehā waters also rendered it "duty-bound to demonstrate that it ha[d] properly exercised the discretion vested in it by the constitution and the statute." *Waiāhole II*, 105 Hawai'i at 11, 93 P.3d at 653 (internal quotations omitted).

### B.

In *Waiāhole I*, this court established that the public trust "effectively prescribes a 'higher level of scrutiny' for private commercial uses." *Waiāhole I*, 94 Hawai'i at 142, 9 P.3d at 454. Accordingly, while the Commission carries the burden of justifying its IIFS, "[i]n practical terms, . . . the burden [of justifying private commercial uses] ultimately lies with those seeking to justify them in light of the purposes protected by the trust." *Id.* at 142, 9 P.3d at 454. Justification of a proposed offstream use requires permit applicants to "demonstrate their actual needs and, within the constraints of available knowledge, the propriety of draining water from public streams to satisfy those needs." *Id.* at 162, 9 P.3d at 474. This process entails "(1) identifying instream and potential instream uses, (2) assessing how much water those instream uses require, and (3) justifying their pro-

posed uses in light of existing or potential instream values." *Id.* at 197, 9 P.3d at 509 (Ramil, J., dissenting).

Nonetheless, the Commission's ultimate decisions, particularly its treatment of HC & S, do not reflect the actual application of a higher level of scrutiny or the enforcement of the requirement that the permit applicants "demonstrate their actual needs and, within the constraints of available knowledge, the propriety of draining water from public streams to satisfy those needs." *Id.* at 162, 9 P.3d at 474. The Commission mentioned the required "higher level of scrutiny" for private commercial users in the introduction section of the D & O. It also acknowledged that "private commercial [users] bear the burden of justifying their uses in light of the purposes protected by the trust," and criticized WWC's Proposed IIFS as "revers[ing] this . . . burden of proof" and failing to provide a " 'reason and necessity' " for accommodating WWC's diversions. However, the Commission did not require HC & S to explain the "reason and necessity" for diverting stream water when available and practicable "[a]lternative sources for HC & S include[d] Well No. 7 and recycled wastewater."

Despite HC & S's long history of pumping from Well No. 7,[50] the Commission's D & O would permit HC & S to pump only 9.5 mgd from Well No. 7. This was a significant decrease from the 14 mgd proposed by Commissioner Miike, who recommended requiring that HC & S mitigate its stream diversion by reasonably maximizing the use of this alternative source. Miike stated in his dissent that he and the Commission "agreed that Well No. 7 should be used only during dry-weather conditions, when available stream flows are insufficient to meet offstream requirements . . . [but] the majority arbitrarily reduce[d] Well No. 7's capacity [by] half."

During the hearings, HC & S offered four explanations for its position that pumping heavily from Well No. 7 would be impractica-

---

**50.** For the past 25 years, HC & S has minimized the use of Well No. 7, but it has used the well heavily on two recent occasions: for six months from June through November of 1996 HC & S pumped an average of 25 mgd, and for six months from May through October 2000 HC & S pumped an average of 18.9 mgd.

ble: (1) HC & S would incur an estimated $1 million in capital costs to install new pipelines and pumps; (2) HC & S did not have adequate electrical power to run the pumps on a consistent and sustained basis, and upgrading its equipment to enable additional pumping would result in substantial costs and jeopardize $1.8 million in annual revenues from its contract with Maui Electric Company; (3) increased pumping would reduce the recharge from the imported surface water that sustains the Kahului aquifer; and (4) increased pumping would increase the salinity of the water. The Commission only addressed the first three of HC & S's proposed reasons in its D & O, and then concluded that "the practical alternative from Well No. 7 is [a lower amount] than historic rates."

In response to the Commission's treatment of HC & S's first two reasons, which were both cost-related, Miike stated that the Commission "without any credible foundation chose 9.5 mgd as the practical alternative from Well No. 7 to protect HC & S's interests, to the detriment of stream resources." The Commission's decision seems to have been driven primarily by the threat of costs and lost revenue to HC & S rather than by a "heightened level of scrutiny" for HC & S's proposed private commercial use of the water. In its findings, the Commission stated that "[a]n applicant's inability to afford an alternative source of water, standing alone, does not render that alternative impracticable." (Quoting *Waiāhole II*, 105 Hawai'i at 19, 93 P.3d at 661.) The Commission further noted that it was "not obliged to ensure that any particular user enjoys a subsidy or guaranteed access to less expensive water sources when alternatives are available and public values are at stake." (Quoting *Waiāhole I*, 94 Hawai'i at 165, 9 P.3d at 477.) Additionally, the Commission concluded that

> HC & S's estimate of electrical costs of pumping Well No. 7, without any information about the costs or benefits of the other options, might be a factor in an economic

analysis, but does not substitute for the analysis. HC & S has not analyzed the economic impact of increased water costs on its business and has done no financial analysis of the impact of having to pay for water at the agricultural rate that other farmers pay.

However, the Commission ultimately decided that 9.5 mgd was a reasonable minimum amount, citing its "decision to place the full burden of remedying [system] losses immediately upon HC & S" as a reason for this lenience and clarifying that the Commission would not require HC & S to incur capital costs, only the costs of additional energy for pumping.

Even if the costs necessary for HC & S to utilize alternative sources would be as great as HC & S contends, this court has adopted the view that if a proposed use would damage a water resource through excessive diversion, the use "should not be permitted, no matter how useful the application of that water might be to a given enterprise ... [and] no further balancing occurs at that extreme level of harm."[51] *Waiāhole I*, 94 Hawai'i at 146 n. 46, 9 P.3d at 458 n. 46. This court has also "rejected the idea of public streams serving as convenient reservoirs for offstream private use." *Waiāhole I*, 94 Hawai'i at 156, 9 P.3d at 468 (quoting *Robinson*, 65 Haw. at 676, 658 P.2d at 311 (maintaining that private parties do not have the unfettered right "to drain rivers dry for whatever purposes they see fit")). The Commission failed to resolve these considerations with the required "higher level of scrutiny" for private commercial uses.

The Commission's findings of fact and several of its conclusions of law as to HC & S's third purported reason are merely restatements of HC & S's testimony.[52] Most notably, the Commission simply adopted as fact HC & S's testimony that increased pumping

---

51. The court cited to Douglas W. MacDougal, *Private Hopes and Public Values in the "Reasonable Beneficial Use" of Hawaii's Water: Is Balance Possible?*, 18 U. Haw. L.Rev. 1, 46–47 n.222 (1996).

52. The majority agreed that the Commission's findings were "plainly descriptions of testimony" and that "the Commission restated several of these 'findings,' indicating that the Commission adopted the testimony as fact." (Majority at 260, 287 P.3d at 161.)

would diminish Kahului aquifer,[53] and failed to mention any of the evidence in the record to the contrary, such as OHA's Exhibit C–90, a letter from HC & S's Senior Vice President to the Commission stating that its sixteen wells in the Kahului and Paia areas "all have been in place and operated for many decades without any long term deterioration in water quality."

The Commission was silent regarding HC & S's fourth argument that increased pumping could increase the salinity of the Kahului aquifer's water stores, which HC & S presented in its Answering Brief and again in its Proposed D & O and its Exceptions to the Hearings Officer's Proposed D & O. Petitioners took issue with this argument, pointing out that HC & S failed to introduce evidence which was admittedly within its possession that would either confirm or deny this argument (the salinity data for Well No. 7 from 1996 and 2000 when HC & S pumped Well No. 7 heavily). Also, Petitioners argued that "[t]he fact that HC & S chose not to introduce that evidence gives rise to the inference" that the evidence would not support HC & S's argument.[54] The Commission did not address either HC & S's salinity argument or Petitioners' objection to that argument, and ultimately chose not to address this issue in its analysis.

The Commission's treatment of HC & S's third argument and silence on HC & S's fourth argument suggest that the Commission based its decision largely on HC & S's first and second cost-related reasons, and failed to expressly set out findings and conclusions from which this court can track the Commission's reasoning. By arriving at a decision that was inconsistent with its findings regarding practicable alternatives, simply reiterating HC & S's position that increased pumping might damage the Kahului aquifer as "fact" without mentioning conflicting evidence, and neglecting to question the veracity of HC & S's claim that increased pumping might cause the salinity of the aquifer to rise, the Commission failed to hold HC & S's intended private commercial use to the required "higher level of scrutiny." *Waiāhole I*, 94 Hawai'i at 142, 9 P.3d at 454. Therefore, we cannot be assured that the Commission has engaged in "reasoned decision-making." *Nakamura*, 98 Hawai'i at 276, 47 P.3d at 743 (Acoba, J., concurring and dissenting).

### C.

In *Waiāhole I*, this court held that "the [S]tate may compromise public rights in the resource pursuant *only* to a decision made with a level of openness, diligence, and foresight commensurate with the *high priority* these rights command under the laws of our state." *Waiāhole I*, 94 Hawai'i at 143, 9 P.3d at 455 (emphases added). The State "bears an affirmative duty to take the public trust into account in the planning and allocation of water resources, and to protect public trust uses whenever feasible." *Waiāhole I*, 94 Hawai'i at 141, 9 P.3d at 453 (internal quotations and citations omitted).

In this regard, for example, the Commission failed to justify its decision not to restore any water to 'Iao and Waikapū Streams. All parties agreed that some water should be restored to 'Iao Stream, and all parties except for HC & S agreed that some water should be restored to Waikapū Stream. It is puzzling, then, that the Commission arrived at a decision that not only conflicts

---

**53.** The Commission listed HC & S's claims regarding the impracticability of pumping Well No. 7, and then concluded: "[t]he combined *facts* that the current sustainable yield of the aquifer is already being exceeded; that increased pumping from Well No. 7 may exacerbate that strain; and that the historically higher levels of pumping occurred during a period where furrow irrigation methods were affecting recharge rates for the aquifer, [suggest that] the practical alternative from Well No. 7 is lower than historic rates. Considering these uncertainties in combination with the Commission's decision to place the full burden of remedying [system] losses immediately upon HC & S, discussed intra, the practical alternative from Well No. 7 is deemed 9.5 mgd. This alternative will not require capital costs, only the costs of pumping." (Emphasis added.)

**54.** According to Hui/MTF, "[a]s OHA pointed out in its Opening Brief, the Well No. 7 salinity data from 1996 and 2000, when HC & S pumped Well No. 7 heavily for sustained periods, would either confirm HC & S's salinity argument or it would not. The fact that HC & S chose not to introduce that evidence gives rise to the inference that it would not."

with the recommendations of all or all but one of the parties, but also undeniably compromises public rights in water resources.

In discussing the basis of its decision, the Commission placed a singular emphasis on the "limited reproductive potential" these two streams offer for amphidromous species without an explanation as to why this particular instream use deserved such emphasis. Although the parties were in disagreement about whether a continuous flow from mauka to makai was actually necessary to sustain the amphidromous species,[55] the Commission decided that Waikapū Stream was not a good candidate for stream flow restoration because, as HC & S's expert testified, "Waikapū Stream may not have flowed continuously mauka to makai prior to the diversions[.]"

Because it is unknown whether Waikapū Stream would flow from mauka to makai if water were restored to it, all parties, as well as the Commission, acknowledged that, "ultimately, restoration of flow would [assess] whether [Waikapū] flows mauka to makai." Despite this consensus, the Commission decided without any apparent justification that "such an assessment [could] be deferred until some future time when the balancing of instream values and offstream uses might be more favorable to such a controlled restoration." The Commission offered no explanation as to why a test flow could or should be postponed, or when "some future time"

might be, demonstrating a lack of the "openness, diligence, and foresight" required when compromising public rights in a resource. The Commission also failed to discuss or analyze the ability of these streams to support other instream uses, see HRS § 174C–3, as required by HRS § 174C–71(2)(D).[56]

The Commission's unexplained focus on amphidromous species and its failure to adequately weigh other instream uses without expressly setting out findings and conclusions which would enable the court to ascertain the basis of its decision violate its duty as a public trustee for the Nā Wai ʻEhā waters to "demonstrate that it properly exercised the discretion vested in it by the constitution and [HRS §§ 174C–3 and 174C–71]" See Waiāhole II, 105 Hawaiʻi at 11, 93 P.3d at 653.

### XVII.

Article XI, sections 1 and 7 of the Hawaiʻi Constitution mandate that the State conserve and protect water resources as a trustee for the public and protect traditional and customary native Hawaiian rights. Additionally, as mentioned, supra, the State Water Code, HRS § 174C–101(c)-(d), provides protection for native Hawaiian rights to water.[57]

In his Proposed D & O, Commissioner Miike noted that, "[i]n addition to the users identified . . . who did not testify about their uses, there is evidence in the record that there are other existing kuleana users who

---

55. Hui/MTF's expert witness maintained that "the amphidromous life cycle requires continuous flow to link biologically the mountains (mauka) to the ocean (makai)." HC & S's expert witness disagreed, stating that "[i]t has not been definitively established that the life cycle of native Hawaiian amphidromous species absolutely depends on continuous mauka to makai flow."

56. HRS § 174C–71(2)(D) provides:

The commission shall establish and administer a statewide instream use protection program . . . [and] shall:
(2) Establish interim instream flow standards;
 (D) In considering a petition to adopt an interim instream flow standard, the commission shall weigh the importance of the present or potential instream values with the importance of the present or potential uses of water for noninstream purposes, including the economic impact of restricting such uses [.]"

(Emphasis added.)

57. To reiterate, HRS § 174C–101(c) and (d) provide:

(c) Traditional and customary rights of ahupuaʻa tenants who are descendants of native Hawaiians who inhabited the Hawaiian Islands prior to 1778 shall not be abridged or denied by this chapter. Such traditional and customary rights shall include, but not be limited to, the cultivation or propagation of taro on one's own kuleana and the gathering of hihiwai, opae, oʻopu, limu, thatch, ti leaf, aho cord, and medicinal plants for subsistence, cultural, and religious purposes.
(d) The appurtenant water rights of kuleana and taro lands, along with those traditional and customary rights assured in this section, shall not be diminished or extinguished by a failure to apply for or to receive a permit under this chapter.
(Emphases added.)

did not testify." Miike estimated that "kuleana users who did not testify about their uses have a combined total of at least 109.39 acres." To address the needs of these unidentified kuleana users, Miike argued that "the estimated 6.84 mgd reportedly being provided to kuleana users currently is reasonable and sufficient ... to satisfy the current and planned needs of the kuleana users *who came forward and testified regarding their uses* ... [but] *does not include any amount to satisfy the needs of existing kuleana users who did not testify, and does not take into account new users who may seek to exercise their appurtenant and/or traditional and customary rights in the future.*" (Emphasis added.) Accordingly, Miike concluded that if "the Commission intends to make a 'collective assessment' of the reasonable needs of all Nā Wai 'Ehā kuleana users, as opposed to just those who testified, the assessment would obviously have to be increased substantially."

Indeed, the Commission failed to adequately weigh, among other instream uses, the feasibility of preserving the traditional and customary native Hawaiian rights of those kuleana users who did not testify at the contested case hearing but who are afforded the protections enumerated in the Constitution and the State Water Code. *See* HRS § 174C–101(c)–(d) ("Traditional and customary rights of ahupua'a tenants who are descendants of native Hawaiians ... shall not be abridged or denied by this chapter...."). The Commission stated that "[e]ven without recognized appurtenant rights, current users of Nā Wai 'Ehā waters qualify as existing uses if their WUPAs are filed with and accepted by the Commission by April 30, 2009

... and kuleana landowners who successfully petition for recognition of their claimed appurtenant rights may subsequently submit WUPAs for the amounts of water recognized as accompanying those rights." However, as noted before, HRS § 174C–101(d) expressly protects even those kuleana users who did not come forward to testify at the contested case hearing or apply for Water Use Permits. HRS § 174C–101(d) ("The appurtenant water rights of kuleana and taro lands, along with those traditional and customary rights assured in this section, *shall not be diminished or extinguished by a failure to apply for or to receive a permit under this chapter*") (emphasis added). Again, by not addressing the rights of these unidentified kuleana users, the Commission neglected "to demonstrate that it ha[d] properly exercised the discretion vested in it by the constitution and the statute.'" *Waiāhole II*, 105 Hawai'i at 11, 93 P.3d at 653 (quoting *Save Ourselves*, 452 So.2d at 1159–60).

The Commission merely stated that the "number of future 'kuleana' users beyond those identified at the [contested case hearing] is unknown." Petitioners suggested that the testifying kuleana users' claims that there was inadequate water evidenced the existence of numerous other unidentified kuleana users who also shared the water.[58] The Commission instead concluded that the lack of adequate water was due to substantial system losses,[59] and omitted any mention or projection of how many unidentified kuleana right-holders might be affected.

This court has held that "the Commission must not relegate itself to the role of a mere 'umpire passively calling balls and strikes for adversaries appearing before it,' but instead

---

**58.** Petitioners asserted that the testifying kuleana users' claims that there was inadequate water was due to the "undisputed existence of other existing kuleana users other than those who testified in this proceeding. Many of the community witnesses identified other kuleana users on their 'auwai." Petitioners also pointed out that "WWC's own list of kuleana users ... includes many more landowners and parcels beyond those covered by the testifying witnesses, and the Proposed Decision incorporates this information in its own tables[.]"

**59.** The Commission estimated that current kuleana lands receive more than 130,000 to 150,000

gallons a day (gad) for their plots, or about 260,000 to 300,000 gad when adjusted for the 50 percent of time that no water is needed to flow into the plot. According to the Commission, this amount should be sufficient for taro cultivation, yet the kuleana users who testified at the contested case hearing indicated that water deliveries were inadequate. Therefore, the Commission concluded that "much of the water reported by WWC as being delivered to the kuleana lands is being lost between the kuleana lands and WWC's ditches and reservoirs from which the kuleana ditches/pipes emanate."

must take the initiative in considering, protecting, and advancing public rights in the resource at every stage of the planning and decisionmaking process." *Waiāhole I,* 94 Hawai'i at 143, 9 P.3d at 455 (emphasis added) (quoting *Save Ourselves,* 452 So.2d at 1157). The public trust also "compels the state duly to consider the *cumulative impact* of existing and proposed diversions on trust purposes and to implement reasonable measures to mitigate this impact ... [and] requires planning and decisionmaking from a global, long-term perspective." *Id.* at 143, 9 P.3d at 455 (emphasis added). The Commission neglected to adequately assess the feasibility of protecting traditional and customary rights of *all* kuleana users, and therefore violated its affirmative duty to protect public trust uses whenever feasible. *Id.* at 139, 9 P.3d at 451. Under the circumstances, this court cannot be assured that the Commission has engaged in "reasoned decision-making." *Nakamura,* 98 Hawai'i at 276, 47 P.3d at 743 (Acoba, J., concurring and dissenting).

## XVIII.

The Commission erred in failing to adhere to the balancing formula set out in *Waiāhole I,* which requires that the Commission (1) "begin with a presumption in favor of public use, access, and enjoyment[,]" 94 Hawai'i at 142, 9 P.3d at 454; (2) hold private commercial uses to a "higher level of scrutiny[,]" *id.*; and (3) make its decision "with a level of openness, diligence, and foresight commensurate with the high priority [public rights in a resource] command under the laws of our state[,]" *id.* at 143, 9 P.3d at 455. Consequently and respectfully, in my view, the Commission did not discharge its "affirmative duty to take the public trust into account in the planning and allocation of water resources, and to protect public trust uses whenever feasible." *Id.* at 139, 9 P.3d at 451 (internal quotations and citations omitted).